# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    vs.<br><br>UNITED STATES STEEL CORPORATION, MARIO LONGHI, DAVID B. BURRITT, AND DAN LESNAK,<br><br>                Defendants. | Civil Action No. 2:19-cv-470<br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

SUMMARY OF THE ACTION ................................................................................................ 2

JURISDICTION AND VENUE ............................................................................................... 9

THE PARTIES ....................................................................................................................... 10

   I.       PLAINTIFF ............................................................................................... 10

   II.      DEFENDANTS ......................................................................................... 10

     A.  U.S. Steel Corp. ................................................................................... 10

     B.  The Individual Defendants ................................................................... 11

       1.  Mario Longhi ............................................................................... 11

       2.  David Burritt ................................................................................ 12

       3.  Dan Lesnak .................................................................................. 13

RELEVANT NON-PARTIES .................................................................................................. 14

STATEMENT OF FACTS ....................................................................................................... 17

   I.       COMPANY BACKGROUND ................................................................... 17

     A.  U.S. Steel's Core Business Products ..................................................... 17

       1.  The Flat-Rolled Segment .............................................................. 18

       2.  The Tubular Segment ................................................................... 21

       3.  The European Segment ................................................................. 22

     B.  After Years of Consecutive Losses, Defendants Implement the "Carnegie Way" Initiative ................................................................... 22

   II.      THE U .S. STEEL MARKET DRASTICALLY DETERIORATES DURING 2015 ............................................................................................ 24

     A.  Market Factors Resulting in the Deterioration of the Steel Market in 2015 ............. 24

     B.  The Deterioration of the Steel Market Forces U.S. Steel to the Brink of Bankruptcy ................................................................................... 26

   III.    U.S. STEEL ABANDONS THE EMPLOYEE ENGAGEMENT AND RELIABILITY CENTERED MAINTENANCE CARNEGIE WAY

INITIATIVES AND FOCUSES SOLELY ON RUTHLESS COST-CUTTING TO SALVAGE THE BOTTOM LINE ................................................. 28

A.  Defendants Abandoned Employee Engagement ....................................... 29

B.  Defendants Abandoned Reliability Centered Maintenance ....................... 30

C.  Defendants Implement Extreme Cost-Cutting Measures Under the Operational Excellence Carnegie Way Initiative to Save the Bottom Line ................................. 33

1.  U.S. Steel's Massive Layoffs Result in Safety Violations ..................................... 34

2.  Defendants Instruct Plant Managers "Don't Buy, Get By" and Forces them to "Jury Rig" Broken Machinery .......................................................... 39

D.  U.S. Steel Slashes Capital Spending .................................................... 44

IV.  CARNEGIE WAY PURPORTED COST SAVINGS WERE A SHAM ................ 45

V.  THE U.S. STEEL DEFENDANTS' DECISION TO DEFER MAINTENANCE AND CAPITAL INVESTMENTS RESULTS IN COSTLY, UNPLANNED OUTAGES, LOWER UTILIZATION RATES, AND LOWER CAPACITY AT U.S. STEEL FACILITIES ................................................................. 49

VI.  THE INDIVIDUAL DEFENDANTS WERE AWARE THAT U.S. STEEL WAS DEFERRING IMPORTANT MAINTENANCE AND REPAIRS THROUGH THE DAILY REPORT OF OPERATIONS AND OPERATING EFFICIENCY REPORT ....................................................................... 56

VII.  U.S. STEEL PROVIDES SWORN TESTIMONY CORROBORATING THE DRO AND OER REPORTS THAT, CONTRARY TO THE INDIVIDUAL DEFENDANTS' PUBLIC STATEMENTS, U.S. STEEL IS NOT INVESTING IN, AND MAINTAINING ITS FACILITIES ...................................................... 58

VIII.  U.S. STEEL LAUNCHES STRATEGICALLY TIMED SECONDARY OFFERING ......................................................................................... 64

IX.  WITH THE "WRITING ON THE WALL," DEFENDANTS LONGHI AND BURRITT QUICKLY SELL THE MAJORITY OF THEIR PERSONAL HOLDINGS OF U.S. STEEL STOCK .................................................. 66

X.  U.S. STEEL'S DECREASED PRODUCTION AND CAPACITY UTILIZATION CAUSE THE COMPANY TO LOSE SIGNIFICANT MARKET SHARE ............................................................................................. 69

XI.  THE FAILURE OF "CARNEGIE WAY" RESULTS IN DEFENDANT LONGHI BEING PHASED OUT AS CEO ........................................ 72

DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD .............. 73

I.    FALSE AND MISLEADING STATEMENTS IN THE JANUARY 2016
      PRESS RELEASE AND PRESENTATIONS....................................................... 73

II.   FALSE AND MISLEADING STATEMENTS ON THE JANUARY 27, 2016
      INVESTOR CONFERENCE CALL.................................................................... 77

III.  FALSE AND MISLEADING STATEMENTS IN THE 2015 FORM 10-K ......... 78

IV.   FALSE AND MISLEADING STATEMENTS IN THE APRIL 26, 2016 PRESS
      RELEASE AND PRESENTATIONS.................................................................. 80

V.    FALSE AND MISLEADING STATEMENTS IN THE APRIL 27, 2016
      INVESTOR CONFERENCE CALL.................................................................... 84

VI.   FALSE AND MISLEADING STATEMENTS IN THE APRIL 27, 2016
      FORM 10-Q .................................................................................................... 85

VII.  FALSE AND MISLEADING STATEMENTS IN THE JULY 26, 2016 PRESS
      RELEASE AND PRESENTATIONS.................................................................. 86

VIII. FALSE AND MISLEADING STATEMENTS IN THE JULY 27, 2016
      CONFERENCE CALL....................................................................................... 90

IX.   FALSE AND MISLEADING STATEMENTS IN THE JULY 27, 2016
      FORM 10-Q .................................................................................................... 92

X.    FALSE AND MISLEADING STATEMENTS IN THE AUGUST 8, 2016
      PRESS RELEASE............................................................................................. 93

XI.   FALSE AND MISLEADING STATEMENTS CONTAINED IN THE
      AUGUST 8, 2016 PRELIMINARY PROSPECTUS.............................................. 94

XII.  FALSE AND MISLEADING STATEMENTS CONTAINED IN THE
      AUGUST 11, 2016 PRELIMINARY PROSPECTUS............................................ 95

XIII. FALSE AND MISLEADING STATEMENTS IN THE NOVEMBER 1, 2016
      PRESS RELEASE............................................................................................. 96

XIV.  FALSE AND MISLEADING STATEMENTS IN THE NOVEMBER 2, 2016
      CONFERENCE CALL....................................................................................... 99

XV.   FALSE AND MISLEADING STATEMENTS IN THE NOVEMBER 2, 2016
      FORM 10-Q .................................................................................................... 103

XVI.  FALSE AND MISLEADING STATEMENTS IN THE JANUARY 31, 2017
      PRESS RELEASE AND PRESENTATIONS..................................................... 105

XVII.    FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 1, 2017
           CONFERENCE CALL...................................................................................... 108

XVIII.   FALSE AND MISLEADING STATEMENTS IN THE 2016 FORM 10-K ........ 111

THE TRUTH IS REVEALED .......................................................................................... 113

POST CLASS PERIOD EVENTS..................................................................................... 118

ADDITIONAL SCIENTER ALLEGATIONS .................................................................. 122

I.       THE INDIVIDUAL DEFENDANTS KNOWINGLY AND/OR RECKLESSLY
         MADE MATERIAL MISSTATEMENTS AND/OR OMITTED MATERIAL
         FACTS.................................................................................................................. 123

    A.   The Individual Defendants Admitted in Sworn Testimony Before the International
         Trade Commission Before and During the Class Period that U.S. Steel Was Not
         Investing in Technology or Maintaining its Facilities ............................................ 124

    B.   The Individual Defendants Were Aware that U.S. Steel Was Under-Investing and
         Deferring Desperately Needed Maintenance and Repairs Through the Daily
         Report of Operations and Operating Efficiency Report ......................................... 126

    C.   The Individual Defendants Belatedly Admitted U.S. Steel's Facilities Were
         Underperforming and Failing at the time of the Secondary Public Offering........... 127

    D.   The Individual Defendants Were Aware That U.S. Steel Was Slashing Its Capital
         Expenditures and Maintenance Because They Reviewed and Approved the
         Maintenance and Capital Budgets ........................................................................ 128

    E.   The Retirement of CEO Longhi Supports an Inference of Scienter........................ 130

    F.   The Individual Defendants Knew that U.S. Steel's Facilities Were Underperforming
         or Experiencing Unplanned Outages Because U.S. Steel's Flat-Rolled Segment and
         Facilities was a Highly Material Aspect of the Company's Business Operations and
         its "Core" Business ............................................................................................. 131

II.      THE INDIVIDUAL DEFENDANTS HAD MOTIVE TO MAKE MATERIAL
         MISSTATEMENTS AND/OR OMIT MATERIAL FACTS.............................. 131

    A.   The Individual Defendants Profited From Their Fraud by Making Millions of
         Dollars From Selling Off Large Blocks of Their Personal Holdings of U.S. Steel
         Common Stock at Inflated Prices ......................................................................... 131

        1.   Individual Defendant Longhi's Insider Sales ..................................................... 132

        2.   Individual Defendant Burritt's Insider Sales ..................................................... 133

    B.   The Individual Defendants Had Motive to Inflate the Desperately Needed

Proceeds from the Secondary Public Offering ....................................................... 135

C.  The Individual Defendants Had Motive to Satisfy U.S. Steel's Obligations
    Under the Credit Facility.......................................................................... 137

D.  The Individual Defendants Had Motive to Preserve Their Excessive
    Compensation ............................................................................................ 138

LOSS CAUSATION ..................................................................................................... 143

CLASS ACTION ALLEGATIONS .............................................................................. 146

NO STATUTORY SAFE HARBOR ............................................................................. 148

APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE ................................... 148

COUNT I ........................................................................................................................ 150

COUNT II ...................................................................................................................... 152

PRAYER FOR RELIEF ................................................................................................. 154

JURY DEMAND ............................................................................................................ 154

Plaintiff Oklahoma Firefighters Pension and Retirement System brings this action pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of itself and all persons other than Defendants (defined *infra*, at 29-38) who purchased or otherwise acquired United States Steel Corporation securities between January 27, 2016 and April 25, 2017, inclusive (the "Class Period").

The Plaintiff files this complaint to preserve its individual claims and its ability to serve as a class representative, if necessary.  *See* 28 U.S.C. Code § 1658(b)(1) (setting statute of limitations for Exchange Act claims involving fraud at "2 years after the discovery of the facts constituting the violation").

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief is based on the investigation of its undersigned lead counsel.  Such investigation included, among other things, review and analysis of (i) U.S. Steel's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) U.S. Steel's other public statements, including press releases; (iii) discussions with industry experts; (iv) interviews with individuals who are former employees of U.S. Steel; (v) reports of securities and financial analysts, news articles, and other commentary and analysis concerning U.S. Steel and the industry in which it operates; and (vi) review of pertinent court filings.

Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      U.S. Steel is an integrated steel producer of flat-rolled and tubular products headquartered in Pittsburgh, Pennsylvania with major production operations in North America and Europe.  The Company's flat-rolled segment accounted for approximately 70% of its net sales at the time Defendants' fraud came to light.  U.S. Steel supplies customers throughout the world, primarily in the automotive, consumer, industrial, and oil country tubular goods markets. The Company has an annual raw steel production capability of 22 million net tons (17 tons in the United States and 5 million tons in Europe).

2.      After several unprofitable years, Defendant Mario Longhi hired his long - time trusted advisor, McKinsey & Company, in 2014 to implement a purported "transformational process" designed to make the Company profitable again. This process was referred to as the "Carnegie Way," named after U.S. Steel co-founder Andrew Carnegie. The Carnegie Way purportedly consisted of three elements: (1) Employee Engagement, which was intended to get personnel interested in and engaged with the Carnegie Way program; (2) Reliability Centered Maintenance ("RCM"), which was purportedly focused on making proactive improvements to U.S. Steel's manufacturing operations and facilities; and (3) Operational Excellence, which was related to process improvements that could save the Company money (*e.g.*, cutting costs).

3.      According to confidential witnesses, the Carnegie Way was a sham. Although the Carnegie Way purportedly consisted of three elements, it was widely known throughout the Company that the only element actually implemented was Operational Excellence which, according to Plaintiff's confidential sources, was "all about cost cutting [] at the expense of operations." Indeed, the Defendants severely curtailed the maintenance initiative because that would cost money.  According to confidential sources, U.S. Steel adopted a motto of "don't buy,

get by" in which plant managers were allowed only to purchase parts when absolutely necessary and were required to "jury-rig" machines to keep them operating, rather than to make the necessary repairs.  U.S. Steel employees thus characterized the Reliability and Employee Engagement elements as "a joke" and "a load of crap" because the Company was not committed to them.

4.      As the steel market deteriorated in 2015, the Defendants implemented extreme cost-cutting measures under the guise of the Carnegie Way in an attempt to improve the bottom line. These extreme cost-cutting measures focused on massive layoffs and deferred desperately-needed maintenance and repairs. These measures left U.S. Steel with a skeleton crew of inexperienced plant employees who did not know how to maintain or repair the equipment, and who were required to work long hours of up to ninety hours per week.  This practice resulted in severe unplanned outages (e.g., downtime resulting in lost production), production delays, and at least a 20% decline in production output due to inoperable equipment that resulted from equipment malfunction. These unplanned outages occurred "quarter after quarter," and could last as long as nine months. Defendants also decreased overall capital spending and spending for the flat-rolled segment in 2016 by approximately 39% and 60%, respectively.

5.      The U.S. Steel Defendants' decision to defer maintenance, repairs and capital spending proved costly, resulting in "thousands of tons of missed steel production" during the Class Period (or about 20% of production capacity) as a result of increasing unplanned outages and repairs. Accordingly, the Company's capability utilization (the amount of steel tons actually produced as a percentage of total production capacity) fell as low as 57%, as compared to the industry average of 80%. One confidential witness stated that the loss in production in 2016 was the most this witness had ever seen during this witness's more than twenty years with U.S. Steel.

3

6.      The Individual Defendants were aware that U.S. Steel was experiencing significant and costly unplanned outages and massive delays in production throughout the Class Period through a Daily Report of Operations (the "DRO") and an Operating Efficiency Report ("OER"). According to confidential sources, the DRO was "well accessible" and "used widely" by those within the Company, to include the Individual Defendants, who could access both the DRO and OER at the click of a button on U.S. Steel's internal website. The DRO and OER reported aggregated operational data and metrics from every U.S. Steel plant, and included key metrics such as tons produced, tons shipped, production delay, and tons per turn. These metrics showed that throughout the Class Period U.S. Steel experienced production delays of as much of 50% and that actual production was "not even close" to planned production as a result of unplanned interruptions.

7.      Yet the Defendants repeatedly assured investors throughout the Class Period that U.S. Steel was implementing the RCM initiative (bold emphasis supplied throughout):

> We **continue to implement our reliability centered maintenance process across all of our facilities. We are starting to see the benefits as we have experienced fewer unplanned outages and lower maintenance costs**, and are allowing for a more efficient allocation of our maintenance labor force. **We are creating a more reliable and agile operating base** that lowers our break-even point, with a key focus on lowering our hot-rolled band costs through operating and process efficiencies.

Defendants also falsely claimed that the Carnegie Way was "much more than a cost cutting initiative" and that U.S. Steel was actively investing in RCM:

> [The Carnegie Way] is **much more than a cost cutting initiative**, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support. Carnegie Way is our culture and the way we run the business. . . We have achieved **sustainable cost improvementsthrough process efficiencies and our investments in reliability centered maintenance (RCM),** and we will continue to find process improvements that enable us to better serve our customers and reward our stakeholders.

8.     According to confidential sources, extreme cost-cutting was in reality the only Carnegie Way initiative that the Defendants implemented.

9.     Although the global steel economy improved throughout 2016, U.S. Steel was unable to capitalize on these more favorable market conditions as a result of mounting repair costs and unplanned outages.

10.     On August 15, 2016 - just two months before U.S. Steel provided the first inkling that it was experiencing unplanned outages in the third quarter of 2016 as a result of "operating challenges" - the Company conducted a well-timed secondary offering of 21.7 million shares sold to unsuspecting investors that raised $482 million. Defendants claimed at the time of the offering that the proceeds would be used for "financial flexibility, capital expenditures and other general corporate purposes." As Defendants would ultimately admit, however, "[w]e issued equity last August to give us the financial strength and liquidity to position us to establish an asset revitalization plan large enough to resolve our issues, and to see that plan through to completion" (emphasis added). In other words, the Defendants were admittedly aware back in August 2016 that U.S. Steel would need to undertake a "large," multi-year "asset-revitalization" in order to fix the Company's problems – a known fact that was not disclosed to investors until the last day of the Class Period.

11.     U.S. Steel issued a press release on November 1, 2016 that reported the Company's third quarter 2016 financial results. Defendants acknowledged therein for the first time that U.S. Steel had been experiencing "unplanned outages in the third quarter [of 2016]" that negatively impacted the Flat-Rolled segment's shipments to the tune of 125,000 tons, or around 5% of the Company's third quarter shipments in this segment.

12.     Defendant Longhi flatly denied during a November 2, 2016 analyst call the following day that the unplanned outages were the result of under-investing, and assured investors that U.S. Steel was "doing all of the right things:"

> And *I would offer that, no, we have not been under-spending*. What we've been doing is, we've only been able to accomplish what we've accomplished and gotten to the position that we are, because *we've been investing appropriately in making sure that everything that we know is being addressed and moving to minimize the conditions that we experienced in the past quarter, which is unplanned events. So we've been able to get to this point, because we've been doing all of the right things*.

13.     Defendants' sworn testimony before the International Trade Commission ("ITC") in 2015 and early 2016, however, painted a very different picture.  The Defendants admitted behind closed doors before the ITC that "investments that we need to make are being – we're not able to make them right now;" and that, while "U.S. Steel had an opportunity to grow its business to reinvest in technology . . . subject imports deprived U.S. Steel . . . of this opportunity; and U.S. Steel's financial results were "nowhere near where they need to be for us to invest in our future" (emphasis added).

14.     While concealing the true state of U.S. Steel's business from the market, Defendants Longhi and David Burritt began on November 23, 2016 to dump approximately 57% and 64% of their personal holdings of U.S. Steel stock, respectively.   These Defendants collectively sold 699,671 shares for proceeds of approximately $25 million over eight trading days. Prior to this neither Longhi nor Burritt had sold a single share of their U.S. Steel stock.

15.     As market conditions continued to improve in 2017, U.S. Steel assured investors that the worst was behind the Company and U.S. Steel was "continuing to improve" and was "positioned for success in a market recovery."

16.    Then, on April 25, 2017 - only *after* the market closed - U.S. Steel shocked the market when the Company announced its first quarter 2017 results. While the market was expecting the Company to turn a strong profit, the Defendants announced a "surprise" net loss of $180 million, or $1.03 per diluted share. Commenting on results, U.S. Steel Chief Executive Officer Mario Longhi said, "While our segment results improved by over $200 million compared with the first quarter of 2016, operating challenges at our Flat-Rolled facilities prevented us from benefiting fully from improved market conditions" (emphasis added).

17.    Upon the news, the price of U.S. Steel common stock declined from a closing share price of $31.11 on April 25, 2017 to close at $22.78 per share on April 26, 2017, a loss of 27% or over $2 billion in market value, on extremely heavy trading volume.  This drop represented the steepest drop in price since 1991.

18.    Analysts responded negatively to this news.  In an April 26, 2017 research note, Analyst Gordon Johnson II of Axiom Capital Management characterized the Company's "surprise" $180 million loss as "all the more troubling given that it occurred in a market where U.S. steel prices are high versus previous years and given that the industry has enjoyed significant protection from imports from both the Obama and Trump administrations."  Gordon went on to state **"[i]f things are so bad during good times (the remainder of the year) looks set to resemble a 'Nightmare on Elm Street.'"**

19.    KeyBanc analysts stated that U.S. Steel's results were not an indictment on the steel industry's fundamentals but, rather, appeared to be Company-specific.

20.    Analyst Chuck Bradford of Bradford Research Inc. stated in an interview with American Metal Market that in his view "Longhi spent too much time lobbying for trade relief in Washington and not enough time focusing on fixing the company's mills."

21.     Another analyst noted that the Carnegie Way initiative "cut too deep" and criticized U.S. Steel for its lack of transparency to investors:

> U.S. Steel blamed the loss on production problems at its North American flat- rolled mills. Those problems appear to be centered around the company's rolling operations, although it's hard to say that with certainly ***because investors have been kept largely in the dark . . . . These issues that they've had last year and into this year have not been clearly described***.

22.     As a result of years of under-investment and under performance, U.S. Steel announced on May 10, 2017 the purported "retirement" of Defendant Longhi.  Defendant Burritt replaced Mr. Longhi as CEO.  Defendant Longhi nevertheless received a $4.35 million bonus for the 2016 fiscal year – his largest bonus ever - despite layoffs, plant closures, lack of profit, under-invested facilities and equipment, and a reported net loss for the 2016 fiscal year of $440 million.

23.     The Plaintiff seeks through this action to recoup billions of dollars of losses that it and other U.S. Steel shareholders suffered as a result of the fraud alleged herein.

24.     As demonstrated in the stock chart below, Defendants Longhi and Burritt sold more than half of their personal holdings of U.S. Steel common stock at a time when they could take advantage of improving market conditions but, as a result of their decision to slash maintenance and capital spending, U.S. Steel could not.



## JURISDICTION AND VENUE

25.    The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

26.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act, 15 U.S.C. § 78aa. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. U.S. Steel trades in an efficient market on the New York Stock Exchange ("NYSE").

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Defendants conduct business and maintain offices in this Judicial District, and U.S. Steel is headquartered in this Judicial District, with its principal place of business located at 600 Grant Street, Pittsburgh, Pennsylvania 15219-2800.

## THE PARTIES

### I.   PLAINTIFF

28.     Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") is a defined benefit pension plan based in Oklahoma City, Oklahoma.  Oklahoma Firefighters manages approximately $2.7 billion in assets on behalf of its retirees.  As set forth in the attached certification, incorporated by reference herein, purchased U.S. Steel securities during the Class Period at artificially inflated prices, and has been damaged thereby.

### II.   DEFENDANTS

#### A.   U.S. Steel Corp.

29.     U.S. Steel is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Pittsburgh, Pennsylvania. The Company's common stock trades on the NYSE under the symbol "X." U.S. Steel, an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe, supplies customers throughout the world primarily in the automotive, consumer, industrial, and oil country tubular goods markets. In 2014, U.S. Steel was the world's 15th largest steel producer by volume of steel production, producing 19.7 million tons of steel. This figure dropped dramatically by 2016 to 14.2 million tons of steel, making U.S. Steel the 24th largest steel producer in the world.

### B. The Individual Defendants

#### 1. Mario Longhi

30.     Individual Defendant Mario Longhi was U.S. Steel's Chief Executive Officer from June 2013 to May 8, 2017.  Mr. Longhi was a member of the Board of Directors from September 2013 to June 30, 2017.  Mr. Longhi was also the Company's President and performed the role of Chief Operating Officer from June 2013 to February 2017.  U.S. Steel emphasized Mr. Longhi's critical role as the Company's President and CEO in Company SEC filings and press releases filed or issued throughout the Class Period. For example, the Company's Schedule 14A Proxy Statement, filed with the SEC on March 14, 2017 ("2017 Proxy Statement") stated:

> As the Chief Executive Officer**, *Mr. Longhi is responsible for all of the business and corporate affairs of U. S. Steel. His diverse experience and deep knowledge of the steel industry is crucial to the Corporation's strategic planning and operational success*. As the only employee-director on the Board, Mr. Longhi is able to provide the Board with an "insider's view" of what is happening in all facets of the Corporation. He shares not only his vision for the Corporation, but also *his hands-on experience as a result of his daily management of the Corporation and constant communication with employees at all levels.* His insider's perspective provides the Board with invaluable information necessary to direct the business and affairs of the Corporation.

31.     Defendant Longhi thus admittedly participated in the management and day- to-day operations of the Company, and had actual knowledge of confidential proprietary information concerning U.S. Steel and its business, operations, growth, financial statements, and financial condition.  Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to U.S. Steel's course of conduct, and his access to material inside information about U.S. Steel during the Class Period, at all material times, Individual Defendant Longhi was a controlling person of U.S. Steel within the meaning of § 20(a) of the Exchange Act.

32.     U.S. Steel announced on February 28, 2017 that Individual Defendant David Burritt had been elected President and Chief Operating Officer and would assume Defendant Longhi's responsibilities for all aspects of the Company's day-to-day business in the United States and Central Europe, effective immediately.  U.S. Steel announced on May 10, 2017 that Defendant Longhi was retiring as CEO, effective immediately, and would be succeeded by Defendant Burritt.

33.     Defendant Longhi's "retirement" came only two weeks following the Company's April 25, 2017 announcement in which it revealed dismal first quarter 2017 financial results despite improved market conditions.  Despite these weak financial figures (and just prior to his retirement), Longhi received a $4.53 million bonus for the 2016 fiscal year – his largest bonus ever – while the Company reported net loss for the 2016 fiscal year of $440 million.

### 2. David Burritt

34.     Defendant Burritt has been U.S. Steel's President and CEO and a member of the Board since May 2017.  Mr. Burritt was the Company's President and Chief Operating Officer From February 2017 to May 2017 with executive responsibility for all aspects of the Company's day-to-day operations.  Mr. Burritt was also the Company's Executive Vice President and Chief Financial Officer from September 2013 to February 2017.  U.S. Steel emphasized the critical role of Burritt as the Company's CFO (and later COO and CEO), in SEC filings and press releases filed or issued throughout the Class Period.  For example, the Company's 2017 Proxy Statement acknowledged that, among other purported achievements: "Burritt set rigorous processes and protocols to not only support high integrity financial reporting, but also to drive Carnegie Way benefits and make timely and effective decisions around cost, revenue and staffing to achieve timeless improvements on structural and operating costs."

35.    Defendant Burritt thus directly participated in the management and day-to-day operations of the Company, and had actual knowledge of confidential proprietary information concerning U.S. Steel and its business, operations, growth, financial statements, and financial condition.  Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to U.S. Steel's course of conduct, and his access to material inside information about U.S. Steel during the Class Period, at all material times, Individual Defendant Burritt was a controlling person of U.S. Steel within the meaning of § 20(a) of the Exchange Act.

### 3.  Dan Lesnak

36.    Individual Defendant Dan Lesnak has been U.S. Steel's General Manager of Investor Relations at all times relevant to this lawsuit, with management responsibility over securities law compliance and communication with the market.  Mr. Lesnak has hosted and been an active participant in the Company's earnings calls and has spoken at length regarding various aspects of U.S. Steel's business, to include matters relevant to the allegations contained herein.

37.    Defendant Lesnak thus directly participated in the management and day-to- day operations of the Company, and had actual knowledge of confidential proprietary information concerning U.S. Steel and its business, operations, growth, financial statements, and financial condition.  Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to U.S. Steel's course of conduct, and his access to material inside information about U.S. Steel during the Class Period, at all material times, Individual Defendant Lesnak was a controlling person of U.S. Steel within the meaning of § 20(a) of the Exchange Act.

38.    Longhi, Burritt, and Lesnak are collectively referred to herein as the "Individual Defendants."  U.S. Steel and the Individual Defendants are collectively referred to herein as the "U.S. Steel Defendants."

## RELEVANT NON-PARTIES

39.    CW#1 was a former Division Administrative Assistant at the Company's Gary Works facility from January 2013 to May 2016 and an Organizational Change & Transformation Facilitator from February 2014 to May 2016. Prior to these positions, CW#1 was a contracted administrative assistant with U.S. Steel since 2011. CW#1 was also a Carnegie Way team member during the Class Period, which meant that CW#1 participated in training U.S. Steel personnel about the Carnegie Way. This included training employees about the "data driven" methodology of the program, how to implement the Carnegie Way, and how to undertake "project charters." CW#1 reported to the Director of Change Transformation, Robert Lange, who reported to the Gary Works Plant Managers and Defendant Burritt.

40.    CW#2 was a former Lean Six Sigma Black Belt Focused on Transformation from April 2016 to March 2017 and a Process Excellence Specialist from January 2015 to April 2016. As a Lean Six Sigma Black Belt, CW#2 was involved in the Carnegie Way initiative. CW#2's role as a Carnegie Way team member was to impart training and information to Company employees regarding the methodologies associated with the Carnegie Way. The training consisted of three separate steps. While the first step consisted of a two-day training, the last step was a week-long training class for the "best of the best employees." During this last training session, Defendant Burritt or Defendant Longhi would speak to the students for approximately 60-90 minutes.

41.    CW#3 worked at U.S. Steel for twenty-two years as a technician and manager, including as a Plant Manager at Gary Works. In February 2014 CW#3 became the General Manager ("GM") of Transformation and remained in this position until April 2016. As the GM of Transformation, CW#3 oversaw the launching of the Carnegie Way initiative across all plants, which involved lean six sigma concepts and statistical analyses. CW#3 had a "coaching" role

14

where CW#3 both developed training and trained employees on the Carnegie Way. CW#3 also set up "war rooms" across the Company and oversaw a group of Lean Six Sigma Master Black Belts who would assist the plants with the "tougher" projects.

42.    CW#4 was a former Reliability Engineer at Fairfield Works from 2014 to March 2016, responsible for implementing a Reliability Centered Maintenance Organization at Fairfield Works, including building, training, coordinating and supervising a new team of planners/schedulers and reliability engineers. CW#4 held various other positions with the Company starting in 2004.

43.    CW#5 was a former U.S. Steel Director of Reliability Centered Maintenance at Great Lakes Works from March 2016 to July 2016 and Director of Reliability Assurance North American Flat-Rolled in Pittsburgh from August 2012 to March 2016. As Director of Reliability Centered Maintenance, CW#5 was responsible for reviewing the state of the equipment at the U.S. Steel facilities to determine what was affecting the Company's production and ability to meet customer demand and making appropriate recommendations. Prior to that, CW#5 was General Manager of Great Lakes Works from January 2011 to August 2012, and General Manager of Minnesota Ore Operations from January 2007 until December 31, 2010.

44.    CW#6 was a former Mechanical Repairman and Team Leader who worked at the Clairton Coke Plant at U.S. Steel's Mon Valley facility for nearly forty years until he retired in January 2017. CW#6 was responsible for running the "shop," procuring parts to repair the coke oven doors, and overseeing all repairs for the coke doors. Part of CW#6's job responsibilities included working with U.S. Steel's vendors to obtain parts.

45.    CW#7 was a former U.S. Steel Buyer/Purchasing Specialist from September 2014 to April 2016, whose primary job responsibility was to order machinery parts for all of U.S. Steel's plants in the United States.

46.    CW#8 was a former Operations & Manufacturing Manager for Pickle Line/Cold Mill Operations-Irvin Works from June 2013 to August 2016, responsible for overseeing all union employees that worked on the pickle line. CW#8 was also a Management Associate Engineer for the same facility from June 2012 to May 2013.

47.    CW#9 was a former U.S. Steel Financial Analyst from January 2015 to October 2016. As a Financial Analyst, CW#9 was responsible for capital spending for all of U.S. Steel's business lines and was liaison between the Company's Financial Planning & Analysis ("FP&A") and Engineering groups. CW#9 participated in capital budget meetings, which included various Company executives, including defendant Burritt, the head of engineering and various directors.

48.    CW#10 was a former Area Manager for Blast Furnace Maintenance and Services and Subject Matter Expert ("SME") regarding blast furnaces and reliability preventative maintenance from November 2014 until May 2015. In this witnesses' role as an SME, CW#10 was responsible for the Company's preventative maintenance program.

49.    CW#11 formerly worked at U.S. Steel in a variety of positions since 1998, most recently as a Senior Manager, Global Financial Planning & Analysis from March 2016 until December 2016. CW#11's position covered two broad areas, including: (i) Operations Planning, which looked at scheduling steel production at all of U.S. Steel's domestic facilities for all product categories; and (ii) Analytics, which dealt with variable costs of revenue to determine  the optimal (i.e. most profitable) mixes of products.

## STATEMENT OF FACTS

### I.    COMPANY BACKGROUND

#### A.  U.S. Steel's Core Business Products

50.     U.S. Steel was founded in 1901 by J.P. Morgan and Elbert H. Gary, who combined Andrew Carnegie's Carnegie Steel Company with the Federal Steel Company and the National Steel Company. At one time, the Company was the largest corporation in the world, and the largest steel producer. Today, U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe. U.S. Steel supplies customers throughout the world, primarily in the automotive, consumer, industrial, and oil country tubular goods markets. The Company boasts an annual raw steel production capability of approximately 22 million net tons (17 million tons in the United States and 5 million tons in Europe).

51.     U.S. Steel divides its operations into three primary segments: (i) Flat-Rolled; (ii) Steel European ("USSE"); and (iii) Tubular. The Flat-Rolled segment includes U.S. Steel's integrated steel plants in the United States involved in the production of slabs, rounds, strip mill plates, sheets and tin mill products, as well as all iron ore and coke production facilities. The USSE segment includes U. S. Steel Kosice (USSK), an integrated steel plant and coke production facility in Slovakia. The Tubular segment includes the Company's tubular production facilities, primarily in the United States, which produce metal products with a hollow tubular cross section in many different forms, including pipe, rectangular shaped, and D-shaped.

## 1. The Flat-Rolled Segment

52.    Flat-rolled steel is a type of steel sheet that is manufactured by rolling, with the starting and ending material having a rectangular cross-section. The material is fed between two rollers, called working rolls, which rotate in opposite directions. The final product is either a sheet or plate, with the former being less than 6 mm (0.24 in) thick and the latter being greater than that.

53.    U.S. Steel's Flat-Rolled segment accounts for 67-70% of the Company's total steel shipments in tons and 67-74% of the Company's net sales:

| STEEL SHIPMENTS | | | | | |
|---|---|---|---|---|---|
| *in thousands of tons* | Flat-Rolled | USSE | Tubular | Total | % Flat-Rolled |
| 2016 | 10,094 | 4,496 | 400 | 14,990 | 67% |
| 2015 | 10,595 | 4,357 | 593 | 15,545 | 68% |
| 2014 | 13,908 | 4,179 | 1,744 | 19,831 | 70% |
| NET SALES | | | | | |
| *in millions* | Flat-Rolled | USSE | Tubular | Total[1] | % Flat-Rolled |
| 2016 | $7,507 | $2,243 | $449 | $10,261 | 74% |
| 2015 | $8,293 | $2,323 | $898 | $11,574 | 72% |
| 2014 | $11,708 | $2,891 | $2,772 | $17,507 | 67% |

54.    Within its Flat-Rolled segment, U.S. Steel produces three primary products: (i) hot rolled steel; (ii) cold rolled steel; and (iii) coated sheets. Hot rolling is a mill process which involves rolling the steel at a high temperature above steel's recrystallization temperature, allowing the steel to be shaped and formed easily. When the steel cools it will shrink slightly, affording less control over the size and shape of the finished product when compared to cold rolled. Hot rolled products are used in the welding and construction trades to make railroad tracks and I-beams, and other

situations where precise shapes and tolerances are not required. Hot rolled steel is typically cheaper than cold rolled steel partly because reheating of the steel is not required (as it is with cold rolled).

55.     Cold rolled steel, in turn, is essentially hot rolled steel that has had further processing in cold reduction mills where the material is cooled followed by annealing and/or tempers rolling. This process will produce steel with a superior surface finish, and superior tolerance, concentricity, and straightness when compared to hot rolled steel. Cold rolled products are used in all areas of manufacturing of durable goods, such as appliances or automobiles, or any other project where tolerances, surface condition, concentricity, and straightness are the major factors. Coated sheets are hot or cold rolled steel products coated with differing types of metallic to provide improvements in corrosion.

56.     As set forth in the chart below, the U.S. Flat-Rolled Segment accounted for 17 million of the Company's 22 million tons, or 77%, of its net ton production capability (excluding the Fairfield Works facility, which was permanently shut down in 2015):

| FLAT-ROLLED FACILITIES | | | |
|---|---|---|---|
| **Facility** | **Location** | **Raw Steel Production Capacity** *in millions of tons* | **Status During Class Period** |
| Gary Works | Indiana | 7.5 | • Producing hot-rolled, cold-rolled and coated sheets.<br><br>• In May 2015, U.S. steel permanently shut down its last remaining coke making facility. |
| Great Lakes Works | Michigan | 3.8 | • Producing hot-rolled, cold-rolled, and coated sheets |
| Mon Valley Works | Pennsylvania | 2.9 | • Producing hot-rolled, cold-rolled, and coated sheets, as well as coke and coke by-products |
| Granite City Works | Illinois | 2.8 | • Producing hot-rolled and coated sheets.<br><br>• During December 2015, the Granite City Works steelmaking operations and hot strip mill were temporarily idled. U.S. Steel partially restarted operations in February 2017. |
| Fairfield Works | Alabama | 2.4 | • During 2015, the steelmaking operations at the Fairfield Works facility were shut down permanently. |

57.     Thus, U.S. Steel's Flat-Rolled segment and facilities was a highly material aspect of the Company's business operations and its "core" business.

58.     Prior to and throughout the Class Period, Defendants consistently stressed the importance of continued innovation and investment in U.S. Steel's steel technology, and in particular, the Company's Flat-Rolled facilities stating, for example, that the Company is "committed to investing in technologies," "have investigated, created and implemented innovative, best practice solutions throughout U.S. Steel," is "position[ed] to be best-in-class in innovation," and is "focused on the investments that we need."

### 2.  The Tubular Segment

59.     Tubular is a type of metal profile with a hollow tubular cross section. U.S. Steel's Tubular segment includes the operating results of U.S. Steel's tubular production facilities, primarily in the United States, and equity investees in the United States and Brazil. These operations produce and sell seamless and electric resistance welded (ERW) steel casing and tubing, standard and line pipe and mechanical tubing and primarily serve customers in the oil, gas and petrochemical markets.

60.     The Tubular segment's annual production capability is 2.8 million tons. During 2014 to 2016, U.S. Steel's Tubular segment accounted for 2.7-8.8% of the Company's total steel shipments in tons and 4.4-15.8% of the Company's net sales. *See supra* Statement of Facts ("SOF"), III.A.1.

### 3.  The European Segment

61.    U.S. Steel's USSE segment includes U.S. Steel Kosice (USSK), an integrated steel plant and coke production facility in Slovakia. USSE primarily serves customers in the European construction, service center, conversion, container, transportation (including automotive), appliance and electrical, and oil, gas and petrochemical markets. During 2014 to 2016, U.S. Steel's USSE segment accounted for 21-30% of the Company's total steel shipments in tons and 16.5-22% of the Company's net sales. See supra Statement of Facts, III.A.1.

62.    According to Defendants, USSK has an annual raw steel production capability of 5.0 million tons, and principally produces hot-rolled steel, cold-rolled steel and coated sheets, tin mill products and spiral welded pipe. USSK also has facilities for manufacturing heating radiators and refractory ceramic materials. This facility has two coke batteries, four sintering strands, three blast furnaces, four steelmaking vessels, a vacuum degassing unit, two dual strand casters, a hot strip mill, two pickling lines, two cold reduction mills, three annealing facilities, a temper mill, a temper/double cold reduction mill, three hot dip galvanizing lines, two tin coating lines, three dynamo lines, a color coating line and two spiral welded pipe mills.

### B.  After Years of Consecutive Losses, Defendants Implement the "Carnegie Way" Initiative

63.    By 2014, U.S. Steel had experienced years of consecutive losses culminating in a 90 percent drop in the Company's stock price and the bankruptcy of its Canadian subsidiary. Defendant Longhi then hired McKinsey, with which he had a long-standing prior relationship through his previous employment at Alcoa, to launch a purported "transformational process" called the "Carnegie Way." The Carnegie Way, named after U.S. Steel co-founder and famous industrialist Andrew Carnegie, was purportedly designed to drive and sustain profitable growth. The Defendants repeatedly told the market that the Carnegie Way initiative was "much more than

a cost cutting initiative, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support."

64.    Defendants described the Carnegie Way as a purported "strategic, disciplined approach to transforming the Company to address the new realities of the marketplace." The Carnegie Way consisted of three elements: (1) Employee Engagement, which was intended to get personnel interested in and engaged with the Carnegie Way program; (2) RCM, which was purportedly focused on making proactive improvements to U.S. Steel's manufacturing operations and facilities; and (3) Operational Excellence, which was related to process improvements that could save the Company money.

65.    According to CWs#1 and 3, Carnegie Way projects had to follow a six sigma methodology. Six Sigma methodology, which was originally introduced by engineers of Motorola back in 1986, is a set of techniques and tools for process improvement to improve the quality of the output of a process. The Six Sigma methodology at U.S. Steel was known as "DMAIC," which stood for Define, Measure, Analyze, Implement, and Control. Each element was assigned a "D-Gate" level, 1-5, depending on the progress of a project.

66.    According to CW#3, the first stage is the Define stage, which included creating a charter and identifying a leader or sponsor for the project. The second stage, Measure, involved measuring the "current state" of something at the Company, which became the "baseline." The Analyze stage involved looking at how far the Company was from the benchmark (i.e. where it wanted to be) and demonstrating that it had an "idea" of what was "missing." Next, the Implement stage involved implementing the project. The Control stage involved establishing a new "benchmark" to keep the Company from "slipping back." The value / cost savings was recognized only when the project reached D-5 Control, meaning the project had been fully implemented.

67.     All five stages were tracked in the Company's "Wave" system. Savings were measured as the "shift" from the "baseline," or the "gap" between the baseline and the "new performance" (e.g., the difference between what was being spent after the project was completed and what had previously been spent).

68.     As discussed below (Statement of Facts, Section III, infra), while the Carnegie Way was initially created to address three elements – Employee Engagement, RCM and Operational Excellence – in 2015, after market conditions became drastically worse, the Defendants abandoned Employee Engagement and RCM and focused solely on "Operational Excellence," which meant ruthlessly cutting costs in order to improve the Company's bottom line.

## II.     THE U.S. STEEL MARKET DRASTICALLY DETERIORATES DURING 2015

### A.  Market Factors Resulting in the Deterioration of the Steel Market in 2015

69.     In 2015, the global demand for steel declined. The Organization for Economic Co-Operation and Development ("OECD") in its Q4 2015 document, *Steel Market Developments*, attributed this weakness to slowing world economic growth reflecting slowdowns and recessions in some major emerging market economies. China's economic growth was among those countries observed as its Gross Domestic Product growth slowed due to a reduction in its demand for buildings and equipment.

70.     The impact of this decline in demand on the health of the global steel industry was exacerbated by a sharp increase in Chinese steel production capacity that had been taking place over the prior decade. Based on OECD data, between 2000 and 2016, Chinese steel capacity increased 678%. China went from having 149.6 million metric tons of steel capacity, slightly above the 116 million metric ton annual steelmaking capacity in the United States in 2000, to 1.16 billion tons of capacity in 2016, or ten times that of the U.S. in 2016.

71.    While some of this increased steel production could be used in China's own expanding economy, it became a net exporter of steel to other countries in 2006. As global demand slowed in 2015, Chinese production and exports put downward pressure on global steel prices, adversely impacting steel companies around the world.[1]



72.    Over the course of 2015, prices of some steelmaking raw materials also declined.

73.    As of November 2015, the spot price of iron ore was $48 per ton (cost and freight to China), equaling a 29% decline from January 2015, and a 63% fall from January 2014. This drastic decrease in price was the result of oversupply of iron ore, as steel demand weakened and supply increased, particularly from Australia. The coking coal and scrap metal markets also fell sharply throughout 2015. In November 2015, the coking coal and scrap prices (spot) were down by 30% and 43%, respectively, relative to their January 2015 levels. While this helped reduce some

---

[1] As the anti-dumping and countervailing duty trade actions in the U.S. went into effect against certain flat-rolled steel products from China in 2016, U.S. imports of those products from China drastically declined.

of the input costs to steelmaking production, it also contributed to the downward pressure on finished steel prices.

74.    The combined effect of weakening global steel demand, growing Chinese production, and decreases in steelmaking costs led to a very sharp decline in world steel prices, as well as U.S. prices. For example, according to American Metal Market, the quarterly average price of U.S. cold-rolled coil declined from $32.90 per hundredweight in Q1 2015 to $25.54 per hundredweight in Q4 2015 (a decline of 22%). These price declines exacerbated the already small operating margins that steel companies command and the reduction in raw materials prices was not enough to overcome that impact. Integrated steel manufacturers, such as U.S. Steel,  were particularly vulnerable, because blast furnace operators are subject to significantly higher operating leverage than electric arc furnace operators and once a blast furnace is started it will typically run for years at a time. The average pre-tax operating margin of 757 publically traded steel companies from October 2013 to September 2014 was 5.99%, well below the 9.3% average operating margin for the world's 42,410 publicly traded firms. Globally, steel's average operating margin was ranked 79th out of 96 listed industries, and in the United States it was 84th. If only manufacturing firms are included, steel is ranked amongst the very least profitable industries.

**B.  The Deterioration of the Steel Market Forces U.S. Steel to the Brink of Bankruptcy**

75.    The deterioration of the steel industry over the course of 2015 had a  nearly disastrous effect on U.S. Steel's financial performance, resulting in record year-over-year losses and a stunning year-end 2015 loss of $1.5 billion, marking the Company's failure to turn a profit in ***six of the last seven years***:

| U.S. Steel's Financial Performance Declines Dramatically Over 2015 | | |
|---|---|---|
| **Quarter** | **Reported Figures** | **Year-Over-Year Change** |

| | Earnings *in millions | EBIT *in millions | Earnings | EBIT |
|---|---|---|---|---|
| Q1 2014 | $52 M | $154 M | (44.68%) | 310.90% |
| Q2 2014 | ($18 M) | $132 M | 76.92% | 180.85% |
| Q3 2014 | ($207) | $479 M | 88.44% | 323.89% |
| Q4 2014 | $275 M | $420 M | (7.40%) | 187.60% |
| FY 2014 | $102 M | $1.185 B | 106.20% | 196.20% |
| Q1 2015 | ($75) M | ($21 M) | (244.23%) | (113.63%) |
| Q2 2015 | ($261) M | ($104 M) | (1350.00%) | (178.78%) |
| Q3 2015 | ($173) M | ($40 M) | 16.42% | (108.30%) |
| Q4 2015 | ($999) M | ($137) M | (463.27%) | (132.61%) |
| FY 2015 | ($1.5) billion | ($302) M | (1370.50%) | (125.48%) |

76.     As detailed further *infra* SOF at VII, these financial losses forced U.S. Steel management to shut down various facilities in 2015, prompting industry analysts to speculate as to whether the Company was headed for bankruptcy. For example, during a conference call discussing the Company's Q4 results for 2015 held on January 27, 2016, David Gagliano, an analyst with BMO Capital Markets, questioned whether temporary facility shutdowns would be enough to save the Company in the long term, stating:

> But really what I am getting at is contingency planning beyond that [asset closures]. In case this environment somehow magically stays in place beyond the next 12 months, I think the working capital improvements may potentially fade. There is risk if that cash burn potentially increases significantly and then there is concern about liquidity, in my opinion. And so I am just wondering what the timing is when those contingency plans start to take effect.

77.     In response, Defendant Burritt reassured analysts and investors that, while "everything is on the table:"

> **We are managing cash extraordinarily closely**. We look at it daily. We have rolling forecasts. We are on it, we got this. We are going to adapt to whatever the economic circumstances are and we will have the trigger points that will tell us what we need to do. **We are still in great cash position…[s]o** we **feel extraordinary comfortable where we are today**…[w]e are not going to tell you what the next steps are but you can understand that we are on it and we got it.

78.     In the same January 27 conference call, Matt Vittorioso, an analyst with Barclays, questioned what would happen when the Company reduced its working capital and inventory. In November 2015, Vittorioso had stated to Bloomberg that, "[f]olks are beginning to question the viability of the business, just given how weak steel fundamentals are."

79.     This industry sentiment continued into 2016. For instance, by year-end 2016, U.S. Steel was projecting full-year 2016 Adjusted EBITDA that would be "near breakeven," and $500 million cash benefits from working capital improvements. Gordon Johnson of Axiom Capital was skeptical of these metrics, noting several reasons in an interview with *Benzinga*.[2] Of particular note, Johnson was skeptical of the fact that the Company had suddenly switched from providing quarterly guidance to yearly guidance. This deviated from U.S. Steel's long-standing policy and, according to Johnson, could have been done to mask weakness in the second half of the year.

### III.    U.S. STEEL ABANDONS THE EMPLOYEE ENGAGEMENT AND RELIABILITY CENTERED MAINTENANCE CARNEGIE WAY INITIATIVES AND FOCUSES SOLELY ON RUTHLESS COST-CUTTING TO SALVAGE THE BOTTOM LINE

80.     In 2015, as market conditions severely deteriorated and U.S. Steel struggled to stay afloat, the Individual Defendants embraced a "tone at the top," which required U.S. Steel employees to abandon the Employee Engagement and RCM elements of Carnegie Way and engage in ruthless cost-cutting measures to improve the bottom line. The Individual Defendants also slashed capital spending for the same reason.

---

[2]  Joel Elonin, *Gordon Johnson of Axiom Capital Not a Believer in U.S. Steel Rally*, BENZINGA at https://www.benzinga.com/general/movers-shakers/15/01/5187737/gordon-johnson-of-axiom-capital-not-a-believer-in-u-s-steel-ral (accessed Sept. 12, 2017).

### A. Defendants Abandoned Employee Engagement

81.    According to CW#2, it was generally recognized throughout the Company that the primary focus of Carnegie Way was on the Operational Excellence cost savings element. As a member of the Carnegie Way initiative, CW#2 was aware of the projects going on at different facilities despite not being directly involved with them.

82.    CW#2 explained that, unlike Operational Excellence, the RCM and Employee Engagement elements were recognized by U.S. Steel personnel as "a joke" and "a load of crap" because the Company was not committed to them and "no one was doing anything" related to them. CW#1 corroborated CW2's account. CW#1 explained that although U.S. Steel personnel were told the Carnegie Way was intended to improve U.S. Steel overall without needing to eliminate personnel, in actuality, there was very little commitment to Employee Engagement.

83.    CW#1 stated that when this witness became a Carnegie Way team member, CW#1 trained U.S. Steel personnel about the Carnegie Way, including on the "data driven" methodology of the program, how to implement the Carnegie Way, and how to undertake "project charters" as part of the program. CW#1 wanted to focus on the Employee Engagement element, but various managers at U.S. Steel told CW#1 that Employee Engagement did not matter compared to Operational Excellence. CW#1 said that the directive from the corporate office in Pittsburgh to the plants was to get as much cost savings as possible, while only pretending to care about employee engagement. Thus, CW#1 stated the focus was solely on the money savings and "how to get velocity" even as Employee Engagement was "wiped out."

## B. Defendants Abandoned Reliability Centered Maintenance

84.    According to CW#4, RCM was a corporate-wide program purportedly intended to improve overall maintenance planning and scheduling throughout the Company. CW#4 stated that RCM was intended to improve overall maintenance planning and scheduling throughout U.S. Steel through "predictive maintenance" in which the Company took a "proactive," rather than a "reactive" approach and ordered parts to be replaced <u>before</u> they wore out. This included efforts to implement and follow-up on preventative maintenance in order to stop the Company's equipment and infrastructure from breaking. By replacing parts before they wore out, downtime would be reduced and, thus, production delays would be decreased. According to CW#4, U.S. Steel used a program called Oracle during the Class Period as its Computerized Maintenance Management Software ("CMMS"). Oracle CMMS tracked parts and maintenance requirements. According to CW#4, this information was available on the Company's network so that personnel in Pittsburgh, including the Individual Defendants, could access it.

85.    As part of the RCM initiative, previous existing maintenance groups within U.S. Steel, including the Reliability Assurance group and Risk Assessment group, became rolled up under the Carnegie Way and, in some instances, were eliminated altogether. Specifically, according to CW#5, U.S. Steel had created a Reliability Assurance team in 2012 to improve U.S. Steel's product delivery times, product quality, and safety. CW#5 stated the group was primarily created because most of the Company's facilities had been built before 1970 so they had old equipment without much automation. CW#5 explained that U.S. Steel wanted to become a more global company, but had recognized that it was "behind the game" with regard to up-to-date controls and equipment, which was affecting the Company's ability to deliver quality products to its customers on time and in a safe manner. According to CW#5, some employees tried to convince

the executives to create a team to address these issues and eventually the executives "halfheartedly" allowed the creation of the Reliability Assurance team.

86.　　According to CW#5, at the time the Reliability Assurance team was created, U.S. Steel employees knew that something had to be done about the Company's facilities, but Reliability Assurance was just a "buzz word" that no one knew much about. CW#5 explained that the team, eventually consisting of five employees and a secretary, was tasked with the responsibility of looking at the equipment at U.S. Steel's facilities and determining what was affecting the Company's ability to service their customers. The team would also make presentations to various plants, such as Gary Works and Great Lakes, to teach employees about reliability assurance and maintenance. CW#5 said the team had trouble "gaining traction," but eventually made some progress. Once the Carnegie Way was implemented, however, the Reliability Assurance team was "indirect[ly] control[ed]" under the RCM element of the Carnegie Way. As explained below, this meant nothing was done to improve or maintain U.S. Steel's facilities.

87.　　The second group to be taken over by the Carnegie Way philosophy was the Risk Assessment group. According to CW#5, the Risk Assessment Group, which was at U.S. Steel since this witness began employment, traveled to the Company's various facilities to create a "critical spare list." CW#5 stated that the group would analyze what parts were available at each facility and what the impact would be if any parts broke. For example, according to CW#5, the Risk Assessment group would analyze things such as: If a motor went out on the cold mill, did the plant have a spare motor? If not, were there spare motors available? What would be the impact if the motor went out?

88.     According to CW#5, however, once the Carnegie Way was implemented in 2014, the Risk Assessment group essentially became "wiped out." CW#5 explained that this was because money was not allowed to be spent on necessary spare parts. CW#5 provided one example in 2016 where U.S. Steel refused to buy a spare motor because the motor was too expensive, even though not having a spare motor would have been risky since the motors that were being used at the time were forty or fifty years old and if a motor broke, the facility would be down and U.S. Steel would lose revenue.

89.     CW#6 corroborated CW#5's account that the Company stopped keeping spare parts on hand at its steel mills in order to cut costs. Instead, employees were made to wait until parts broke. At that point, it became a fire drill and employees would wind up calling vendors in the middle of the night to obtain a needed part. This practice was particularly problematic because some of the replacement parts took as long as 14-16 weeks to receive according to CW#6.

90.     CW#1 recounted similar details about how the RCM program was ignored. Specifically, according to CW#1, the general consensus of U.S. Steel employees was that the RCM was a "waste of time" since management was not committed to it. In fact, CW#1 explained that the training CW#1 received regarding RCM did not even make it clear what RCM meant. According to CW#1, RCM initiatives were never implemented at the Gary Works facility because there was no dollar value to be achieved by implementing them. Thus, managers would not spend money on tools because doing so would not "make money" as the Operational Excellence projects would. CW#1 commented that if the RCM element was meant to engage preventative maintenance to avoid equipment and infrastructure from breaking, "nothing was really done" at Gary Works because the equipment and infrastructure there kept breaking.

91.    For example, CW#1 explained that Blast Furnace 14, the biggest furnace at Gary Works, went "completely down" at some point between January 2016 and May 2016 for two weeks because the wiring for the furnace had flooded. According to CW#1, this would not have occurred with adequate maintenance.

92.    Likewise, CW#6 stated that during 2015 and 2016, U.S. Steel allowed the steel making machinery and equipment to run until it broke, rather than providing preventative maintenance and timely repairs. Moreover, according to CW#6, U.S. Steel abandoned any training in order to save money. Thus, the employees operating the coke ovens were "busting parts left and right" during 2015 and 2016 due to lack of proper training, causing more  frequently needed repairs. CW#6 believed that many of the unplanned outages in 2015 and 2016 were the direct result of the Company's failure to properly maintain and repair its equipment because U.S. Steel let "things go a little too far."

93.    Thus, contrary to Defendants' public statements that U.S. Steel was "continu[ing] to implement our reliability *centered maintenance process across all of our facilities*" and, thus, was "starting to see the benefits as we have experienced *fewer unplanned outages and lower maintenance costs*," in reality, U.S. Steel was performing little maintenance, resulting in costly repairs and outages. *See* Section SOF VII *infra*.

### C.    Defendants Implement Extreme Cost-Cutting Measures Under the Operational Excellence Carnegie Way Initiative to Save the Bottom Line

94.    To offset years of losses and avoid bankruptcy, Defendants Longhi and Burritt doubled down on the purported Carnegie Way "transformation" by implementing extreme cost-*cutting* measures in the form of: (1) massive layoffs; (2) deferring maintenance and repairs; and drastic reductions in capital expenditures.

### 1. U.S. Steel's Massive Layoffs Result in Safety Violations

95.    Throughout the Class Period, U.S. Steel laid off thousands of employees, leaving the Company with few individuals possessing the knowledge or experience to adequately maintain its facilities. As a result, machines were not maintained, became dangerously unsafe, and caused numerous injuries, even death.

96.    Beginning in 2015, U.S. Steel was forced to idle facilities due to decreased market demand, including Gary Works and Fairfield Works. For example, on February 26, 2015, U.S. Steel closed down its Gary Works coke plant in Gary, Indiana, signaling the first in a long line of plant shutdowns and employee layoffs. On August 17, 2015, U.S. Steel announced that it was permanently closing its Fairfield Works blast furnace located in Birmingham, Alabama on November 17, 2015. The shutdown of Fairfield Works resulted in over 1,100 employees losing their jobs. Contemporaneously, on November 23, 2015, U.S. Steel closed its Granite Mill in Granite City, Illinois in order to save on operation costs, and laid off about 2,000 employees. Granite Mill remained closed until a small portion of the facility was reopened in February 2017.

97.    As a result, the Company laid off thousands of employees, exacerbating understaffing and maintenance issues already plaguing the Gary Works facility. Critically, according to the United Steelworkers Union and public reports, these layoffs centered on maintenance employees.[3] Indeed, in April 2016, the Company announced it was laying off one quarter (25%) of its salaried workforce. Shortly after these April layoffs, in June 2016, a U.S. Steel employee, Charles Kremke, 67, was killed from accidental electrocution while working at the Company's Gary Works facilities.[4] The Indiana Occupational Safety and Health Administration

---

[3]    Joseph S. Pete, *U.S. Steel Lays Off More Workers at Gary Works*, NWI.com at http://www.nwitimes.com/business/steel/u-s-steel-lays-off-more-workers-at-gary-works/article_5b5725f5-25b2-5982-8c5a-88b4067e2a5d.html (accessed Aug. 12, 2016).
[4]    Joseph S. Pete, *U.S. Steel Fined $28,000 for Death at Gary Works*, NWI.com at

found U.S. Steel committed four serious safety violations resulting in the death and fined the Company $28,000 for the lapses in safety that contributed to the death. U.S. Steel also exercised its right for an informal settlement meeting and IOSHA is in the process of working out a settlement agreement, an IOSHA spokeswoman reported.

98.    By August 2016 the United Steelworkers Union had filed a grievance alleging U.S. Steel's layoff of about 75 employees at Gary Works and demotions of an additional 200 to work gangs raised serious safety concerns. According to Union District 7 Director Mike Millsap ("Millsap"), U.S. Steel had replaced full-time maintenance workers with independent contractors at Gary Works, resulting in "hundreds of work orders [] going unfilled, and *no preventative maintenance [] getting done at the sprawling plant on Lake Michigan*."[5] Millsap elaborated:

> Every workplace has work hazards that the employers and employees must be aware of. At any given time a workplace accident can happen that can result in very serious injuries and sometimes fatalities. It is the obligation and responsibility of the company to minimize these hazards a[s] much as possible to make the workplace safe. In this steel plant, those risks are much greater. The risk is greater for the employees.
>
> ***
>
> This union is prepared to bargain over the layoffs McKinsey says need to happen. *How will the maintenance work get done? That's our question*. Specifically, the safety work.

99.    Meanwhile, state investigators faulted U.S. Steel for not de-energizing live parts before an employee worked on them, for not training an employee to be able to distinguish live parts from other electrical equipment, for not testing that circuit elements and electric equipment parts were de-energized before going in to do work, and for not providing a worker with protective

---

http://www.nwitimes.com/business/steel/u-s-steel-fined-for-death-at-gary-works/article_a75223e1-d957-5580-8e1c-25f741bc48cc.html (accessed Sept. 11, 2017).
[5]    Joseph S. Pete, *USW says U.S. Steel Layoffs Jeopardize Safety*, NWI.com at http://www.nwitimes.com/business/steel/usw-says-u-s-steel-layoffs-jeopardize- safety/article_2d1ce954-2716-56f6-b1d3-274042615903.html?utm_medium=social&utm_source=email&utm_campaign=user-share (accessed Sept. 11, 2017).

shields or barriers to prevent inadvertent contact with an electrical current while working in a confined space. Union officials publicly announced that U.S. Steel had made the mill less safe by cutting maintenance workers and rushing roving labor gangs through a backlog of jobs. The Union had appealed the layoffs, filing a grievance with a third-party arbiter, and argued the layoffs threatened workplace safety by running understaffed, under-maintained facilities.

100.    Around the time of these additional layoffs, the understaffing and decreased maintenance resulted in a second tragic death of a U.S. Steel employee on September 29, 2016 at the Company's Gary Works facility. As reported, U.S. Steel electrician and maintenance worker Jonathan Arizzola, 30, was killed in the U.S. Steel Slab Storage Yard just weeks after Union employees had held demonstrations to protest that U.S. Steel was making the mill less safe by laying off and demoting maintenance workers. The United Steelworkers Union had filed an appeal to arbitrate the mass layoffs, arguing the cuts were putting workers at risk by putting off preventative maintenance and causing work orders to pile up.[6]

101.    Arizzola had been employed at the mill for about four years, and was killed in an accident while working in a four-man crew assigned to troubleshoot a crane at the U.S. Steel slab storage yard in Gary. In the wake of his death, his widow reported that Arizzola had frequently expressed concern regarding the deterioration of working conditions at the mill in Gary, and had even suffered an electric shock in a separate accident at Gary Works the week before his death, elaborating: "He was constantly complaining about McKinsey group cutting back workers. There was always some kind of close call with someone he worked with…[a]ll they care about is making money…They keep cutting when they should have a safer environment for people. It shouldn't be

---

[6] Joseph S. Pete, *Steelworker Who Died Told Wife Mill Was Getting Less Safe*, NWI.com at http://www.nwitimes.com/business/steel/steelworker-who-died-told-wife-mill-was-getting-less-safe/article_92ddbe7d-6133-5ee8-9002-42ec48aa5a37.html (accessed Sept. 11, 2017).

all about the money."[7]

102.    Also in response to his death, United Steelworkers Union Local 1014 President Rodney Lewis said in a Facebook post to steelworkers that bare-bones crews at Gary Works put steelworkers at risk for more accidents:

> *Our company has decided that, to save a dollar, they'll farm people out all over this mill which only increases the chances for accidents like these happening.* They should instead be asking themselves if it's high time they started listening to *what* we've been saying all along. Moving people all around a mill like chess pieces only promises to result in something tragic. Shutting down training when you need it the most is just bad business when you consider that we are 'the company's most important asset.

103.    In May 2017, the Indiana Department of Labor found U.S. Steel committed two serious safety violations at Gary Works after investigating Arizzola's death and fined U.S. Steel $14,000 total, or $7,000 for each violation, the amount is prescribed by statute.[8] The Indiana Department of Labor found U.S. Steel failed to provide safety training and protections against live electrical equipment. United Steelworker Union officials tied his death and the June 2016 electrocution death of 67-year-old Charles Kremke at Gary Works *to cutbacks in maintenance staffing* that they said posed safety hazards and that have since been reversed. Additionally, an Occupational Safety and Health Administration investigation found that maintenance employees were performing repairs to the 501 crane in the slab yard while three collector rails were live, exposing the workers to electrical hazards.

104.    Confidential sources confirmed that massive layoffs resulted in understaffing with inexperienced employees with little to no training. For instance, according to CW#9, the Company cut back on its personnel to such an extent that it often was left with people who CW#9 understood lacked the skills to perform maintenance or work on capital projects. This was extremely

---

[7] *Id.*

[8] *Id.*

detrimental because U.S. Steel's maintenance of its facilities just "fell by the wayside." CW#5 confirmed that the Company was laying off the longer-term, more expensive personnel with the most "experience" and "institutional knowledge," while keeping on the less experienced personnel who were less expensive to employ. In fact, prior to CW#9's departure, CW#9 did not train the new individuals who replaced this witness and, to this day, CW#9 still receives calls from the Company asking for advice and assistance with different matters, further evidencing the lack of experience and knowledge of those personnel remaining.

105.    Moreover, CW#9 explained that even those personnel who were qualified to perform maintenance were unable to do so because they were tasked with working on other projects.

106.    CW#1 offered a similar account, stating that personnel were being transferred to other roles and/or being laid off, which resulted in many projects being neglected. CW#5 also had similar observations, noting that if an employee was highly paid and had been with U.S. Steel for many years, the Company would find a way to "get rid" of them. CW#10 similarly recounted that the Company had a practice of getting rid of experienced, highly paid personnel and replacing them with inexperienced workers. According to CW#10, this left a number of employees who did not know enough about equipment or the necessary maintenance required and resulted in "haphazard" maintenance.

107.    Similarly, as discussed above, CW#6 recounted that the Company abandoned job training and filled positions with inexperienced employees that did not know how to operate the equipment and machinery.

### 2. Defendants Instruct Plant Managers "Don't Buy, Get By" and Forces them to "Jury Rig" Broken Machinery

108.    According to confidential witnesses, U.S. Steel repeatedly canceled purchase orders for parts needed to keep facilities running and used cheaper, less durable materials to operate machinery. Rather than invest in its equipment, U.S. Steel plant managers would deny maintenance requests and tell employees to "jury rig" the machines and operate by the motto, "Don't Buy, Get By." U.S. Steel also repeatedly deferred maintenance projects and once the Company's machines inevitably broke, the Company suffered millions in losses as a result.

109.    Specifically, CW#7 explained that U.S. Steel began cancelling purchase orders for parts that were necessary to keep its facilities running. CW#7's primary job responsibility was to order machinery parts for all of U.S. Steel's plants in the United States. CW#7 stated that the Company's cost cutting measures were so extreme that it began cancelling hundreds of orders. CW#7 recalled that in one day, alone, this witness worked on 30 to 40 cancellations. According to CW#7, this cost saving technique was a directive from the Vice President of Purchasing in the Pittsburgh corporate office and started occurring during the last several months leading up to CW#7's departure in April 2016.

110.    U.S. Steel also deferred maintenance and repairs spending at all costs. According to CW#7, the process for ordering machinery parts was as follows: (1) planners at U.S. Steel plants determine what needs to be ordered; (2) a "Min-Max report" is run to determine the maximum number of units the planners can buy; (3) a "requisition" was submitted through the Company's Oracle program; and (4) depending on the cost of the item, multiple layers of approval may be needed. According to CW#7, starting in September or November of 2015, this process was altered so that some requisitions required approval of a "control tower," which consisted of McKinsey and the Plant Manager. The control tower was part of the Company's Carnegie Way cost cutting

efforts and would determine whether the plants could "get by" without the requested parts. The implementation of the control tower resulted in a significant reduction of requisition approvals.

111.    CW#7 recounted that when CW#7 first started working at U.S. Steel, this witness worked on 60-70 requisitions per day. By the time CW#7 left the Company in 2016, this number dropped 95% to about two or three per day. CW#7 explained that the requisition denials led to a decrease in submissions as the Company had a philosophy of "don't buy, get by" and placed a lot of "pressure" on plant employees to not buy anything if the machines were running. Unless a machine was not working, workers were expected to "jury rig" the machines to keep them running rather than order new parts. By way of example, CW#7 explained that while some parts are supposed to be replaced every six months to one year and receive regular maintenance, workers would jury rig the machine when it broke until it got to the point where the machine kept breaking and could no longer be fixed without a new part. CW#7 stated that the machines would essentially "sit and rot" because of this philosophy.

112.    In addition, CW#7 explained that spare parts were not kept at U.S. Steel's facilities and if a machine was down, the workers would "clear out" that section of the plant and "work around" the broken part if they could by using another section of the plant. According to one employee, workers were also being ordered to use cheaper materials which inevitably led to machines breaking down sooner.[9] For instance, one former operations and maintenance employee said "purchasing managers in Pittsburgh had ordered his mill to use cheaper oils to lubricate bearings. That caused the bearings to wear out more quickly, resulting in extra costs and longer down time."[10]

---

[9] Len Boselovic, "Analysts Say U.S. Steel Cost-Cutting Hurting Operations, Safety," Pittsburgh Post-Gazette, November 3, 2016 (last accessed Sept. 19, 2017), available at http://www.post- gazette.com/business/pittsburgh-company-news/2016/11/02/U-S-Steel-shares-dip-in-early- trading-Pittsburgh-steelmaker/stories/201611020168.

[10] Len Boselovic, "Analysts Say U.S. Steel Cost-Cutting Hurting Operations, Safety," Pittsburgh Post-Gazette,

113.    CW#5 corroborated U.S. Steel's refusal to implement necessary maintenance. According to CW#5, U.S. Steel began deferring numerous projects, some of which included structural integrity issues that absolutely needed to be done or it would cost a lot of money. As CW#5 explained, spending on plant structural maintenance drastically decreased since 2010 at Great Lakes Works. Specifically, in 2010, U.S. Steel spent approximately $29 million on structural maintenance. This amount decreased every year with U.S. Steel spending the following: 2011 - $14 million; 2012 - $9 million; 2013 - $7 million; 2014 - $6 million and 2015 - $3 million.

114.    According to CW#5, maintenance spending was determined based upon a Business Plan, which contained the budget for repair and maintenance costs, capital spending, production costs and other items. The Business Plan for a given year was created in the fall before. CW#5 recalled meeting with McKinsey and the Great Lakes Plant Manager, among others, in the fall of 2015 to discuss the proposed 2016 Business Plan. According to CW#5, after he met with McKinsey, McKinsey then took the Business Plan to Longhi, Burritt and other executives in Pittsburgh for approval. CW#5 recalled that the 2016 Business Plan went through numerous iterations because McKinsey and Defendants kept cutting the repair and maintenance budget. CW#5 eventually obtained an acceptable budget number for repairs and maintenance from Defendants and "backed into" the number for purposes of creating the Business Plan. CW#5 described the process as "insanity." CW#5 stated that this process was the same for the other U.S. Steel Flat-Rolled facilities, including Gary Works and Fairfield Works.

115.    CW#5 explained that maintenance projects at U.S. Steel were coded accordance to priority. Projects coded as "S-1," meant those projects needed repair immediately or the Company would risk disruption in operations and/or employee injury. CW#5 stated that as of July 25, 2016,

November 3, 2016 (last accessed Sept. 19, 2017), available at http://www.post- gazette.com/business/pittsburgh-company-news/2016/11/02/U-S-Steel-shares-dip-in-early- trading-Pittsburgh-steelmaker/stories/201611020168.

at Great Lakes there was a "significant amount of work to be done" with a backlog of 253 projects categorized as "S-1" projects that should have been completed years ago. CW#5 stated the cost to complete all 253 projects would have be "astronomical" and estimated it in the tens of millions of dollars, "if not more." According to CW#5, the Individual Defendants and McKinsey did not "want to hear" about the critical structural maintenance and repairs that needed to be done because it cost money. This caused the Company to get even further behind on maintenance.

116.    CW#5 recalled several examples of equipment and facilities in need of repairs that the Individual Defendants refused to make. For example, according to CW#5, the cranes at Great Lakes were installed between 1958 and 1964 and, not surprisingly, their parts were wearing out at an accelerated pace. Although they were "almost unsafe to operate," they were never replaced during CW#5's employment because it would have cost U.S. Steel millions of dollars to fix them. In another example, CW#5 recalled a building that housed the product going into the pickle line that had "many issues" relating to needed repairs and maintenance. Despite asking "over and over," the repairs were never done. CW#5 also recalled another example of a motor rotor that broke in 2015 or 2016, which caused the motor to go down for five days while the rotor was being repaired.

117.    According to CW#5, all of U.S. Steel's Flat-Rolled facilities faced similar spending cuts and were unable to make necessary repairs.

118.    CW#9 confirmed other witness accounts. According to CW#9, as a result of U.S. Steel's drastic cost cutting measures, CW#9 understood that machines had to be replaced sooner than they otherwise would have had the proper repair and maintenance occurred. Rather than perform maintenance, however, CW#9 reported that the Company, instead, "put a patch" on the issue. CW#9 stated one example related to the Mon Valley plant, which had two electrical generators that were over 70 years old. During 2015, the first machine kept breaking and after

employing "every band-aide" and "bubble gum-aide" possible, it was decided that the generator had to be replaced. However, it took nine months to customize a generator for U.S. Steel which resulted in a loss of $1 million per month since U.S. Steel had to procure electricity from an alternate source. This increased the overall cost per ton. While CW#9 recommended that the Company procure a spare generator before the second generator broke and the Company suffered another $9 million loss, this proposal was rejected. As predicted, the second generator failed right before CW#9 left the Company in the fourth quarter of 2016.

119.    CW#8 also confirmed U.S. Steel's lack of preventative maintenance and use of cheap substitutes for parts. CW#8 explained, for example, that the first two sets of rollers that steel goes through have chrome plates, which are expensive but cost effective in the long term because they last longer. When U.S. Steel started cutting costs in "every way possible," the Company stopped purchasing chrome plates. As a result, CW#8 stated that the rollers failed sooner and only ended up lasting a few weeks, whereas chrome rollers lasted three times as long.

120.    According to CW#1, the cost cuts were so bad that union personnel frequently complained that they could not get the right tools they needed, even at a minimal costs, and even as the Company was purportedly spending millions on the Carnegie Way. While CW#1 would report these issues to the plant and division managers, such matters fell on "deaf ears" because managers did not want to spend money on tools unless they were going to "make money."

121.    Thus, while the Carnegie Way measures were billed to investors as "not just a cost cutting initiative," in reality, the Carnegie Way had become an extreme cost cutting measure designed to salvage the Company's short-term bottom-line at any means necessary, including through the U.S. Steel Defendants' top-down consistent refusal and failure to invest in critically necessary new technology or maintain U.S. Steel's Flat-Rolled facilities.

### D. U.S. Steel Slashes Capital Spending

122.    According to Goodish, U.S. Steel's former COO from June 2005 to December 2010, during his employment at U.S. Steel, the Company created its capital expenditure forecasts on a five-year, plant by plant basis. CW#9 and CW#8 confirmed that the Company forecasted capital expenditures on a plant by plant basis over a five-year future period during their employment at the Company.

123.    Goodish explained that the capital expenditures were calculated based on revenue projects and plant managers' requests for repairs and upgrades. CW#9 corroborated Goodish's account that the Company created an annual capital budget and further explained that the annual budget was approved by the U.S. Steel Board. CW#9 personally participated in the creation of the annual capital budget and reviewed the capital projects proposed by the plant engineers that were ultimately submitted to the Board for approval. According to CW#9, the 2016 capital budget was submitted to the Board in November 2015 and approved by January 2016 of the applicable year.

124.    As reflected in the chart below, not only was U.S. Steel not reinvesting or maintaining its facilities, but it had slashed its capital expenditure investments throughout 2015 and 2016 by a total of 44.9% in total year-over-year. With respect to capital expenditures in the Company's Flat-Rolled facilities, in particular, Defendants slashed the Company's capital expenditures by a remarkable 66.9% year-over-year.

| Quarter | Capital Expenditure | | Percentage Change | |
|---------|-------|-------------|-------|-------------|
|         | Total | Flat-Rolled | Total | Flat-Rolled |
| Q1 2015 | $109 M | $69 M | - | |
| Q2 2015 | $104 M | $56 M | -4.5% | -18.8% |
| Q3 2015 | $142 M | $72 M | 36.5% | 28.6% |
| Q4 2015 | $146 M | $84 M | 2.8% | 16.67% |
| FY 2015 | $500 M | $280 M | - | - |
| Q1 2016 | $148 M | $46 M | 1.4% | -45.2% |
| Q2 2016 | $69 M | $28 M | -53.4% | -39.1% |

| Q3 2016 | $51 M | $23 M | -26.1% | -17.9% |
| Q4 2016 | $38 M | $14 M | -25.5% | -39.1% |
| FY 2016 | $306 M | $111 M | -44.9% | -66.9% |

125.    CW#10, stated that "*everybody* knows that" the Company was under-investing. It was "common knowledge" within U.S. Steel. According to CW#10, one example of Defendants' cut of the capital budget involved the Edgar Thomson plant. CW#10 explained that the Edgar plant was allocated money for capital improvement projects each year. However, invariably when the capital improvement projects were presented for approval, the same response was always received - the capital improvement money was being cut and allocated elsewhere, usually because something had broken that needed immediate attention. CW#10 informed the manager at Edgar Thomson of all the issues concerning under-investing but U.S. Steel kept running its equipment "into the ground."

126.    In another instance, CW#1 stated that in the last year of CW#1's employment there was supposed to be money allocated to blast furnaces but the blast furnace projects could not have been getting done since Blast Furnace 14 at Gary Works ended up going "completely down" at some point between January 2016 and May 2016.

127.    According to CW#9 a lot of capital projects were being paused or cancelled outright, including the Electric Arc Furnace proposed for the Alabama facility.

**IV.    CARNEGIE WAY PURPORTED COST SAVINGS WERE A SHAM**

128.    According to several CWs, the Carnegie Way program was a sham because many of the purported savings were not real or the projects had actually not been completed or even implemented yet and, thus, were not "realized." For example, CW#7 explained that during the end of 2015 and during 2016, U.S. Steel began extending payment terms to vendors from 30 days to 60 days and eventually 120 days. U.S. Steel then attributed purported cost savings to paying

vendors late as a Carnegie Way benefit. CW#7 stated that the vendor payment terms were changed by the General Manger of Purchasing in the Pittsburgh corporate office and seemed to be part of the Company's cost cutting efforts. Extending payment terms to vendors did not save the Company money because vendors would become angry and stop selling parts and supplies to the Company.

129.    In another example, Goodish described a sham cost-cutting benefit that he learned about in 2016 from a current U.S. Steel employee who worked in purchasing at U.S. Steel. This employee described to Goodish that U.S. Steel obtained three price quotes from vendors for every purchase and then, after selecting the lowest bid, reported the difference in price between the highest and lowest bid as a Carnegie Way benefit.

130.    In addition, throughout 2015 until this witness left the Company in 2016, CW#1 attended weekly "war room" meetings where new and existing projects were discussed, including the nature of the project, potential cost savings, plans for implementing the projects and other details. At these "war room" meetings, CW#1 observed that projects designated as being at the D-Gate1 (Define) phase on Monday would miraculously be at the D-Gate 5 (Control) phase by Friday of the same week. CW#1 was baffled as to how these projects could move so quickly on the scale, especially considering the extreme age of Gary Works since older infrastructures cannot be changed that quickly. CW#1 was further baffled as to how purported cost savings (which could be as much as $4-5 million in claimed savings per project) could be reported for these projects because they had not yet been implemented.

131.    In addition, CW#1 observed that in some instances, projects that would take a long time to complete, would miraculously be at D-Gate 5 by the end of the week. CW#1 commented that individuals responsible for each project just had to call this witness' boss, Robert Lange, the Director of Change Transformation, and request that he advance a project and Lange would do so

regardless of whether the project had actually been implemented.

132.    According to CW#1, this witness observed multiple projects per week that moved through the D-Gate scale from Monday to Friday, just a five-day period, that could not possibly have been completed in that short of a timeframe. CW#1 also observed that there was a general increase in this activity towards the end of quarters, which reflected a need "to get the numbers in" before the end of a period so that purported Carnegie Way cost savings could be reported in

133.    U.S. Steel's quarterly reports to the market. With all the layoffs, CW#1 commented that people were afraid their jobs would "be on the chopping block" if they did not "produce value" by having their projects advance through the D-Gate system.

134.    CW#1 was not the only one who noticed that the reported Carnegie Way savings were overstated. According to CW#8, charts showing the Carnegie Way savings were distributed internally throughout the Company. CW#8 recalled these charts would show savings that had supposedly been achieved by certain projects, although some of the projects had not yet been implemented. For instance, CW#8 recalled seeing a project on the reports relating to the delivery end of the cold mill at Irvin Works that was shown to be saving the Company money in 2016, yet in actuality, the project had not been implemented yet.

135.    Despite the truth – that Carnegie Way was a sham -- Defendants consistently assured investors throughout the Class Period that U.S. Steel was investing in new technologies and maintaining its facilities pursuant to Carnegie Way, stating for example:

- The Carnegie Way "*[i]s much more than a cost cutting initiative*, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support. Carnegie Way is our culture and the way we run the business. We focus on our strengths and how we can create the most value for our stockholders and best serve our customers. *We have achieved sustainable cost improvements through process efficiencies and investments in reliability centered maintenance (RCM), and we will continue to find more cost improvements*." (November 4, 2015 Q&A Packet;

January 27, 2016 Q&A Packet; July 26, 2016 Q&A Packet).

- "Contract pricing resets had an immediate impact on our results, while our cost reduction efforts progressed as planned and will continue to grow throughout the year. We took significant actions to align our overhead costs with our operations*, contributing $100 million to our Carnegie Way benefits* for this year. We remain focused on reducing our costs, *improving the quality and reliability of our operations, and working with our customers* to deliver differentiated solutions that will improve our market position and create value for all of our stakeholders." (April 26, 2016 Press Release).

- "We *continue to implement our reliability centered maintenance process across all of our facilities. We are starting to see the benefits as we have experienced fewer unplanned outages and lower maintenance costs*, and are allowing for a more efficient allocation of our maintenance labor force. We are creating a more reliable and agile operating base that lowers our break-even point, with a key focus on lowering our hot-rolled band costs through operating and process efficiencies. We are improving our ability to adapt quickly to changing market conditions, while striving to provide superior quality and delivery performance for our customers." (July 26, 2016 Earnings Presentation).

- "With our very strong cash and liquidity position, we remain focused on the investments that we need to continue to make to revitalize our facilities and deliver value enhancing solutions for our customers. (November 1, 2016 Press Release). We have been investing in revitalizing our facilities but, based on the operating challenges we faced in the third quarter, we are accelerating the pace of our efforts. The projects we are pursuing cover all aspects of our operations, and are focused on addressing the assets most critical to our success." (November 1, 2016 Earnings Presentation).

- "We entered 2016 facing very challenging market conditions, but remained focused on our Carnegie Way transformation efforts. Despite lower average realized prices and shipments in 2016, our results are better as we continued to improve our product mix and cost structure. Our focus on cash, including better working capital management and opportunistic capital markets transactions, resulted in an improved debt maturity profile and stronger cash and liquidity. We are well positioned to accelerate the revitalization of our assets *to improve our operating reliability and efficiency*, and deliver value-enhancing solutions to our customers." (January 31, 2017)*.*

136.    As discussed below (SOF VII, *infra*), while deferring maintenance, repairs and asset upgrades may have saved money in the short-term, these decisions often ended up costing U.S. Steel more money in the long run.

## V.    THE U.S. STEEL DEFENDANTS' DECISION TO DEFER MAINTENANCE AND CAPITAL INVESTMENTS RESULTS IN COSTLY, UNPLANNED OUTAGES, LOWER UTILIZATION RATES, AND LOWER CAPACITY AT U.S. STEEL FACILITIES

137.    It is commonly known within the steel industry that "[s]teel mills can be more prone to [unplanned] outage[s] as a result of increasingly deferred maintenance." Michelle Applebaum, The Misconceptions and Realities of Today's Steel Market, AMERICAN METAL MARKET (Oct. 31, 2013).

138.    According to CW#11, the "vast majority" of equipment at U.S. Steel facilities was made between 1930 and 1960 and, consequently, required "a lot more repair and maintenance" than contemporary equipment. In fact, prior to and throughout the Class Period,

139.    U.S. Steel faced a higher degree of operating leverage compared to the industry cost curve because it produced steel exclusively through the use of blast furnaces, which are older, less efficient, and produce greater fluctuations in capability utilization than electric arc furnaces which were used, at least in part, by the majority of U.S. Steel's competitors.

140.    As detailed infra SOF at IX, Defendant Longhi and other U.S. Steel executives admitted under oath in their testimony before the U.S. International Trade Commission,[11] *inter alia* that "[u]nfortunately, those investments that we need to make are being -- ***we're not able to make them right now***;"[12] "[t]he situation we face is very grave,"[13] and the Company's financials

---

[11] Defendants' testimony before the ITC was not contained, cited or referenced in any of Defendants' public statements, analyst reports or any other media sources.
[12] August 18, 2015, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM.
[13] *Id*.

"are nowhere near where they need to be for us to invest in our future."[14]

141.    As a result of the U.S. Steel Defendants' decisions to idle and close mills and "swing facilities," its draconian cuts in capital investment and deferral of maintenance and repairs, as well as its massive layoffs of maintenance employees, the Company was required to operate flawlessly at nearly peak capacity all of the time – an impossible task given the age of

142.    U.S. Steel's outdated furnaces. CW#11 explained that swing facilities were U.S. Steel facilities that were available to absorb production if and when a plant suffered an unplanned outage. Because every facility was operating at max capacity due to the shutdowns, however, there were no swing facilities available to divert production when a plant outage occurred. According to CW#11, inevitably, the Company's infrastructure could not sustain such production without regular maintenance and repairs and, thus, fell into disrepair beginning in 2015, before the beginning of the Class Period and only continued to worsen throughout the Class Period.

143.    For example, according to CW#10, the Edgar Thomson "melt shop" contained cooling towers that had not been maintained in "years." At some point during 2015, a new tower was put in. However, according to CW#10, the new tower was not maintained correctly and, in late 2016, all of the "cooling media" ended up melting. CW#10 estimated that this error resulted in significant costs of as much as $500,000-$750,000. The cooling tower was eventually repaired in the first quarter of 2017 by CW#10's current employer.

144.    Also in 2015, the Company suffered $9 million in losses as a result of an electrical generator breaking at U. S. Steel's Mon Valley facility. Specifically, CW#9 explained that the Mon Valley plant had two electrical generators that were over 70 years old and would repeatedly break. After the "band-aid" could no longer revive one of the electrical generators,  the Company

---

[14] May 24, 2016, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM.

was forced to obtain electricity elsewhere. This turned out to be extremely costly, as it took nine months to obtain a new generator and it cost the Company $1 million per month to obtain electricity from another source.

145.    Thereafter, beginning at least by the second quarter of 2016, the Company's Gary Works plant – which Defendant Longhi described during the Company's April 26, 2017 earnings call as "one of our most critical assets" – suffered a cascade of undisclosed unplanned outages throughout the year.

146.    According to CW#1, it was sometime during January and May 2016 that the wiring for Blast Furnace 14, one of the biggest at the Gary Works facility, was flooded, causing the entire furnace to shut down "for upwards of two weeks."

147.    Soon after that, in May 2016, U.S. Steel also suffered unplanned outages at its Great Lakes Works facility that it did not disclose in its quarterly filings. After being sent a violation notice from the Michigan Department of Environmental Quality regarding the facility's D4 and B2 blast furnaces, U.S. Steel responded by way of a letter dated May 11, 2016, which was signed by Jon Olszewski, the Primary Plant Manager for Great Lakes Works, and Alexis Piscitelli, the Director of Environmental Control at Great Lakes Works. A carbon copy of the letter was sent to Dave Hacker, U.S. Steel's General Attorney. In the May 11, 2016 letter the Company averred that on, "Monday April 4th, 2016, United States Steel Great Lakes Works D4 Blast Furnace was in recovery state from a process malfunction."[15]

148.    CW#11 stated that the unplanned outages in 2016 occurred "quarter after quarter" and resulted in "thousands of tons of missed steel production" and "hundreds of millions of missed revenue." CW#11 further explained that unplanned outages could not be predicted and, without

---

[15] *See* http://www.deq.state.mi.us/aps/downloads/SRN/A7809/A7809_RVN_20160511.pdf, last visited September 18, 2017

swing plants available to divert production during these unplanned outages, production had to be halted. When production is halted or delayed, then the delivery of a customer order is halted or delayed as well, resulting in lost revenue.

149.    According to CW#11, production shortfalls in 2016 were "a good bit short" and more than CW#11 had ever seen, estimating that they were likely as much as 20% short in 2016. CW#11 was able to make such an estimate because CW#11's position required CW#11 to know manufacturing capacity verses the actual production in order to create a production plan. CW#11 stated that this witness further knew this information because he reviewed daily reports in the Company's Oracle system, which were closely scrutinized by the Company, and which tracked the actual production verses anticipated production goals. Based on these reports, CW#11 said it was easy to see that actual production was "not even close" to the planned production amount. This was a "painful lesson" for U.S. Steel because "no one wants to give up revenue."

150.    CW#11 believed U.S. Steel's apparent strategy of underinvesting to be "pennywise/pound foolish" because the corporate office decided to build up the Company's cash position by cutting back on maintenance, which came at the cost of being unable to meet customer needs and resulted in U.S. Steel losing revenue when it could not fulfill customer orders.

151.    As demonstrated in the chart below, contrary to the U.S. Steel Defendants' contemporaneous Class Period public statements claiming U.S. Steel was experiencing "fewer unplanned outages," such unplanned outages were significantly increasing during the Class Period as a result of the U.S. Steel Defendants' decision to forego needed maintenance and capital spending:

| U.S. Steel Unplanned Outages | | | | |
|---|---|---|---|---|
| **Date** | **Facility** | **Length of Outage** | **Cost** | **Source** |
| Q1 2014 | Great Lakes Works - Steel shop went "offline" | Half of the second quarter 2014 | Unknown | Michael Cowden, *No Summer Doldrums For Flat Steels: Longhi,* AMERICAN METAL MARKET (July 30, 2014) |
| 2015 | Mon Valley - Electrical Generator broke down | Nine months | $9 million | CW#9 – cost $1 million per month |
| November 2015 | Great Lakes Works - two blast furnaces not running | Unknown | Estimated at $1 million per day per CW#9 | Michael Cowden, *USS Restarts Second Great Lakes Works BF,* AMERICAN METAL MARKET (Nov. 25, 2015) |
| April 2, 2016 | Gary Works - Blast Furnace 14 underwent "unscheduled maintenance" | Two to three days | $2-$3 million | Thorsten Schier, *U.S. Steel Slates Gary Works Furnace Outage,* AMERICAN METAL MARKET (Apr. 7, 2016) |
| April 4, 2016 | Great Lakes Works - D4 Blast Furnace was in "recovery state from a process malfunction" | Unknown | Unknown | May 11, 2016 Letter to State of Michigan, Department of Environmental Quality |
| April 2016 | Gary Works - Blast Furnace 14 flooded | Upwards of two weeks | $14 million | CW#1  Michael Cowden, *USS Restarts Gary Works' No. 14 BF,* AMERICAN METAL MARKET (Apr. 26, 2016) |
| Third Quarter 2016 | "Several . . . steelmaking and finishing facilities" experienced unplanned outages  Loss of 125,000 tons of production at flat-rolled operations | Last half of the third quarter | Unknown | U.S. Steel November 1, 2016 Press Release |

| Around October 2016 | Mon Valley - Electrical Generator broke | Unknown | Unknown | CW#9 |
| Fourth Quarter 2016 | Edgar Thomson - "cooling media" in the Cooling Towers melted (¶ 144) | U.S. Steel Q1 2017 Presentation states repair made in first quarter 2017 | $2 million | CW#10; U.S. Steel Q1 2017 Presentations disclosed this was repaired in Q1 2017 |

152.    Although these unplanned outages occurred in 2015 and throughout 2016, the Defendants failed to disclose to investors important details, including the nature of the outages, the length of them, the cost to the Company or that such unplanned outages ever occurred.

153.    The parade of unplanned outages throughout 2016 wreaked havoc on the Company's capability utilization, which equals the raw steel tonnage produced divided by the tonnage capability of the Company to produce raw steel for a sustained full order book. During the Company's February 1, 2017 earnings call, Defendant Longhi admitted that "[t]he capacity utilization for the finishing last year was pretty tight, and this was the reason why Dan [Lesnak] was saying that some of the investments that we are going to be making, they are going to be given as a capability to do better products, but also to be able to push [capability utilization] up a little bit."

154.    As reflected in the charts set forth below, the Company's capability utilization in its flat-rolled segment shrunk, bottoming out at 57% as compared to the industry average of 80%:

| Period | Utilization % |
|---|---|
| Three Months Ended March 31, 2015 | 60% |
| Three Months Ended June 30, 2015 | 58% |
| Three Months Ended September 30, 2015 | 66% |
| Three Months Ended December 31, 2015 | 57% |
| Three Months Ended March 31, 2016 | 66% |
| Three Months Ended June 30, 2016 | 65% |

| Three Months Ended September 30, 2016 | 64% |
|---|---|
| Three Months-ended December 31, 2016 | 57% |
| Three Months Ended March 31, 2017 | 65% |



155.    These utilization rates are problematic. As Longhi admits, "Blast furnaces are untamable beasts when it comes to flexibility. You have to operate at very high utilization. If you don't, the level of instability you create sometimes is untenable." Michael Cowden, USS Aims to Be Iconic Again Despite Downturn, AMERICAN METAL MARKET (Oct. 15, 2015).

156.    Further, as demonstrated in the chart below, these unplanned outages also resulted in declining steel shipments in the Flat-Rolled Segment:

| Period | Shipments (thousands of net tons) |
|---|---|
| Full Year 2014 | 13,908 |
| Full Year 2015 | 10,595 |
| Full Year 2016 | 10,094 |

157.    Despite that U.S. Steel was experiencing costly, unplanned outages and a drastic decrease in capability utilization resulting in as much as 20% less tons of steel produced and, thus, correspondingly less revenue, Defendants falsely represented that the Company was continuing to invest in its facilities and the RCM Carnegie Way initiative.

## VI.    THE INDIVIDUAL DEFENDANTS WERE AWARE THAT U.S. STEEL WAS DEFERRING IMPORTANT MAINTENANCE AND REPAIRS THROUGH THE DAILY REPORT OF OPERATIONS AND OPERATING EFFICIENCY REPORT

158.    According to Goodish, during his employment he created and implemented a Daily Report of Operations to assist in reviewing and analyzing the Company's daily operational performance. Goodish stated that the DRO was published every morning at approximately 5:30 a.m. and was widely available throughout U.S. Steel. All executives, including Burritt, Longhi and Lesnak, could access the DRO from their desktop by clicking on an icon linked to the Company's internal website.

159.    Goodish reviewed the DRO report every morning "because that was [his] job." As COO, Goodish explained that he was responsible for overseeing the operations of the Company, including designing and implementing business processes, establishing policies and overseeing executives. CW#5 similarly stated that CW#5 reviewed the DROs every day throughout this witness' employment as a Plant Manager at Great Lakes and Director of RCM at U.S. Steel. CW#5 described the DRO as the "Bible" and "number 1 report" to review for those employees who worked in operations and needed to know how facilities were performing.

160.    CW#5 confirmed that the DRO was "well accessible," "used widely" and "anyone" at U.S. Steel could access the reports on the Company's internal website. CW#11 similarly confirmed that planned tons per turn and actual production achieved for all facilities were recorded in Oracle, which was closely scrutinized by the Company.

161.    According to Goodish and CW#5, the DRO Report contained various operational data, metrics and statistics reported internally from each plant (*e.g.*, Gary Works, Granite City, etc.). Among the most important metrics were: (1) tons produced; (2) tons shipped; (3)  scheduled tons for the day, week, and month-to-date; and (4) tons per scheduled turn. CW#11 explained that

capacity was measured by how many tons of steel could be produced by a facility "per turn" and there were three turns per day.

162.    CW#5 also reviewed an Operating Efficiency Report ("OER"), which was prepared monthly and contained information by facility (e.g., Great Lakes) and by unit (e.g., Blast Furnace #14). The OER contained metrics such as delay rate/percentage (indicating downtime from repairs and/or outages), production tons, variable and fixed costs, yield, man hours per ton and utilization, among other metrics, for the prior five years and monthly for the current year. According to CW#5, the OER was available from the Pittsburgh headquarters website and, thus, the Individual Defendants had access to the OER.

163.    CW#5 stated that this witness knew the Individual Defendants reviewed the OER because they discussed information contained in the reports at quarterly meetings for operations managers. CW#5 recalled the quarterly meetings primarily took place in Pittsburgh and were attended by approximately 120 managers and included Defendants Longhi and Burritt wherein U.S. Steel's financial performance, capital spending and other issues were discussed.

164.    According to Goodish, one key metric in the DRO from his view was the delay percentage. The delay percentage was calculated as the tons per scheduled turn compared with actual tons produced. A delay percentage of greater than 15% indicated an operational issue that needed immediate attention. CW#11 confirmed that if the stated capacity of a given facility was, for example, 6,000 tons but the actual production was 4,000 tons (e.g., a 33.33% delay), this would be a "red flag."

165.    CW#5 stated that if there was a "big issue," such as a blast furnace that produced significantly less than it was supposed to produce because of an issue such as an unplanned outage, everyone at the Company could tell "right away" because this was reflected in the DRO. CW#5

also commented that when a blast furnace went down, it cost U.S. Steel approximately $1 million per day.

166.    Recently, within the last couple of months, a current employee of U.S. Steel told Goodish that delay rates on the Hot Strip Mills at Gary Works and Mon Valley were between 35 and 50%, significantly above normal rates of 15%. Delay rates above 15% indicate significant operational problems.

167.    The above confidential source accounts are corroborated by the decline in steel shipments, unplanned outages and decreased capital and maintenance spending, among other facts alleged herein, that occurred prior to and throughout the Class Period. See  Sections IV,V.D, and VII.

168.    As discussed above, as a result of unplanned outages and costly repairs from Defendants' failure to invest in and maintain its assets, U.S. Steel's facilities had been "across the board falling short" on production by "thousands of tons of missed steel production" amounting to approximately 20% of total missed production and resulting in "hundreds of millions of dollars of missed revenue." This information would have been reported in the DRO and/or OER reports that Defendants reviewed, and therefore knew about or recklessly ignored.

**VII.    U.S. STEEL PROVIDES SWORN TESTIMONY CORROBORATING THE DRO AND OER REPORTS THAT, CONTRARY TO THE INDIVIDUAL DEFENDANTS' PUBLIC STATEMENTS, U.S. STEEL IS NOT INVESTING IN, AND MAINTAINING ITS FACILITIES**

169.    As detailed further infra pp. 78-118, prior to and throughout the Class Period, Defendants assured investors that U.S. Steel was investing in its assets and maintaining its facilities, stating for example that:

> *We continue to implement our reliability centered maintenance process across all of our facilities. We are starting to see the benefits as we have experienced fewer unplanned outages and lower maintenance costs*, and are allowing for a more efficient allocation of our maintenance labor force. *We are creating a more reliable and agile operating base* that lowers our break-even point, with a key focus on lowering our hot-rolled band costs through operating and process efficiencies.

*See, e.g.*, July 26, 2016 Earnings Presentation. (Emphasis added).

170.    Yet in direct contradiction to these statements, the Defendants and other U.S. Steel executives were testifying under oath before the U.S. International Trade Commission that the Company was not reinvesting in its technology or undertaking necessary capital expenditures to sufficiently maintain its facilities, stating for example: "investments that we need to make are being – we're not able to make them right now." See Robert Kopf, U.S. Steel, August 18, 2015 Transcript in Cold-Rolled Steel Flat Products from Brazil, China, India, Japan Korea, Russia and the United Kingdom (Investigation Nos. 701-TA-540-544 and 731-TA- 1283-1290) (Emphasis added).

171.    Specifically, throughout 2015 and 2016, U.S. Steel and several other domestic steel producers filed complaints with the U.S. International Trade Commission to initiate investigations under Title VII of the Tariff Act of 1930 to determine if China and certain other countries were involved in dumping steel in U.S. markets or were subsidizing steel sold in U.S. Markets. U.S. Steel also filed a complaint to initiate an investigation under Section 337 of the Tariff Act of 1930 against the largest Chinese steel producers and their distributors, as well as other foreign steel producers. The Section 337 complaint alleged illegal unfair methods of competition and sought the exclusion of all unfairly traded Chinese steel products from the U.S. market.

172.    In testimony under oath before the ITC in the anti-dumping investigations, the Defendants and other U.S. Steel executives admitted that the Company was not investing in, or maintaining, its assets, which directly contradicted their public statements to investors. For example, Defendants made the following contradictory statements to the ITC, under oath:

| Date | Speaker | Statement |
|------|---------|-----------|
| August 18, 2015 | Doug Matthews, U.S. Steel's Senior Vice President of Industrial, Service Center and Mining Solutions | As the U.S. grew out of the recent economic crisis and demand for cold-rolled steel increased, ***U.S. Steel had an opportunity to grow its business to reinvest in technology,*** and its workers and undertake useful capital expenditures. ***However, subject imports deprived U.S. Steel and other U.S. producers of this opportunity***. |
| August 18, 2015 | Doug Matthews, U.S. Steel's Senior Vice President of Industrial, Service Center and Mining Solutions | "Let me be clear, the current situation is not sustainable. We cannot afford cold-rolled steel at such low prices. ***We cannot afford to keep operating at such low levels of capacity utilization***. If these conditions continue, ***there is no question that there will be further shutdowns and layoffs*** throughout the industry." |
| August 18, 2015 | Doug Matthews, U.S. Steel's Senior Vice President of Industrial, Service Center and Mining Solutions | ***The situation we face is very grave***. Only yesterday we were forced to announce the shutdown of all steel making and rolling operations at our facility in Fairfield, Alabama. A decision which was really hard…. |
| August 18, 2015 | Rob Kopf, US Steel's General Manager | ***So we're having to spend enormous amounts of money to put together alternatives for our customers, to still buy steel. <u>Unfortunately, those investments that we need to make are being -- we're not able to make them right now</u>***, given the fact that these people are coming in and taking $750 million of revenue that this industry should have used to invest in further products. |
| September 29, 2015 | Robert B. Schagrin, Counsel for Domestic Steel Industry | And when you go through periods in which competition gets tougher, and pricing gets worse, and ***you've got a mill that has been under-invested, that's going to close. And one of the things that shocks me, and it came about as I was, you know, listening in a recent case about the closure of most of U.S. Steel Fairfield, I was saying, wow, that was, you know, trumpet is such a great new state-of-the-art mill, and then I was thinking, yeah, that's when I started doing this in the early '80s, you know?...Because even a super duper brand new mill in an area like steel, if you under-invest for 10 years, all of a sudden you're not going to be competitive anymore***. |

| | | |
|---|---|---|
| May 24, 2016 | Mario Longhi, U.S. Steel Chief Executive Officer | More than half of the Domestic Producers reported operating at a net loss in 2015. *At the risk of stating the obvious, these results do not even come close to representing a sufficient return for a capital-intensive industry like ours.*<br><br>*I'm choosing my words carefully when I say that for an industry that must invest and innovate to survive, these results occurring in a period of excellent demand are simply catastrophic*… |
| May 24, 2016 | Mario Longhi, U.S. Steel Chief Executive Officer | "The last two years should have been banner years for American cold-rolled steel producers. We should have been able to increase our sales, operate our plants on maximum capacity utilization levels, hire more workers, *make badly needed profits and re-invest some of those profits into new technologies and new products,*" |
| May 24, 2016 | Mario Longhi, U.S. Steel Chief Executive Officer | *[O]ur company and our industry have experienced dramatic declines in production, sales and capacity utilization. The effects have been disastrous. In cold-rolled steel, the American industry's operating income and operating margins have been low and continue to decline. <u>In fact, they are nowhere near where they need to be for us to invest in our future</u>,* to compete at home and abroad and to comply with all the environmental and<br>regulatory requirements that we face. |
| June 24, 2017 | Doug Matthews, U.S. Steel's Senior Vice President of Industrial, Service Center and Mining Solutions | Demand for corrosion resistant steel is the strongest since 2007 and yet U.S. Steel has not had a fair chance to take full advantage of this demand because of unfairly traded imports. *We will never know the new products that we could have invested in,* or the number of new workers that could have been hired. |

173.   In addition to this testimony, U.S. Steel was required to fill out confidential questionnaires in connection with each antidumping and countervailing duty complaint filed with the ITC, which detailed the Company's capital expenditures and effects on investments, amongst other information. Based on a blank questionnaire, issued in the corrosion-resistant steel

investigation (final), page 7, for example, U.S. Steel was required to detail any changes in its facility operations such as prolonged shutdowns, disruptions, or production curtailments. The questionnaire, at pages 11-12, also required U.S. Steel to report its average production capacity versus actual production.

174.    In testimony before the ITC on May 26, 2016 in *Certain Corrosion-Resistant Steel Products from China, India, Italy, Korea, and Taiwan* (Investigation Nos. 701-TA-534-538 and 731-TA-1274-1278), expert Jim Dougan of Economic Consulting Services, LLC testified on behalf of respondents, stating:

> In presenting its case, the domestic industry points to an increase in subject import volume, a decline in market share and allegedly inadequate profits, but without acknowledging some of the basic realities of the marketplace.
>
> \*\*\*
>
> To begin, there were ***no adverse volume effects by reason of subject imports***. First, subject imports' volume increased only in 2014 when the Commission found no reasonable indication of current material injury. As shown in prehearing report Table C-1, during 2014, the industry's production and capacity utilization increased and were at their highest levels of the POI.
>
> ***The industry's reported capacity utilization in both 2014 and 2015 would undoubtedly been higher if not for the effect of supply disruptions that limited the practical capacity of many domestic producers*** *and drew both subject and non subject imports into the market.*
>
> Interestingly, in presenting their injury case, petitioners made no mention of these well-documented supply disruptions. Instead, they blamed subject imports for their decrease in market share, making no mention of the impact of 2014's cold winter on their operations. But in addition to the bad weather events of 2014, ***the domestic industry undertook extended maintenance outages and closed inefficient and outdated equipment lines in 2014, 2015 and 2016,*** *none of which are attributable to subject imports.*
>
> There are a myriad of contemporaneous press articles that document these disruptions, attached to respondents' prehearing brief. And much of that information is public, so I'll be happy to expand on that later if you like.
>
> ***U.S. Purchaser's Questionnaires in the final phase confirmed these supply disruptions.*** Sixteen of forty-two purchasers reported supply constraints, and

fourteen of them, which represent a very significant percent of purchases, their allegations repeated at prehearing brief for our Korean respondents, Pages 29 to 31. *These were not fictional supply constraints. They were real and they were significant.* ***In the case of U.S. Steel alone, one article noted that they lost 400,000 tons of production in 2014***.

***

The key employment indicators all rose from 2013 to 2015, and absent one producer, the sales volume of the rest of the industry increased. ***Additionally, although the domestic industry's market share declined, as we discussed in the prehearing briefs, it was attributable to significant supply disruptions in 2014 and 2015, the effects of which continue into the current year***.

***

So, you know, there is a number of these things that -- this isn't limited to January through March of 2014. ***This recurred again and again and again and it may have been most severe -- I mean the US Steel, 400,000 tons, 400,000 tons in 2014. That's a big number. And that was the most significant***, which is why you hear the most about it. But these things did not stop them.

(Emphasis added).

175.    Thus, while Defendant Longhi was assuring investors throughout the Class Period that, *inter alia*, "[w]e are starting to see the benefits as ***we have experienced fewer unplanned outages and lower maintenance costs***," "there has been and will be sustainable cost improvements through process efficiency and ***investments in reliability centered maintenance***," and "***no, we have not been under-spending***," (emphasis added), he was contemporaneously pleading with the ITC that "those investments that we need to make are being – ***we're not able to make them right now***," "[t]he situation we face is very grave," and the Company's financials "***are nowhere near where they need to be for us to invest in our future***." (Emphasis added).

## VIII.    U.S. STEEL LAUNCHES STRATEGICALLY TIMED SECONDARY OFFERING

176.    As discussed *supra* SOF at VII, the Company's failure to engage in preventative maintenance and timely repairs resulted in numerous unplanned outages, which cost the Company as much as $1 million per day. As the number of outages and plant shutdowns increased in 2016, the Company was in desperate need of cash to continue its operations and repair its facilities. Accordingly, the Defendants discretely engaged in a secondary offering in August of 2016. At the time of the SPO, the Company stated it intended to "use the net proceeds from the offering for financial flexibility, capital expenditures and other general corporate purposes." However, on April 25, 2017, Defendant Longhi admitted that the true reason the SPO was conducted was "to give us the financial strength and liquidity ***to position us to establish an asset revitalization plan large enough to resolve our issues*** and to see that plan through to completion." (Emphasis added).

177.    Specifically, on August 8, 2016, Defendants filed a preliminary prospectus supplement (the "SPO Prospectus") with the SEC indicating the Company would be offering 17 million shares of common stock for sale. The SPO Prospectus also granted the underwriters an option to purchase up to an additional 2.55 million shares of common stock. The underwriters for the SPO include J.P Morgan Securities LLC, Goldman Sachs & Co., Barclays Capital Inc., Wells Fargo Securities, LLC, Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., PNC Capital Markets LLC, Scotia Capital (USA) Inc., Citizens Capital Markets, Inc., SunTrust Robinson Humphrey, Inc., BNY Mellon Capital Markets, LLC, Citigroup Global Markets, LLC, Commerz Markets LLC, The Huntington Investment Company, SG America Securities, LLC, The Williams Capital Group, L.P., and ING Financial Markets LLC.

178.    A few days later, on August 11, 2016, the Company filed a prospectus supplement (the "Expanded SPO Prospectus") announcing that the size of the SPO was being expanded to 18.9 million shares of common stock. The Expanded SPO Prospectus reiterated that the SPO was being conducted for "financial flexibility, capital expenditures and other general corporate purposes." The Expanded SPO Prospectus also granted the underwriters an option to purchase an additional 2.835 million shares of common stock.

179.    The SPO was a firm commitment underwriting meaning the underwriters agreed to purchase all of the shares in the offering and sell them to the investing public. Accordingly, pursuant to the Underwriting Agreement between U.S. Steel and the underwriters, each underwriter was obligated to purchase the following number of shares:

| Underwriter | Number of shares |
|---|---|
| J.P Morgan Securities LLC | 6,418,240 |
| Goldman Sachs & Co. | 5,348,534 |
| Barclays Capital Inc. | 1,355,730 |
| Wells Fargo Securities, LLC | 1,355,730 |
| Credit Suisse Securities (USA) LLC | 625,722 |
| Morgan Stanley & Co. LLC | 625,722 |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 725,736 |
| PNC Capital Markets LLC | 343,770 |
| Scotia Capital (USA) Inc. | 343,770 |
| Citizens Capital Markets, Inc. | 229,180 |
| SunTrust Robinson Humphrey, Inc. | 229,180 |
| BNY Mellon Capital Markets, LLC | 190,983 |
| Citigroup Global Markets, LLC | 190,983 |
| Commerz Markets LLC | 190,983 |
| The Huntington Investment Company | 190,983 |
| SG America Securities, LLC | 190,983 |
| The Williams Capital Group, L.P. | 190,983 |
| ING Financial Markets LLC | 152,788 |
| **Total:** | **18,900,000** |

180.    The Company estimated such expenses, excluding underwriting discounts and commissions, would be approximately $500,000. The underwriters received a total of $15.2 million in underwriting discounts and commissions.

181.    In total, U.S. Steel issued 21.735 million shares of common stock in the SPO at a price of $23.00 per share, netting proceeds of approximately $482 million.

182.    Meanwhile, unbeknownst to U.S. Steel investors, and as later admitted on April 25, 2017 by Defendant Longhi, these funds were expected to be used for a much needed asset revitalization program to make up for the fact the RCM program was never implemented. Defendant Longhi's April 25, 2017 admission leaves no doubt as to the reason for the SPO, when he unequivocally stated that "[w]e issued equity last August to give us the financial strength and liquidity to position us to establish an asset revitalization plan large enough to resolve our issues, and to see that plan through to completion." (Emphasis added).

183.    Accordingly, the SPO was conducted to provide funds for immediate and costly updates as a result of the increased unplanned outages and other operational challenges faced by U.S. Steel, and was not conducted for "financial flexibility" as originally represented to investors.

## IX.    WITH THE "WRITING ON THE WALL," DEFENDANTS LONGHI AND BURRITT QUICKLY SELL THE MAJORITY OF THEIR PERSONAL HOLDINGS OF U.S. STEEL STOCK

184.    While Defendants were fully aware that U.S. Steel's Flat-Rolled facilities were experiencing increased unplanned outages and other operational challenges that necessitated immediate costly updates and improvements, the Individual Defendants unloaded their holdings of U.S. Steel stock at inflated prices. These sales began immediately after U.S. Steel's November 2016 announcement that the Company had faced "some operational challenges," including "unplanned outages in the third quarter [2016]," but while U.S. Steel's stock price was still

artificially inflated by the SPO and Defendant Longhi's tempering, unequivocal assertion on a November 2, 2016 conference call, that:

> And ***I would offer that, no, we have not been under-spending.*** What we've been doing is, we've only been able to accomplish what we've accomplished and gotten to the position that we are, because ***we've been investing appropriately in making sure that everything that we know is being addressed and moving to*** minimize the conditions that we experienced in the past quarter, which is unplanned events. So we've been able to get to this point, because we've been doing all of the right things.

(Emphasis added).

185.     As detailed further *infra* pp.137-140, the Individual Defendants sold approximately $25 million of personally held common stock over an abbreviated timeframe, under circumstances that were extremely suspicious in timing and amount. Specifically, neither Defendant Longhi nor Burritt had sold a single share of common stock before the start of the Class Period. Then, beginning just after U.S. Steel's partial disclosure of "some operational issues" and "unplanned outages" at its Flat-Rolled facilities on November 1, 2016 (and simultaneous representation by Defendant Longhi that "we have not been under-spending" and that "we've been investing appropriately"), they collectively sold or determined to sell 699,671 shares of U.S. Steel common stock over the course of only eight trading days, for total proceeds of $24,980,414.46.

186.     These sales began with Defendant Burritt's transaction on November 23, 2016 – just weeks after the Company's tempered partial disclosure of "some operational issues" and "unplanned outages" – where he sold $1,686,315 worth of common stock. Only two trading days later, on November 28, 2016, Defendant Longhi followed suit and sold shares for proceeds of $8,938,688 worth of common stock. Over the next seven trading days, between December 5 and 7, 2016, Longhi sold $5,775,142 worth of common stock. On February 21, 2017, Defendant Burritt sold shares of common stock for proceeds of $8.4 million. Thus, in effect, U.S. Steel's two primary

executives sold or determined to sell, in parallel, $25 million of personally held common stock over the course of only two weeks, immediately following their partial disclosure of "some operational issues," and "unplanned outages."

187.    These sales often correlated with market moving news days and/or days in which the Individual Defendants were in possession of material non-public information. For example, the executives' trades began shortly after the Company's August 2016 SPO, which was later disclosed to have been conducted to fund the Company's critically necessary asset revitalization process as U.S. Steel's Flat-Rolled facilities were experiencing severe operational issues and outages. Indeed, Defendant Longhi subsequently admitted on the last day of the Class Period – after he and Defendant Burritt had successfully sold approximately 57% and 64%, respectively, of their personal holdings – that the SPO had been conducted to "establish an asset revitalization plan large enough to resolve our issues." (Emphasis added). Further, Burritt sold approximately $8,363,327 in common stock on February 21, 2017, only eight days before he took over day-to-day control of the Company.

188.    In total, Defendant Longhi sold 443,250 shares over eight trading days for total proceeds of $14,930,871.40 representing 57% percent of his holdings and has not transacted since, while Defendant Burritt sold or determined to sell 256,421 shares over five trading days for total proceeds of $10,049,543.06 representing 64% percent of his holdings and has not sold a sing share of U.S. Steel stock since.

### X.    U.S. STEEL'S DECREASED PRODUCTION AND CAPACITY UTILIZATION CAUSE THE COMPANY TO LOSE SIGNIFICANT MARKET SHARE

189.    As a result of the U.S. Steel Defendants' decisions to defer maintenance and facility upgrades, U.S. Steel was unable to contend with competitors who maintained and repaired their modern equipment (such as mini mills using electric arc furnaces), which they use rather than older blast furnaces used in integrated steel production – which U.S. Steel uses exclusively.

190.    Mini-mills can more easily adjust production volume in response to changes in demand, and the steel market improved over the course of 2016, making it much easier for competitors to adjust to this demand with their electric furnaces. By deferring maintenance and upgrades, U.S. Steel was unable to increase shipments and capacity utilization as nimbly as competitors such as Nucor Corporation, AK Steel Holding Corporation, and Steel Dynamics, Inc. In fact, Defendants' decisions exacerbated the situation by causing outages and missed shipments which affirmatively reduced U.S. Steel's market share.

191.    The disparity between Defendants' capital spending and its peer group is illustrated in the chart below, which shows that while steel companies, such as Nucor Corporation, were increasing capital expenditures and investing in the future, U.S. Steel was doing the complete opposite and continuously decreasing its spending and focusing on near term cost cutting:



192.    Indeed, as May 4, 2017 article from The Motley Fool, entitled "*United States Steel Corporation Stock Plunged 34% in April: What Now*?, the author noted [w]hile Nucor turned the downturn into an opportunity by acquiring businesses and keeping its existing facilities in shape, U.S. Steel is upgrading its core facilities and fixing up inefficiencies now, at a time when it should be improving operational rates."

193.    As demonstrated in the chart below, based upon data from the 2016 Form 10-K and the 2016 Annual Statistical Report produced by the American Iron and Steel Institute,[16] U.S. Steel's market share shrunk year-over-year between 2014 and 2016 in every product category except coated steel, which remained approximately level between 2015 and 2016:

| U.S. Steel Shipments Compared with American Iron and Steel Institute Net Shipments by Domestic Producers[17] |
| --- |
| **(in thousands of tons)** |

---

[16] The American Iron and Steel Institute is a trade association of North American steel producers, including U.S. Steel, which was founded in 1908 by Elbert H. Gary who was U.S. Steel's chairman at the time.

[17] American Iron and Steel Institute ("AISI") data are from its 2016 Annual Statistical Report. AISI states "[g]ross shipments represent aggregate tonnage shipped by reporting companies including steel consumed by the companies in their own construction, maintenance, repair and operations, as well as in their own manufacture of fabricated products. Net shipments eliminate tonnage duplication by deducting from the gross total those shipments from one reporting company to another reporting company for conversion, further processing or resale."

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| **Hot Rolled Sheets** | | | |
| -   U.S. Steel | 4,909 | 3,283 | 2,784 |
| -   AISI Hot Rolled Sheets | 22,739 | 20,578 | 21,161 |
| **U.S. Steel Share of AISI Total** | **21.59%** | **15.95%** | **13.16%** |
| **Cold Rolled Sheets** | | | |
| -   U.S. Steel | 4,207 | 3,507 | 3,775 |
| -   AISI Cold Rolled Sheets | 11,248 | 10.038 | 10,972 |
| **U.S. Steel Share of AISI Total** | **37.4%** | **34.9%** | **34.4%** |
| **Coated Sheets** | | | |
| -   U.S. Steel | 3,316 | 2,511 | 2,655 |
| -   AISI Hot Dipped, Electrolytic, all other metallic coated sheets and strips | 18,199 | 17,674 | 18,316 |
| **U.S. Steel Share of AISI Total** | **18.2%** | **14.2%** | **14.5%** |
| **Tubular** | | | |
| -   U.S. Steel | 1,622 | 593 | 400 |
| -   AISI Standard Pipe, OCTG, line pipe | 4,400 | 2,229 | 2,070 |

| U.S. Steel Share of AISI Total | 36.9% | 26.6% | 19.3% |
|---|---|---|---|

194.    At the same time the Defendants ultimately announced a net loss of $180 million in the First Quarter of 2017, its competitors all announced profits. For example, on April 20, 2017, Nucor Corporation announced consolidated net earnings of $356.9 million, or $1.11 per diluted share, for the first quarter of 2017. On April 25, 2017, AK Steel reported net income of $62.5 million, or $0.19 per diluted share of common stock, for the first quarter of 2017, compared to a net loss of $13.6 million, or $0.08 per diluted share, for the first quarter of 2016. On April 19, 2017, Steel Dynamics, Inc. reported first quarter 2017 net income of $201 million, or $0.82 per diluted share, with net sales of $2.4 billion.

195.    U.S. Steel continues to significantly underperform its competitors.

## XI.    THE FAILURE OF "CARNEGIE WAY" RESULTS IN DEFENDANT LONGHI BEING PHASED OUT AS CEO

196.    On February 28, 2017, U.S. Steel announced that Defendant Burritt had been elected to the positions of President and Chief Operating Officer of the Company, and would assume all responsibility for the day-to-day operations of U.S. Steel in the United States and Central Europe. This announcement signaled the first step in the transition of power from Longhi to Burritt and the Company's abandonment of the botched Carnegie Way initiative.

197.    Then, on May 10, 2017, U.S. Steel announced that Defendant Longhi was retiring as CEO, effective immediately, and that Burritt would assume the role in place of Longhi. Conspicuously, Defendant Longhi's retirement came merely two weeks after the Company had announced its dreadful first quarter 2017 results, which reflected deteriorating financial results despite improved market conditions due to the Company's operational challenges.

198.    Despite layoffs, plant closures, lack of profit, under-invested facilities and equipment, and a reported net loss for the 2016 fiscal year of $440 million, Longhi received a $4.35 million bonus for the 2016 fiscal year– his largest bonus ever.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

199.    In order to conceal the Company's true condition from investors throughout the Class Period, Defendants issued a series of pervasive and material misstatements and omitted material facts in the Company's public filings, press releases, conference calls, investor presentations and other documents. These material misstatements and omissions created the false impression that U.S. Steel was not experiencing severe unplanned outages and operational issues at its Flat-Rolled facilities, and that the Company was actually investing in and maintaining its facilities. Indeed, Defendants were fully aware in 2015 that U.S. Steel's Flat-Rolled facilities were experiencing increased unplanned outages and other operational challenges that necessitated immediate costly updates and improvements.

200.    This false impression caused the Company's stock price to be artificially inflated throughout the Class Period and, among other things, facilitated the Individual Defendants' massive insider sales.

### I.    FALSE AND MISLEADING STATEMENTS IN THE JANUARY 2016 PRESS RELEASE AND PRESENTATIONS

201.    On January 26, 2016 after the market closed, U.S. Steel issued a press release, entitled *United States Steel Corporation Reports 2015 Fourth Quarter and Full Year Results with Strong Liquidity and Positive Operating Cash Flow Under Challenging Market Conditions*, announcing the Company's fourth quarter 2015 and annual 2015 financial results (the "2015 Press Release"). In the 2015 Press Release, the Company reported an annual net loss and adjusted net

loss of $1.5 billion, or $10.32 per diluted share, and $262 million, or $1.79 per diluted share, respectively. U.S. Steel also reported revenue of $11.6 billion, down $5.9 billion from $17.5 billion in 2014.

202.    With respect to the Flat-Rolled segment, the Company reported an EBIT loss for 2015 of $237 million, down from positive EBIT in 2014 of $709 million. In explaining the decline in the Company's fourth quarter and annual 2015 financial results for its Flat-Rolled segment, Defendants blamed it all on the "challenging" market conditions causing a "decrease in average realized prices:"

> Fourth quarter results for our Flat-Rolled segment declined as compared to the third quarter primarily due to a decrease in average realized prices. Imported flat- rolled products, much of which we believe are dumped and/or subsidized, continued to harm the domestic market, as they did for all of 2015, placing downward pressure on both our spot and our contract prices. Our average realized prices declined during the fourth quarter by approximately $30 per ton, while fourth quarter shipments were comparable to third quarter. Full-year Flat-Rolled segment results for 2015 declined from 2014 driven by lower shipments and average realized prices due primarily to the negative impact of imports, as described above, and high supply chain inventories . . . .

203.    In the 2015 Press Release, Defendant Longhi praised the purported benefit of the Carnegie Way initiative, falsely assuring investors that U.S. Steel was experiencing "real" and "significant progress:"

> The ***$815 million of Carnegie Way benefits we realized*** in 2015 show that we continue to make ***significant progress*** on our journey toward our goal of achieving economic profit across the business cycle. ***Our progress is real*** and ***it is substantial***, but our fourth quarter and full-year results show that it is not yet enough to fully overcome some of the worst market and business conditions we have seen.

(Emphasis added).

74

204.    Despite the U.S. Steel Defendants' undisclosed decision to defer spending on desperately needed maintenance and upgrades to its manufacturing facilities and infrastructure, they applauded the Company's "positive operating cash flow of $359 million for the year ended December 31, 2015," with $755 million in reported cash.

205.    Commenting on U.S. Steel's 2016 Outlook, Defendant Longhi assured investors that U.S. Steel was successfully "positioned to respond to improving market conditions" and expected 2016 adjusted EBITDA to "be near breakeven" under current market conditions:

> We have a strong and growing pipeline of Carnegie Way projects that will provide benefits in our operating segments and all other areas of our company. The substantive changes and improvements we are making continue to increase our earnings power. We are working hard every day to serve our customers and are ***well positioned to respond to improving market conditions***.

(Emphasis added).

206.    In connection with the January 2016 Press Release, U.S. Steel also provided a Fourth Quarter and Full Year 2015 Earnings Conference Call and Webcast Presentation (the "2015 Earnings Presentation") and a Fourth Quarter 2015 Questions and Answers Presentation (the "Q4 2015 Q&A Packet") posted on the Company's website.

207.    The 2015 Earnings Presentation falsely reported a "realized" Carnegie Way benefit of $815 million, attributing $647 million to the Flat-Rolled Segment.

208.    The Q4 2015 Q&A Packet falsely stated that:

- Carnegie Way was "***much more than a cost cutting initiative***, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support."

- U.S. Steel had: "***achieved sustainable cost improvements through process efficiencies and our investments in reliability centered maintenance (RCM)***, and we will continue to find process improvements that enable us to better serve our customers and reward our stakeholders."

209.    The above statements were materially false and misleading when made because: (i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) the purported "realized" Carnegie Way benefit of $815 million was materially overstated because the Defendants recognized purported cost savings for "multiple" projects every week ranging in an estimated value of up to $4-$5 million before the projects were complete or, in some instances, before they were even implemented; (iii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iv) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 that "those investments that we need to make are being – *we're not able to make them right now*," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and the situation was "grave"; (v) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first quarter of 2016 (*see* SOF at VII, *supra*); (vi) as a result of (iii) through (v) above, the decrease in sales and shipments was not attributable to market factors but, instead, was Company-specific; (vii) U.S. Steel's purported positive operating cash flow was at the expense of the U.S. Steel Defendants' decision to defer desperately needed maintenance and capital spending; and, thus (viii) U.S. Steel's business and prospects were far worse than represented.

## II.    FALSE AND MISLEADING STATEMENTS ON THE JANUARY 27, 2016 INVESTOR CONFERENCE CALL

210.    On January 27, 2016, the Individual Defendants held an investor conference call with analysts to discuss the Company's fourth quarter and full year 2015 financial results (the "January 2016 Call"). During the January 2016 Call, Defendant Burritt falsely claimed that U.S. Steel was making investments to achieve its "long-term strategy:"

> [W]e know we are managing our business to maintain a strong cash position and to be prepared to respond quickly when the recovery begins. We said last quarter that we will be disciplined on our capital allocation strategies and decisions and ***will continue to make the investments that support our long-term strategy*** but we will do so in a manner and at a pace that is appropriate based on our ability to generate cash.

(Emphasis added). According to the U.S. Steel Defendants, the Company's long-term strategy under the Carnegie Way program was to, among other things, improve the "reliability of our operations."

211.    Defendant Burritt further assured investors that U.S. Steel was "deeply focused" on the manufacturing processes and "creating a more reliable and agile operating base that lowers [the Company's] breakeven point and improves [its] ability to adapt quickly to changing market conditions while providing superior quality and delivery performance for [U.S. Steel's] customers."

212.    Remarkably, Longhi stated that the Company was "realizing [operating efficiencies] from higher utilization rates" and that "if you look at the improvements that are being put in place, it's not going to require us to go back to the full volume to deliver even better results." Longhi further stated "[w]e can go to higher utilization rates at our current facilities. We're not required to go back to full volume in order to produce better results."

213.    The above statements were materially false and misleading when made because: (i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iii) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 that "those investments that we need to make are being – *we're not able to make them right now*," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and the situation was "grave"; (iv) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first quarter of 2016 (*see* SOF at VII, *supra*); and, thus, (v) U.S. Steel's business and prospects were far worse than represented.

### III.    FALSE AND MISLEADING STATEMENTS IN THE 2015 FORM 10-K

214.    On February 29, 2016, U.S. Steel filed its Annual Report on Form 10-K with the SEC for the year-ended December 31, 2015 (the "2015 Form 10-K"), which was signed by defendants Longhi and Burritt.

215.    The 2015 Form 10-K contained essentially the same false and misleading statements as the 2015 Press Release. In the 2015 Form 10-K, the Defendants also made material misstatements concerning U.S. Steel's: (1) Carnegie Way benefits and results; (2) declining financial results as being attributable primarily to market factors; and (3) outlook and financial forecasts.

216.    Specifically, in the 2015 Form 10-K, the Defendants falsely represented with respect to the Carnegie Way initiative that U.S. Steel's "progress is real and it is substantial." (Emphasis added).

217.    The Company also reported $815 million of purported Carnegie Way benefits realized in 2015.

218.    With respect to the substantial decrease in net sales, Defendants blamed it primarily on unfavorable market conditions without any mention of the Company's failure to properly invest and maintain its asset base:

> Decrease in net sales in 2015 is primarily due to decreased shipment volumes and lower average realized prices as a result of challenging market conditions, including high import levels, much of which we believe are unfairly traded, which have served to reduce shipment volumes and drastically depress both spot and contract prices.
>
> *          *          *
>
> The decrease in sales for the Flat-Rolled segment primarily reflected a decrease in shipments (decrease of 3,313 thousand net tons), which includes the deconsolidation of USSC (represents 1,532 thousand net tons, or 46%, of the total volume decrease) and lower average realized prices (decrease of $77 per net ton) ***as a result of market conditions, including high import levels, which has served to reduce shipment volumes*** and drastically depress both spot and contract prices. . . The decrease in sales for the Tubular segment primarily reflected lower shipments (decrease of 1,151 thousand net tons) as a result of decreased drilling activity and continued high import levels and lower average realized prices (decrease of $74 per net ton).

(Emphasis added).

219.    The above statements were materially false and misleading when made because: (i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) the purported "realized" Carnegie Way benefit of $815 million was materially overstated because Defendants recognized purported cost savings for "multiple" projects every week ranging in an estimated value of up to $4-$5 million before the

projects were complete or, in some instances, before they were even implemented; (iii) the Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iv) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first quarter of 2016 (see SOF at VII, supra); (v) as a result of (iii) and (iv) above, the decrease in sales and shipments was not attributable to market factors but, instead, was Company-specific; and, thus (vi) U.S. Steel's business and prospects were far worse than represented.

220.    In response to the above material misstatements, U.S. Steel's stock price increased 24.5% from $9.12 per share on February 29, 2016 to $11.35 per share on March 2, 2016.

## IV.    FALSE AND MISLEADING STATEMENTS IN THE APRIL 26, 2016 PRESS RELEASE AND PRESENTATIONS

221.    On April 26, 2016, U.S. Steel issued a press release, entitled "*United States Steel Corporation Reports 2016 First Quarter Results with Strong Liquidity and Positive Operating Cash Flow Under Challenging Market Conditions*," announcing the Company's first quarter 2016 financial results (the "April 2016 Press Release"). In the April 2016 Press Release, the Company reported a first quarter net loss of $340 million, or $2.32 per diluted share. U.S. Steel's reported revenues decreased by $231 million and $931 million as compared to $2.6 billion in the fourth quarter 2015 and $3.3 billion in the first quarter of 2015, respectively.

222.    In particular, for the Flat-Rolled segment, the Company reported an EBIT loss for the first quarter 2016 of $188 million, as compared to an $88 million EBIT loss in the fourth quarter 2015 and $67 EBIT loss for the first quarter 2015. In the accompanying Segment and Financial Operating Data Presentation, U.S. Steel reported tons shipped for the first quarter 2016 of 2,498 thousand as compared to 2,617 thousand tons for the first quarter of 2015 and 2,591

thousand tons for the fourth quarter 2015.

223.    Commenting on U.S. Steel's first quarter 2016 results, Defendant Longhi claimed Carnegie Way benefits realized for the first quarter 2016 of $100 million and falsely assured investors:

> We took significant actions to align our overhead costs with our operations, contributing $100 million to our Carnegie Way benefits for this year. We remain focused on reducing our costs, ***improving the quality and reliability of our operations***, and working with our customers to deliver differentiated solutions that will improve our market position and create value for all of our stakeholders. We ***are well-positioned to benefit from currently improving market conditions for our Flat-Rolled*** and European segments.

224.    In explaining the decline in the Company's first quarter 2016 results for its Flat-Rolled segment, the U.S. Steel Defendants, again, blamed it primarily on poor market conditions and did not attribute any of the Company's declining sales or inability to take advantage of improving raw material and energy prices to U.S. Steel's outdated and poorly maintained infrastructure that was significantly affecting production:

> First quarter results for our Flat-Rolled segment declined as compared to the fourth quarter primarily due to decreases in average realized prices for our contract business and slightly lower average spot prices compared to the fourth quarter. Seasonally lower results from our mining operations and a $50 million unfavorable effect from planned liquidations of inventory costed using the last-in- first-out (LIFO) method related to our targeted working capital reductions in 2016 contributed to the decline in results in the first quarter. The favorable impacts of lower raw materials and energy prices, lower spending and overhead costs, and increased operating efficiencies from our current operating configuration only partially offset the unfavorable items

225.    Moreover, despite the Individual Defendants' undisclosed decision to defer spending on desperately needed maintenance and upgrades to its manufacturing facilities and infrastructure, U.S. Steel highlighted its "positive operating cash flow" of $113 million for the first quarter 2016 with $705 million in reported cash.

226.    Commenting on U.S. Steel's 2016 Outlook, Defendant Longhi told investors that "recent increases in prices for flat-rolled products will begin to be reflected in [U.S. Steel's] results in the second quarter" and the Company would "benefit from the improving market conditions."

227.    U.S. Steel also increased the Company's 2016 forecast from "breakeven" to "2016 adjusted EBITDA [of] near $400 million" and projected Flat-Rolled segment results to be "higher than" 2015 results.

228.    In connection with the April 2016 Press Release, U.S. Steel also provided a First Quarter 2016 Earnings Presentations (the "Q1 2016 Earnings Presentation") and a First Quarter 2016 Questions and Answers Presentation (the "Q1 2016 Q&A Packet") posted on the Company's website.

229.    The Q1 2016 Earnings Presentation contained similar false and misleading statements concerning the purported benefits of the Carnegie Way initiative and that the Company was positioned to take advantage of positive changes to market conditions:

- "Including the benefits from projects we implemented during the first quarter, our new total for the *full year impact from Carnegie Way benefits in 2016 is $600 million* as compared to 2015 as the base year. These benefits resulted from the *completion of almost 500 projects* in the first quarter. . . particularly in the areas of manufacturing and supply chain, where we have our greatest opportunities for improvement.

- We *continue to implement our reliability centered maintenance process across all of our facilities. The benefits are starting to be reflected in fewer unplanned outages and lower maintenance costs and are allowing for a more efficient allocation of to be reflected in fewer unplanned outages and lower maintenance costs*, and are allowing for a more efficient allocation of our maintenance labor force."

- "The Company is undertaking "*operating updates*" at "Steelmaking facilities[,] Flat-Rolled finishing facilities[,] . . . Tubular facilities [and] U.S. Steel Europe."

- "The Carnegie Way methodology remains a powerful driver of new value creating projects . . . Our pace of progress on the Carnegie Way transformation continues to exceed our expectations. The continuing benefits are improving

our capability to earn the right to grow and then ***drive sustainable profitable growth*** over the long-term . . . .

230.    Similarly, the Q1 2016 Q&A Packet falsely stated that:

- Carnegie Way was "***much more than a cost cutting initiative***, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support."

- U.S. Steel had "achieved sustainable cost improvements through process efficiencies ***and our investments in reliability centered maintenance*** (RCM), and we will continue to find process improvements that enable us to better serve our customers and reward our stakeholders."

231.    The above statements were materially false and misleading when made because:

(i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) the purported "realized" Carnegie Way benefit of $100 million was materially overstated because the Defendants recognized purported cost savings for "multiple" projects every week ranging in an estimated value of up to $4-$5 million before the projects were complete or, in some instances, before they were even implemented; (iii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iv) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 that "those investments that we need to make are being – we're not able to make them right now," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and the situation was "grave"; (v) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first quarter of 2016 (see SOF at VII, supra); (vi) as a result of (iii) through (v) above, the decrease in sales and shipments was not attributable to market factors but,

instead, was Company-specific; (vii) U.S. Steel's purported positive operating cash flow was at the expense of Defendants' decision to defer desperately needed maintenance and capital spending; and, thus (viii) U.S. Steel's business and prospects were far worse than represented.

232.    On this news Macquarie Capital, Inc., downgraded the Company's stock to "Underperform," noting in its April 28, 2016 article that "[w]e expect a stronger [second half of 2016] based on improving pricing, but [X's] volume is not expected to rise much and the high fixed cost base should limit X's ability to meet its EBITDA goal."

## V.    FALSE AND MISLEADING STATEMENTS IN THE APRIL 27, 2016 INVESTOR CONFERENCE CALL

233.    On April 27, 2016, the Individual Defendants held an investor call to discuss the Company's first quarter 2016 financial results (the "April 2016 Call"). When asked about recent undisclosed unplanned outages, defendant Burritt minimized the outages stating:

> *Operations are normal*, they are stable. Europe has concluded a couple of planned maintenance that they needed to do. We had a little bit of an issue, Gary over back, but all furnaces are back and running and the downstream lines are shape. Everything is going okay.

234.    Defendant Longhi downplayed the outages, characterizing them as "minor repairs."

235.    When asked by analyst Anthony Rizzuto of Cowen & Co. LLC about U.S. Steel's ability to increase shipment volumes to increase market share, Defendant Burritt assured investors that the Company was ready, willing and able to meet market demands as they increase:

> Q: Tony Rizzuto: You're welcome. Thank you. The shipment volumes, I have a question about that, with your current configuration the flat-rolled segment and imports declining. Do you expect you'll be able to regain some market share?

> A: David Burritt: Well, we have been supplying the customers with whatever they needed and we have re-positioned the footprint in order to better acclimate to the current market conditions. But *we remain also ready to increase our supply and sooner the market from a volume perspective demonstrate some real sustainability*. We are not going to hastily moving to bring in more capacity on line unless you see that there is real sustainable increase in the market demand.

236.    The above statements were materially false and misleading when made because: (i) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (ii) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 that "those investments that we need to make are being – *we're not able to make them right now*," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and the situation was "grave"; (iii) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first quarter of 2016 (*see* SOF at VII, *supra*); (iv) the unplanned outages and increased repairs were the direct result of the Individual Defendants' decision not to invest in U.S. Steel's infrastructure; and, thus (v) U.S. Steel's business and prospects were far worse than represented.

## VI.    FALSE AND MISLEADING STATEMENTS IN THE APRIL 27, 2016 FORM 10-Q

237.    On April 27, 2016, the U.S. Steel filed its quarterly report on Form 10-Q for the period-ended March 31, 2016 (the "First Quarter 2016 Form 10-Q") with the SEC, which was signed by Defendants Longhi and Burritt. The First Quarter 2016 Form 10-Q contained nearly identical false and misleading statements as the April 2016 Press Release and April 2016 Call.

238.    In addition, the First Quarter 2016 Form 10-Q, Defendants blamed the decline in results for the Flat-Rolled segment solely to market factors:

> The decrease in Flat-Rolled results for the three months ended March 31, 2016 compared to the same period in 2015 resulted from lower average realized prices (approximately $395 million) as a result of challenging market conditions, including high import levels, which have served to drastically depress both spot and contract prices and lower steel substrate sales to our Tubular segment (approximately $20 million).

239.    With respect to the Company's 2016 Outlook, Defendants stated that U.S. Steel would achieve adjusted EBITDA of $400 million if market conditions remained the same.

240.    The above statements were materially false and misleading when made because: (i) the Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (ii) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 that "those investments that we need to make are being – *we're not able to make them right now*," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and the situation was "grave"; (iii) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first quarter of 2016 (*see* SOF at VII, *supra*); (iv) the unplanned outages and increased repairs were the direct result of the Individual Defendants' decision not to invest in U.S. Steel's infrastructure; and, thus (v) U.S. Steel's business and prospects were far worse than represented.

## VII.    FALSE AND MISLEADING STATEMENTS IN THE JULY 26, 2016 PRESS RELEASE AND PRESENTATIONS

241.    On July 26, 2016, U.S. Steel issued a press release, entitled "United States Steel Corporation Reports Improved Second Quarter Results and Stronger Cash and Liquidity Position," announcing the Company's second quarter 2016 financial results (the "July 2016 Press Release"). In the July 2016 Press Release, the Company reported essentially flat sales with a negligible increase of $243 million for the second quarter 2016 as compared to the first quarter 2016 and a decrease of $316 million as compared to the same quarter of 2015.

242.    Defendants reported EBIT for the Flat-Rolled segment of just $6 million for the second quarter 2016. In the accompanying Segment and Financial Operating  Data Presentation, U.S. Steel reported tons shipped for the second quarter 2016 of 2,692 thousand as compared to 2,712 thousand tons in the second quarter of 2015.

243.    Despite the Individual Defendants' undisclosed decision to defer spending on desperately needed maintenance and upgrades to its manufacturing facilities and infrastructure, U.S. Steel highlighted its "positive operating cash flow" of $313 million for the six months ended June 30, 2016 with $820 million in reported cash.

244.    Commenting on U.S. Steel's 2016 Outlook, Defendant Longhi assured investors that U.S. Steel's financial performance would continue to improve as a result of Carnegie Way benefits, which had paved the way for the Company to take advantage of improving market conditions:

> The **significant improvements we have made to our earnings power through our Carnegie Way transformation will become more apparent as market prices recover** from the very low levels at the end of 2015. While we began to realize some benefit from recent price increases in the second quarter, we will see better average realized prices, primarily in our Flat-Rolled and European segments, in the second half of the year. . . **Our Carnegie Way journey continues to create improvements in our business model that will enable us to be profitable** across the business cycle.

245.    U.S. Steel also increased the Company's 2016 forecast from "2016 adjusted EBITDA [of] near $400 million" to adjusted EBITDA of $850 million and net earnings to $50 million, or $0.34 per share, and reaffirmed that the Flat-Rolled segment results would be "higher than" 2015 results. The Individual Defendants further promised investors that the Company would be "cash positive for the year, including approximately $400 million of cash benefits from working capital improvements in 2016, **primarily related to better inventory management, driven by improved sales and operations planning practices**, helping to offset growing accounts

receivables balances." (Emphasis added).

246.    In conjunction with the July 2016 Press Release, U.S. Steel provided a Second Quarter 2016 Earnings Presentation (the "Q2 2016 Earnings Presentation") and a Second Quarter 2016 Questions and Answers Presentation (the "Q2 2016 Q&A Packet") posted on the Company's website.

247.    The Q2 2016 Earnings Presentation reported purported realized Carnegie Way benefits of $115 million and falsely claimed U.S. Steel was implementing its RCM Carnegie Way initiative and observing "fewer unplanned outages:"

- Including the benefits from projects we implemented during the second quarter, our new total for *the full year impact from Carnegie Way benefits in 2016 is $645 million* as compared to 2015 as the base year. These benefits resulted from the *completion of almost 400 projects* in the second quarter . . . particularly in the areas of manufacturing and supply chain, where we have our greatest opportunities for improvement.

- "We *continue to implement our reliability centered maintenance process across all of our facilities*. We are *starting to see the benefits as we have experienced fewer unplanned outages and lower maintenance costs*, and are allowing for a more efficient allocation of our maintenance labor force."

- "The Carnegie Way methodology remains a powerful driver of new value creating projects. . . ."

248.    Similarly, the Q2 2016 Q&A Packet contained the following material misstatements:

[The Carnegie Way] is much more than a cost cutting initiative, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support. Carnegie Way is our culture and the way we run the business. . . We *have achieved sustainable cost improvements through process efficiencies and our investments in reliability centered maintenance (RCM),* and we will continue to find process improvements that enable us to better serve our customers and reward our stakeholders.

249.    The above statements were materially false and misleading when made because: (i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) the purported "realized" Carnegie Way benefit of $115 million was materially overstated because the Defendants recognized purported cost savings for "multiple" projects every week ranging in an estimated value of up to $4-$5 million before the projects were complete or, in some instances, before they were even implemented; (iii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iv) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 and May 24, 2016 that "those investments that we need to make are being – ***we're not able to make them right now***," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and operating margins "are nowhere near where they need to be for us to invest in our future;" (v) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first and second quarters of 2016 (*see* SOF at VII, *supra*); (vi) as a result of (iii) through (v) above, the decrease in sales and shipments was not attributable to market factors but, instead, was Company-specific; (vii) U.S. Steel's purported positive operating cash flow was at the expense of Defendants' decision to defer desperately needed maintenance and capital spending; and, thus (viii) U.S. Steel's business and prospects were far worse than represented.

## VIII.    FALSE AND MISLEADING STATEMENTS IN THE JULY 27, 2016 CONFERENCE CALL

250.    On July 27, 2016, Defendants held a conference call with analysts to discuss the Company's second quarter 2016 financial results (the "July 2016 Call"). Despite reporting a net loss of $46 million, or $0.32 per share, Defendant Longhi claimed U.S. Steel was successfully implementing the Carnegie Way, which had "greatly enhanced [the Company's] earnings power" and, thus, U.S. Steel was "***well-positioned to deliver strong results under current market conditions***." (Emphasis added).

251.    When asked by analyst David Gagliano of BMO Capital Markets about the Company's "volume expectations over the next couple of quarters," Defendant Longhi assured investors that U.S. Steel was making investments in its assets and growing:

> Well, we do have certainly several projects that we're contemplating going forward. But we haven't quite stopped doing it. ***There are so many investments that we're making***, that are making us so much better, and there's still opportunity for improvement within what we have. ***So, the opportunity for growth is real, it is happening***. And what we are considering, it's really more value rather than just volume. And you're seeing that, as I referred to my initial remarks here, we continue to evolve into that chain. We're doing well, and that's sort of an important feature as we think about how we go forward.

(Emphasis added).

252.    In response to a question from analyst Michael F. Gambardella of JPMorgan Securities LLC during the July 2016 Call about whether U.S. Steel had a sufficient supply of hot-rolled steel if needed, Defendant Longhi responded "***we certainly are capable of supplying – we still have capacity available. So, the answer would be, yes, I mean, we're still ready to support the market***." (Emphasis added).

253.    Finally, when asked by analyst Jorge M. Beristain of Deutsche Bank Securities about maintenance and outages in the flat-rolled segment in the second quarter, Defendant Lesnak minimized the outages claiming they were "not …material."

**Jorge M. Beristain - Deutsche Bank Securities, Inc.**
Hey, guys. Good morning and congrats on the results. My question just is, what were specifically the maintenance and outage costs in the second quarter for Flat-Rolled?

**Dan Lesnak - General Manager-Investor Relations**
All right. So we would just point out they were higher in the prior, but ***they were not – we'd say material.*** They were not – it was a normal planned blast furnace outage that we had. It wasn't a reline; so was the maintenance outage. So, I mean, it's just a change quarter-over-quarter, but it's starting on an unusual spend for us. It's just really – you can't really smooth it out across the quarter. It just gets lumpy. That's why we tend to call it out when there's a change quarter-to-quarter.

254.    The above statements were materially false and misleading when made because:

(i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iii) Steel was no making "so many" investments, it was making no investments; (iv) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 and May 24, 2016 that "those investments that we need to make are being – ***we're not able to make them right now***," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and operating margins "are nowhere near where they need to be for us to invest in our future;" (v) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first and second quarters of 2016 (*see* SOF at VII *supra*); (vi) as a result of (ii) through (v) above, U.S. Steel's was not "well-positioned to deliver strong results under current market conditions because the Company lacked the capacity to meet market demand due to underinvesting and failing to maintain its facilities.

### IX.    FALSE AND MISLEADING STATEMENTS IN THE JULY 27, 2016 FORM 10-Q

255.    On July 27, 2016, U.S. Steel filed its quarterly report on Form 10-Q for the period-ended June 30, 2016 (the "Second Quarter 2016 Form 10-Q") with the SEC, which was signed by Defendants Longhi and Burritt. The Second Quarter 2016 Form 10-Q contained  nearly identical false and misleading statements as the July 2016 Press Release and July 2016 Call.

256.    Specifically, in the Second Quarter 2016 Form 10-Q, the Defendants blamed the decline in results for the Flat-Rolled segment primarily to market factors:

> The decrease in sales for the Flat-Rolled segment primarily reflected lower average realized prices (decrease of $53 per net ton) due to lower average contract prices year over year on both fixed price and quarterly adjustable contracts, that do not yet reflect the recent price increases resulting from the more balanced supply and demand relationship in the North American flat-rolled market.

257.    With respect to the Company's 2016 Outlook, Defendants stated that U.S. Steel would achieve net earnings of $50 million, or $0.34 per share, and adjusted EBITDA of $850 million if market conditions remained the same.

258.    The above statements were materially false and misleading when made because: (i) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (ii) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 that "those investments that we need to make are being – *we're not able to make them right now*," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and the situation was "grave"; (iii) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first and second quarters of 2016 (*see* SOF at VII, *supra*); (iv) the unplanned outages and increased repairs were the direct result of the Individual

Defendants' decision not to invest in U.S. Steel's infrastructure; and, thus (v) U.S. Steel's business and prospects were far worse than represented.

259.    In response to the above material misstatements, U.S. Steel's stock price increased 29% from $21.31 per share on July 25, 2016 to $27.49 per share on July 29, 2016.

## X.    FALSE AND MISLEADING STATEMENTS IN THE AUGUST 8, 2016 PRESS RELEASE

260.    On August 8, 2016, U.S. Steel issued a press release entitled "*United States Steel Corporation Announces Proposed Common Stock Offering*," announcing that the Company had commenced an underwritten public offering of 17 million shares of common stock, which granted the underwriters a 30-day option to purchase up to 2,550,000 additional shares.

261.    According to the release, U.S. Steel "intends to use the net proceeds from the offering for financial flexibility, capital expenditures and other general corporate purposes."

262.    The above statement was materially false and misleading when made because: (i) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; and (ii) as Defendants would later admit in April 2017, ***"[w]e issued equity last August to give us the financial strength and liquidity to position us to establish an asset revitalization plan large enough to resolve our issues, and to see that plan through to completion***." (Emphasis added).

263.    In other words, Defendants' were admittedly aware back in August 2016 that U.S. Steel would need to undertake a "large," multi-year "asset- revitalization" in order to fix the Company's problems, yet failed to disclose these facts.

## XI.    FALSE AND MISLEADING STATEMENTS CONTAINED IN THE AUGUST 8, 2016 PRELIMINARY PROSPECTUS

264.    On August 8, 2016 Defendants announced a Secondary Public Offering of 17,000,000 shares of common stock and filed a preliminary prospectus supplement (the "SPO Prospectus") and an accompanying prospectus pursuant to the Securities Act of 1933, as amended.

265.    In the SPO Prospectus, Defendants incorporated by reference all of the statements contained in the 2015 Form 10-K, the Q1 2016 Earnings Presentation, the First Quarter 2016 Form 10-Q, the Q2 2016 Earnings Presentation, and the Second Quarter 2016 Form 10-Q, as follows:

> The SEC allows us to 'incorporate by reference' into this prospectus supplement the information in documents we file with it, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus supplement, and later information that we file with the SEC will update and supersede this information. We incorporate by reference the documents listed below and any future filings we make with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 . . .:
>
> a) Annual Report on Form 10-K for the year ended December 31, 2015;
> b) Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016 and June 30, 2016;
> c) Current Reports on Form 8-K filed on April 26, 2016 (solely with respect to Items 8.01 and 9.01 thereof), . . . July 26, 2016 (solely with respect to Items 8.01 and 9.01 thereof) . . . .

266.    Accordingly, by incorporating such statements by reference, and therefore, making such statements a part of the SPO Prospectus, the SPO Prospectus was materially false and misleading in the same manner and for the same reasons as all of the statements enumerated above that are contained in the 2015 Form 10-K (¶¶214-220), the Q1 2016 Earnings Presentation (¶¶228-232), the First Quarter 2016 Form 10-Q (¶¶237-240), the Q2 2016 Earnings Presentation (¶¶246-249), and the Second Quarter 2016 Form 10-Q (¶¶255-258).

## XII.    FALSE AND MISLEADING STATEMENTS CONTAINED IN THE AUGUST 11, 2016 PRELIMINARY PROSPECTUS

267.    On August 11, 2016 Defendants announced that they were expanding the size of the Secondary Public Offering to 18,900,000 shares of common stock and filed a preliminary prospectus supplement (the "Expanded SPO Prospectus") and an accompanying prospectus pursuant to the Securities Act of 1933, as amended.

268.    In the Expanded SPO Prospectus, Defendants incorporated by reference all of the statements contained in the 2015 Form 10-K, the Q1 2016 Earnings Presentation, the First Quarter 2016 Form 10-Q, the Q2 2016 Earnings Presentation, and the Second Quarter 2016 Form 10-Q, as follows:

> "The SEC allows us to 'incorporate by reference' into this prospectus supplement the information in documents we file with it, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus supplement, and later information that we file with the SEC will update and supersede this information. We incorporate by reference the documents listed below and any future filings we make with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 . . .:
>
> a)  Annual Report on Form 10-K for the year ended December 31, 2015;
> b)  Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016 and June 30, 2016;
> c)  Current Reports on Form 8-K filed on April 26, 2016 (solely with respect to Items 8.01 and 9.01 thereof), . . . July 26, 2016 (solely with respect to Items 8.01 and 9.01 thereof) . . . ."

269.    Accordingly, by incorporating such statements by reference, and therefore, making such statements a part of the Expanded SPO Prospectus, the Expanded SPO Prospectus was materially false and misleading in the same manner and for the same reasons as all of the statements enumerated above that are contained in the 2015 Form 10-K (¶¶214-220), the Q1 2016 Earnings Presentation (¶¶228-232), the First Quarter 2016 Form 10-Q (¶¶237-240), the Q2 2016 Earnings Presentation (¶¶246-249), and the Second Quarter 2016 Form 10-Q (¶¶255-258).

## XIII.    FALSE AND MISLEADING STATEMENTS IN THE NOVEMBER 1, 2016 PRESS RELEASE

270.    On November 1, 2016, U.S. Steel issued a press release, entitled "*United States Steel Corporation Reports Best Quarterly Results Since 2014*," announcing the Company's third quarter 2016 financial results (the "November 2016 Press Release"). In the November 2016 Press Release, the Company, again, reported essentially flat sales of $2.7 billion for the third quarter 2016 as compared to $2.6 billion in the second quarter 2016 and a decrease of $144 million as compared to the same quarter of 2015.

271.    Defendants reported EBIT for the Flat-Rolled segment of $114 million as compared to $6 million for the second quarter of 2016 and an EBIT loss of $18 million for the third quarter of 2015. In the accompanying segment presentation, Defendants reported total shipments for the third quarter 2016 of 2,535 thousand tons as compared to 2,692 thousand tons in second quarter of 2016 and 2,676 thousand tons in the third quarter of 2015.

272.    In the November 2016 Press Release, Defendant Longhi touted the Company's results as having improved "significantly" from the second quarter, minimized the unplanned outages that occurred in the third quarter, and falsely claimed that U.S. Steel and been investing in its assets all along stating:

> Our third quarter results improved significantly from the second quarter as each of our segments improved, resulting in our highest quarterly segment income since the fourth quarter of 2014. *We faced some operational challenges that limited our ability to realize the full benefits of an improved pricing environment, but we continued to make progress in our Carnegie Way transformation efforts. With our very strong cash and liquidity position, we remain focused on the investments that we need to **continue** to make* to revitalize our facilities and deliver value-enhancing solutions for our customers.

273.    Despite the unplanned outages in the Flat-Rolled Segment, the Defendants claimed results for that segment had "improved":

Third quarter results for our Flat-Rolled segment *improved* from the second quarter as both spot and contract prices increased, and benefits from an improving product mix and our Carnegie Way initiatives continued to grow. ***Operational issues adversely impacted shipments from our Flat-Rolled facilities. In the last half of the third quarter, we experienced unplanned outages at several of our steelmaking and finishing facilities. Our third quarter shipments were negatively impacted by approximately 125,000 tons as a result of unplanned outages***, as our streamlined plant operating configuration extends the time it takes to recover volumes from unplanned outages. A planned outage and lower operating rates at our mining operations also negatively impacted our results.

(Emphasis added).

274.    Moreover, despite the Individual Defendants' undisclosed decision to defer spending on desperately needed maintenance and upgrades to its manufacturing facilities and infrastructure, U.S. Steel applauded its "positive operating cash flow" of $577 million for the nine months ended September 30, 2016 with $1.4 billion in reported cash.

275.    With respect to the 2016 outlook, while the Defendants reduced U.S. Steel's guidance for 2016 to a net loss of $355 million and adjusted EBITDA of $475 million, down from the previous adjusted EBITDA guidance of $850 million, Defendant Longhi falsely assured investors:

As we move through the rest of 2016, operational issues remain a headwind for us, as we continue to recover from unplanned outages in the third quarter, while also completing our planned maintenance outages. ***We have identified the critical assets that require additional capital investment and increased maintenance spending in order to improve our reliability and quality and to lower our costs. We plan to use our strong cash and liquidity position to expedite the revitalization of our facilities*** and to fund additional growth projects. This will enhance the ongoing development of the differentiated solutions that make us a strategic business partner for our customers. We continue to make progress on our Carnegie Way transformation, and we have many opportunities ahead of us.

(Emphasis added).

276.    The U.S. Steel Defendants, however, made no mention of the fact that the Flat-Rolled Segment facilities required far more extensive and expensive repairs, upgrades and maintenance than Defendants disclosed.

277. In connection with the November 2016 Press Release, U.S. Steel also provided a Third Quarter 2016 Earnings Presentation (the "Q3 2016 Earnings Presentation") and a Third Quarter 2016 Questions and Answers Presentation (the "Q3 2016 Q&A Packet") posted on the Company's website.

278. The Q3 2016 Earnings Presentation falsely reported $60 million in purported realized Carnegie Way benefits and claimed that:

- Including the benefits from projects we implemented during the third quarter, our new total for the ***full year impact from Carnegie Way benefits in 2016 is $705 million*** as compared to 2015 as the base year. These benefits resulted from the ***completion of 370 projects in the third quarter*** . . . particularly in the areas of manufacturing and supply chain, where we have our greatest opportunities for improvement.

- "***We are continuing to implement RCM at all of our facilities*** and have ***seen the benefits of improved maintenance capabilities*** raise our facilities up to higher performance standards. While RCM improves maintenance efficiency, the revitalization of our assets will increase our production."

279. Similarly, the Q3 2016 Q&A Packet falsely stated that

- Carnegie Way was "***much more than a cost cutting initiative***, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support."

- U.S. Steel had "achieved sustainable cost improvements through process efficiencies ***and our investments in reliability centered maintenance (RCM)***, and we will continue to find process improvements that enable us to better serve our customers and reward our stakeholders."

280. The above statements were materially false and misleading when made because: (i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) the purported "realized" Carnegie Way benefit of $60 million in the third quarter 2016 and $705 million year-to-date were materially overstated because the Defendants recognized purported cost savings for "multiple" projects every week ranging in

98

an estimated value of up to $4-$5 million before the projects were complete or, in some instances, before they were even implemented; (iii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iv) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 and May 24, 2016 that "those investments that we need to make are being – *we're not able to make them right now*," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and operating margins "are nowhere near where they need to be for us to invest in our future;" (v) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs in late 2015 and the first three quarters of 2016 (*see* SOF at VII, *supra*); (vi) as a result of (iii) through (v) above, the decrease in sales and shipments was not attributable to market factors but, instead, was Company-specific; (vii) the "additional capital investment" was the culmination of years' worth of cost-cutting and insufficient or non-existent capital investment and maintenance and, thus, U.S. Steel's assets and infrastructure were in far worse condition than disclosed; (viii) U.S. Steel's purported positive operating cash flow was at the expense  of Defendants' decision to defer desperately needed maintenance and capital spending; and, thus (ix) U.S. Steel's business and prospects were far worse than represented.

## XIV.    FALSE AND MISLEADING STATEMENTS IN THE NOVEMBER 2, 2016 CONFERENCE CALL

281.    On November 2, 2016, the Individual Defendants held a conference call with analysts to discuss the Company's third quarter 2016 financial results (the "November 2016 Call"). In his opening remarks on the November 2016 Call, Defendant Longhi referred to the acceleration of investments in the Company's manufacturing facilities in order to *improve* operating and

reliability – initiatives that Defendants had previously claimed the Company was already doing:

> We continue to make significant progress on improving our business model, lowering our breakeven point, improving our already industry-leading safety performance, and strengthening our balance sheet. We have faced and continue to face many challenges, some at the Company level and some at the industry level. At the Company level, we have streamlined our operating configuration, including the temporary idling of facilities to create greater production efficiencies under today's market conditions and have made many hard decisions to permanently address unprofitable businesses and facilities with a final resolution of our former operations.

*    *    *

> ***We are accelerating our investments in our facilities to achieve sustainability better and more consistent operating performance including improved reliability, quality, delivery, and customer service***. Innovation in both products and processes is the foundation for our future success.

282.    When asked for more detail about the nature of the unplanned outage that occurred in the third quarter of 2016, Defendant Longhi, again, minimized the impact of the outages and falsely claimed that conditions had actually "improved:"

> Anthony B. Rizzuto - Cowen and Company, LLC

> Hey, Mario. Can you provide more color on the nature of the unplanned outages and the operational headwinds that you face? And specifically, for one question just part of it, the facilities and the equipment that was affected directly in the quarter?

> Mario Longhi Filho - United States Steel Corp.

> There was not any single major event that impacted the output, Tony. It was a convergence of several things that happened in sequence. And in an operation like ours with the improved streamlined footprint that we have, when you have a half a day of an issue here, another half a day of an issue there, and it begins to compound, and it makes it more difficult with the absence of slacking the system to be able to recover more quickly. That is the nature of what happened.

283.    When pressed about whether U.S. Steel had been under-investing in its facilities, Longhi flatly denied that U.S. Steel had under-invested and affirmatively claimed, instead, that the Company had "***been investing appropriately***:"

Anthony B. Rizzuto - Cowen and Company, LLC

Okay. And when you talk about the need for revitalization, obviously, this has been a transformation process, a journey as you have referred to Carnegie Way. As you're going through this process, are you finding now that maybe you've under-spent on the capital side and is this something that's coming? I mean just by looking at the language you used in the release, it seemed that way to us. And I just want to make sure – what – if that's the case, what kind of magnitude of capital spending might we see that gravitate towards from the roughly $350 million that you've kind of targeted? Is this – could you just delve into that a little bit for us?

Mario Longhi Filho - United States Steel Corp.

Sure, first and foremost, thanks for describing the nature of what we're doing here as a journey, because it truly is. And ***I would offer that, no, we have not been under-spending***. What we've been doing is, we've only been able to accomplish what we've accomplished and gotten to the position that we are, because ***we've been investing appropriately in making sure that everything that we know is being addressed and moving to minimize the conditions that we experienced in the past quarter, which is unplanned events***. So we've been able to get to this point, because ***we've been doing all of the right things***..

284.    In response to a question from analyst Evan Kurtz of Morgan Stanley about U.S. Steel's plans for an electric arc furnace (EAF), Longhi assured investors that the Company regularly updates its capex analysis and blamed the delay of putting in an EAF entirely on the market:

Evan L. Kurtz - Morgan Stanley & Co. LLC

So I have a similar question just about next year's capital spend. I know you had talked before in the past about maybe doing some EAF work at some of the other facilities outside of Fairfield, and I'm wondering – some of these furnaces and some of the equipment that you have is a little bit older at some of the other plants. Is something that you're evaluating now, some sort of an EAF solution that maybe would replace some of the older technology that you might have in place? Is that something that we could see for next year?

Mario Longhi Filho - United States Steel Corp.

Well, ***the analysis has been updated on a regular basis***, and I would go back to when we started this, which led us to make the decision on the first EAF. It's just unfortunately that we faced this terrible energy market, and we were forced into a position of stalling it for a little bit..

285.    With respect to the unplanned outages in the third quarter of 2016, Defendant Lesnak claimed that, although "[m]aintenance was up quarter-over-quarter," the decrease in production was mainly related to "the volume and the operating efficiency" and assured investors that U.S. Steel would "make some better improvements to the facilities" in the fourth quarter of 2016.

286.    A November 2, 2016 American Metal Market article discussed Defendant Lesnak criticizing the notion that U.S. Steel might be spending less on maintenance this year than it had in the past and quoted Lesnak as stating "we have a lot less facilities than we did last year. So, ... if you think of maintenance on a per ton of capacity that's running, we're actually spending more on the facilities this year than we did last year."[18]

287.    During the November 2016 Call, Defendant Longhi confirmed that U.S. Steel had realized "very significant levels of improvement" from the Carnegie Way program, while downplaying any operational issues:

> **Mario Longhi Filho - United States Steel Corp.**
>
> Well, we've had a quarter where some of the efforts had to be diverted a little bit to make sure we addressed the unforeseen challenges that came our way. But in spite of that, we still – I think we ended the quarter with more than 300 new initiatives being completed. And I think going into the next quarter, there are probably another 500 slated to be pursued. So in the pipeline it's even much greater than that. So I wouldn't focus so much on the actual dollars that you saw coming out of this quarter. I think there is more to come. Eventually, these things will begin to taper off, as we get closer to the point of – that we can achieve an incredibly higher level of competitive base from a cost perspective and that is the ultimate goal of what we're relentlessly pursuing.
>
> ***On the other hand, the Carnegie Way also encompasses very significant levels of improvement***. On the overall value chain, you look at the amount of cash that we've been able to generate both from operations as well as the value chain and the logistics side of things. We're talking here about some different types of innovations and we just mentioned a couple of them here on packaging and

---

[18] Michael Cowden, *USS Flat-Rolled Outages to Persist In 4th Qtr.,* AMERICAN METAL MARKET (Nov. 2, 2016).

automotive. So this whole context is what the Carnegie Way encompasses. It's not just the cost and I think we're going to continue to show interesting results in both fronts.

288.    The above statements were materially false and misleading when made because: (i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iii) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 and May 24, 2016 that "those investments that we need to make are being – *we're not able to make them right now*," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and operating margins "are nowhere near where they need to be for us to invest in our future;" (iv) the accelerated asset revitalization was, actually, the culmination of years' worth of cost-cutting and insufficient or non-existent capital investment and maintenance and, thus, U.S. Steel's assets and infrastructure were in far worse condition than disclosed; (v) as a result of the above, U.S. Steel had not "been doing all the right things" and, was "under-spending" for years; thus (vi) U.S. Steel's business and prospects were far worse than represented.

## XV.    FALSE AND MISLEADING STATEMENTS IN THE NOVEMBER 2, 2016 FORM 10-Q

289.    On November 2, 2016, the U.S. Steel filed its quarterly report on Form 10-Q for the period-ended September 30, 2016 (the "Third Quarter 2016 Form 10-Q") with the SEC, which was signed by Defendants Longhi and Burritt. The Third Quarter 2016 Form 10-Q contained nearly identical false and misleading statements as the November 2016 Press Release and November 2016 Call. The Third Quarter 2016 Form 10-Q also stated in relevant part:

Net sales were $2,686 million in the three months ended September 30, 2016, compared with $2,830 million in the same period last year. ***The decrease in sales for the Flat-Rolled segment primarily reflected decreased shipments (decrease of 141 thousand net tons) due to operational issues across our Flat-Rolled facilities. In the last half of the third quarter of 2016 we experienced unplanned outages at several of our steelmaking and finishing facilities*** and our current operating configuration in 2016 extends the time it takes to recover volumes from unplanned outages. Additionally, sales in our Flat-Rolled segment decreased due to reduced coke and iron ore pellet sales to U. S. Steel Canada Inc. These decreases were partially offset by higher average realized prices (increase of $44 per net ton) due to improved spot market prices.

290.    With respect to the Company's 2016 Outlook, the Defendants stated that U.S. Steel would achieve a net loss of $355 million, or $2.26 per share, and adjusted EBITDA of $475 million if market conditions remained the same.

291.    The above statements were materially false and misleading when made because: (i) the Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (ii) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 and May 24, 2016 that "those investments that we need to make are being – ***we're not able to make them right now***," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and operating margins "are nowhere near where they need to be for us to invest in our future;" (iii) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs (*see* SOF at VII, *supra*); and, thus, (iv) U.S. Steels business and prospects were far worse than represented.

292.    In response to the above material misstatements, U.S. Steel's stock price increased $2.04 per share, or 11.4% from $17.82 per share on November 2, 2016 to $19.86 per share on November 4, 2016.

## XVI.    FALSE AND MISLEADING STATEMENTS IN THE JANUARY 31, 2017 PRESS RELEASE AND PRESENTATIONS

293.    On January 31, 2017, U.S. Steel issued a press release, entitled "*United States Steel Corporation Reports Improved 2016 Results with Operating Cash Flow and Stronger Cash and Liquidity*," announcing the Company's fourth quarter and full year 2016 financial results (the "January 2017 Press Release"). In the January 2017 Press Release, the Company reported an annual and quarterly net loss of $440 million, or $2.32 per diluted share, and $105 million, or $0.61 per diluted share, respectively. U.S. Steel's reported revenues decreased by $1.3 billion from $11.6 billion in 2015 to $10.3 billion in 2016.

294.    The Company also reported a fourth quarter 2016 decrease in EBIT for the Flat-Rolled Segment of $65 million as compared to EBIT of $114 million for the third quarter 2016. In the accompanying Segment and Financial Operating Data Presentation, U.S. Steel reported steel shipments of 2,369 thousand tons as compared to 2,535 thousand tons in the third quarter 2016 and 2,591 thousand tons in the fourth quarter 2015.

295.    In addition, U.S. Steel reported Carnegie Way benefits realized of $745 million for 2016, as compared to $815 million in 2015.

296.    Commenting on the decline in the Company's financial performance, Defendant Longhi blamed "very challenging market conditions," resulting in lower prices and shipments and assured investors that U.S. Steel was poised to benefit from improved market conditions and its Carnegie Way transformation efforts:

> We entered 2016 facing very challenging market conditions, but remained focused on our Carnegie Way transformation efforts. Despite lower average realized prices and shipments in 2016, ***our results are better as we continued to improve our product mix and cost structure***. Our focus on cash, including better working capital management and opportunistic capital markets transactions, resulted in an improved debt maturity profile and stronger cash and liquidity. ***We are well positioned to accelerate the revitalization of our assets to improve our operating reliability and efficiency,*** and deliver value-enhancing solutions to our customers.

\*    \*    \*

We are starting 2017 with much better market conditions than we faced at the beginning of 2016. ***Our Carnegie Way transformation efforts over the last three years have improved our cost structure***, streamlined our operating footprint and increased our customer focus. These substantive changes and improvements have ***increased our earnings power***. While we will benefit from improved market conditions, they continue to be volatile and we must remain focused on improving the things that we can control. Pursuing our safety objective of zero injuries, improving our assets and operating performance, and driving innovation that creates differentiated solutions for our customers remain our top priorities.

297.    With respect to the Flat-Rolled segment, the Defendants blamed continued worsening results on lower prices, fewer shipments and an increase in "planned" outages spending, yet failed to make any mention of the numerous, costly ***unplanned*** outages that resulted from U.S. Steel's failure to properly invest in its facilities:

Fourth quarter results for our Flat-Rolled segment declined as compared with the third quarter primarily due to a decrease in average realized prices, fewer shipments, as well as increased outage spending. Planned outages as part of our previously announced asset revitalization process limited the amount of tons we could ship in the quarter. Full-year Flat-Rolled segment results for 2016 improved from 2015 largely due to lower raw material costs, lower spending, and benefits provided by our Carnegie Way efforts. These improvements were partially offset by lower average realized prices and shipments.

298.    In the January 2017 Press Release, Defendant Longhi also falsely assured investors that U.S. Steel was "***well positioned*** to accelerate the revitalization of [the Company's] assets to improve [its] operating reliability and efficiency, and deliver value-enhancing solutions to our customers." (Emphasis added).

299.    U.S. Steel further highlighted its "positive operating cash flow of $727 million for the year ended December 31, 2016" with $1.5 billion in reported cash.

300.    The Defendants also projected 2017 net earnings of $535 million, or $3.08 per share, EBITDA of $1.3 billion and results from the Flat-Rolled segment to be "higher than 2016."

301.    In a Fourth Quarter and Full-Year 2016 Earnings Presentation (the "Q4 Earnings Presentation"), Defendants reported $745 million of "realized" Carnegie Way benefits." The Q4 Earnings Presentation also falsely represented:

Our pace of progress on The Carnegie Way transformation continues to exceed our expectations. The ***continuing benefits are improving our ability* to earn the right to grow and then *drive sustainable profitable growth over*** the long-term as we deal with the cyclicality and volatility of the global steel industry. With over long 4,000 active projects, we have many opportunities ahead of us.

302.    Similarly, the Q4 2016 Q&A Packet falsely stated that:

- Carnegie Way "is ***much more than a cost cutting initiative***, improving all our core business processes, including commercial, manufacturing, supply chain, procurement, innovation, and functional support.

- U.S. Steel had "achieved sustainable cost improvements through process efficiencies and ***our investments in reliability centered maintenance (RCM)***, and we will continue to find process improvements that enable us to better serve our customers and reward our stakeholders."

303.    The above statements were materially false and misleading when made because: (i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) the purported "realized" Carnegie Way benefit of $745 million was materially overstated because the Defendants recognized purported cost savings for "multiple" projects every week ranging in an estimated value of up to $4-$5 million before the projects were complete or, in some instances, before they were even implemented; (iii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iv) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 and May 24, 2016 that "those investments that we need to make are being – ***we're not able to make them right now***," that "subject imports deprived U.S.

Steel" of "an opportunity to grow its business to reinvest in technology," and operating margins "are nowhere near where they need to be for us to invest in our future;" (v) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs (*see* SOF at VII, *supra*); (vi) as a result of (iii) through (v) above, the decrease in sales and shipments was not attributable to market factors but, instead, was Company-specific; (vii) the U.S. Steel Defendants' purported positive operating cash flow was at the expense of Defendants' decision to defer desperately needed maintenance and capital spending; and, thus (viii) U.S. Steel's business and prospects were far worse than represented.

## XVII.   FALSE AND MISLEADING STATEMENTS IN THE FEBRUARY 1, 2017 CONFERENCE CALL

304.    On February 1, 2017, the Initial Defendants held a conference call with analysts to discuss the Company's third quarter 2016 financial results (the "February 2017 Call"). In his opening remarks, Defendant Longhi continued to hype the progress and positive impact of the Carnegie Way program:

> We have now completed the third year of our transformation and our progress continues to exceed our expectations. The hard and competent work of the Carnegie Way transformation is translating into stronger financial results and better performance for our investors, customers and employees.
>
> As we have demonstrated over the last couple of years, we have a robust process in place that has consistently generated benefits even during times of difficult market conditions.

305.    Longhi also reiterated his prior false assurances that U.S. Steel had been properly investing in its assets, despite contradictory testimony before the U.S. International Trade Commission, among other evidence discussed above:

> We have given you regular updates on the significant progress we have made on improving our cost structure. And our increased focus on our customers through our commercial entities, which has resulted in the continuing improvement and our value added product mix. ***We have also been investing in our facilities***, and as we indicated last quarter, increasing both the pace and magnitude of our efforts in

this area is a priority for this year.

> ***These substantive changes and improvements have increased our earnings power*** and while ***we will benefit from improved market conditions*** they continue to be volatile, and we must remain focused on improving the things that we can control. As I mentioned earlier, accelerating our efforts to revitalize our assets is a priority for 2017. . . We face structured and flexible plans based on the completion of a large number of smaller and less complex projects to reduce execution risk, and it is ***adaptable in both its scale and the pace of its implementation to changing business conditions***.

> We will be implementing this plan over the next 3 to 4 years in order to minimize disruptions to our operations and to ensure we continue to support our customers throughout this process. Our asset revitalization plan is not just sustaining capital and maintenance spending. These projects will deliver both operational and commercial benefits.

306.    Longhi also began to concede that U.S. Steel had not been properly investing in its facilities and needed the asset revitalization to "improve[] reliability:"

> After we complete our asset revitalization plan we ***will have well-maintained facilities*** with a strong core infrastructure, strong reliability centered maintenance organizations and we will deliver products to our customers ***with improved reliability and quality***. Executing this plan is a critical milestone in the Carnegie Way journey to take us from earning the right to grow to driving and sustaining profitable growth.

307.    When asked by analyst Timna Tanners of Bank of America about the volume of steel the Company would produce from its Flat-Rolled segment in 2017, Defendant Longhi stated that U.S. Steel was already positioned to supply "whatever additional" steel needed:

> Timna Tanners

> [W]hat kind of volume might we expect into 2017, where can you flex from 2016 levels that at least started out pretty strong if we have a decent demand environment into your imports in 2017?

> Mario Longhi Filho

> Well, our blast furnace capacity is going to be capable of supplying whatever additional alternatives that we're going to find out there Timna. So, from blast furnace capacity, we're not anticipating bringing any of that online. What we do anticipate is to being more reliable than we were, so that we can benefit from being able to roll more of that.

308.    When asked by another analyst about the Company's potential capital projects, Longhi maintained that U.S. Steel had, all along, been adequately investing in its facilities:

I think that -- we see there is a lot of value in ***continuing to invest in our facilities*** invest in our innovation. . . .It's a myriad of projects we have under the [Carnegie Way] concept and it's not in the 100 [hundreds] it's been many cases in the thousands.

309.    The above statements were materially false and misleading when made because: (i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost, instead of saved, the Company money; (ii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity; (iii) Defendant Longhi and other Company executives testified under oath before the ITC on August 18, 2015 and May 24, 2016 that "those investments that we need to make are being – ***we're not able to make them right now***," that "subject imports deprived U.S. Steel" of "an opportunity to grow its business to reinvest in technology," and operating margins "are nowhere near where they need to be for us to invest in our future;" (iv) U.S. Steel was experiencing unplanned outages "quarter after quarter" in several of its facilities, as well as costly repairs (*see* SOF at VII, *supra*); and, thus (v) U.S. Steel's business and prospects were far worse than represented.

310.    In response to the above material misstatements, U.S. Steel's stock price increased 11.2% from a closing stock price of $31.33 per share on February 1, 2017 to $34.85 per share on February 2, 2017.

311.    On these results, analysts noted the gulf between U.S. Steel and its competitors. Specifically, on February 6, 2017, Barclays reported that "[i]n simple terms, we see [Nucor Corporation] as better positioned to drive additional growth while X must now turn its focus to the recapitalization of its existing asset base: We've written on this theme before – NUE has been aggressive in acquiring businesses . . . that expand its product and geographical diversity. . . ."

## XVIII.    FALSE AND MISLEADING STATEMENTS IN THE 2016 FORM 10-K

312.    On February 28, 2017, U.S. filed U.S. Steel's Annual Report on Form 10-K for the year-ended December 31, 2016 with the SEC (the "2016 Form 10-K"), which was signed by Defendants Longhi and Burritt.

313.    In the 2016 Form 10-K, Defendants made material misstatements concerning U.S. Steel's: (1) Carnegie Way benefits and results; (2) U.S. Steel's financial results; and (3) outlook and financial forecasts.

314.    Specifically, in the 2016 Form 10-K, Defendants falsely represented that, as a result of the Carnegie Way initiative, U.S. Steel was able to withstand negative market factors and, thus, was positioned to take advantage of favorable market conditions:

> Carnegie Way has already driven a shift in the Company that ***has enabled us to withstand the prolonged downturn in steel prices while positioning us for success in a market recovery***.

315.    The Company also reported $745 million of purported Carnegie Way benefits realized in 2016.

316.    Defendants also attributed the fact that U.S. Steel did not turn a profit despite improving market conditions to "higher levels of imports" and "lower average realized prices," without any mention of the costly unplanned outages the Company sustained in 2016 as a result of years' worth of under-investment:

The increase in Flat-Rolled results for 2016 compared to 2015 resulted from lower raw materials costs (approximately $275 million), reduced losses in 2016 after the shutdown of the blast furnace and associated steel making assets and most of the finishing operations at Fairfield Works in the third quarter of 2015 (approximately $145 million), decreased spending for repairs and maintenance and other operating costs (approximately $145 million), reduced costs associated with lower operating rates at our mining operations (approximately $70 million) and lower energy costs, primarily natural gas costs (approximately $55 million). These changes were partially offset by lower average realized prices (approximately $390 million) as a result of market conditions and higher levels of imports and higher costs for profit based payments (approximately $75 million).

317.    Finally, with respect to U.S. Steel's outlook for 2017, Defendants forecasted net earnings of $535 million, or $3.08 per share and, again, claimed that U.S. Steel was poised to take advantage of favorable changes in market conditions:

Outlook for 2017

If market conditions, which include spot prices, raw material costs, customer demand, import volumes, supply chain inventories, rig counts and energy prices, remain at their current levels, we expect:

- 2017 net earnings of approximately $535 million, or $3.08 per share, and EBITDA of approximately $1.3billion;

- Results for our Flat-Rolled, European, and Tubular segments to be higher than 2016;

- To be cash positive for the year, primarily due to improved cash from operations; and

- Other Businesses to be comparable to 2016 and approximately $50 million of postretirement benefit expense.

The outlook for 2017 is based on market conditions as of February 22, 2017. We believe market conditions will change, and as changes occur during the balance of 2017, our net earnings and EBITDA should change consistent with the pace and magnitude of changes in market conditions.

318.    The above statements were materially false and misleading when made because:

(i) the Carnegie Way initiative was a sham that was largely the result of fabricated cost savings that were not actual savings, and/or cost cutting to such an extent that the purported savings cost,

instead of saved, the Company money; (ii) the purported "realized" Carnegie Way benefit of $745 million was materially overstated because the Defendants recognized purported cost savings for "multiple" projects every week ranging in an estimated value of up to $4-$5 million before the projects were complete or, in some instances, before they were even implemented; (iii) Defendants were deferring badly needed maintenance and facility upgrades, rather than investing in the Company's infrastructure, resulting in "thousands of tons of missed steel production" of at least 20% of total capacity and, thus, U.S. Steel was no positioned to recover in a more favorable market; and (iv) U.S. Steel's business and prospects were far worse than represented.

### THE TRUTH IS REVEALED

319.    On April 25, 2017, after the market closed, U.S. Steel shocked the market when it issued a press release, entitled "*United States Steel Corporation Reports First Quarter 2017 Results*," announcing the Company's first quarter 2017 financial results (the "April 2017 Press Release"). While investors were expecting the Company to turn a profit based on its prior false and misleading statements, the Defendants announced a net loss of $180 million, or $1.03 per diluted share. The April 2017 Press Release also revealed: (i) an "unfavorable adjustment" to earnings of $35 million or $0.20 per diluted share due to the "loss on the shutdown of certain tubular assets"; (ii) a negative operating cash flow of $135 million; (iii) a $155 million decline in flat-roll earnings as compared to the previous quarter; (iv) downgraded 2017 EBITDA guidance from $1.3 billion to $1.1 billion; and (v) downgraded earnings guidance from $3.08 to $1.50 per share.

320.    The April 2017 Press Release further revealed, for the first time, that U.S. Steel actually conducted the Secondary Public Offering in August 2016 to fund the Company's asset revitalization plan in the face of increased unplanned outages and operational issues, with

Defendant Longhi admitting in the April 2017 Press Release that the outages existed at the time of the SPO, stating unequivocally: "*[w]e issued equity last August* **to give us the financial strength and liquidity** *to position us to establish an asset revitalization plan large enough to resolve our issues*, and to see that plan through to completion." (Emphasis added). This disclosure was in direct contradiction to the Company's representations at the time of the SPO that it intended to "use the net proceeds from the offering for financial flexibility, capital expenditures and other general corporate purposes" and – just three weeks before the SPO – that "*we have experienced fewer unplanned outages and lower maintenance costs*…We are creating a more reliable and agile operating base." (Emphasis added).

321.    The results reflected in the April 2017 Press Release were caused by U.S. Steel's extreme cost-cutting measures under the purported Carnegie Way initiative which resulted in the U.S. Steel Defendants' top-down refusal and failure to invest in critically necessary new technology or maintain U.S. Steel's Flat-Rolled facilities, contrary to their contemporaneous representations, and rendered U.S. Steel incapable of taking advantage of an aggressive upswing in the domestic steel market. The press release stated in relevant part:

> PITTSBURGH, April 25, 2017 – United States Steel Corporation (NYSE: X) reported a first quarter 2017 net loss of $180 million, or $1.03 per diluted share, which included an unfavorable adjustment of $35 million, or $0.20 per diluted share, associated with the loss on the shutdown of certain tubular assets. This compared to a first quarter 2016 net loss of $340 million, or $2.32 per diluted share, and a fourth quarter 2016 net loss of $105 million, or $0.61 per diluted share.

> For a description of the non-generally accepted accounting principles (non- GAAP) measures and a reconciliation from net earnings (loss) attributable to U.S. Steel, see the non-GAAP Financial Measures section.

> Commenting on results, U. S. Steel Chief Executive Officer Mario Longhi said, "While our segment results improved by over $200 million compared with the first quarter of 2016, *operating challenges at our Flat-Rolled facilities prevented us from benefiting fully from improved market conditions*. However, we continue to be encouraged by the strength of our European business and we are also seeing

improving energy markets. Overall, improved commercial conditions more than offset higher raw materials and energy costs and ***increased maintenance and outage spending driven by our asset revitalization efforts***. The execution of our asset revitalization program and the continued implementation of reliability centered maintenance practices are critical to achieving sustainable improvements in our operating performance and costs. We have built the financial strength and resources to move forward more aggressively on these initiatives, and remain focused on providing the service and solutions that will create value for our stockholders, customers, employees, and other stakeholders."

*      *      *

2017 Outlook

Commenting on U. S. Steel's Outlook for 2017, Longhi said, "Market conditions have continued to improve, and we will realize greater benefits as these improved conditions are recognized more fully in our future results. We are focused on long-term and sustainable improvements in our business model that will position us to continue to be a strong business partner that creates value for our customers. This remains a cyclical industry and ***we will not let favorable near-term business conditions distract us from taking the outages we need to revitalize our assets in order to achieve more reliable and consistent operations, improve quality and cost performance***, and generate more consistent financial results. We issued equity last August to give us the financial strength and liquidity to position us to establish an asset revitalization plan large enough to resolve our issues, and to see that plan through to completion. As we get deeper into our asset revitalization efforts, we are seeing opportunities for greater efficiency in implementing our plan. ***We believe we can create more long-term and sustainable value by moving faster now***. We have made the strategic decision to ***accelerate our efforts to resolve the issues that challenge our ability to achieve sustainable long-term profitability***. We believe our objective to achieve economic profit across the business cycle will result in true value creation for all of our stakeholders over the long-term."

If market conditions, which include spot prices, raw material costs, customer demand, import volumes, supply chain inventories, rig counts and energy prices, remain at their current levels, we expect:

- 2017 net earnings of approximately $260 million, or $1.50 per share, and adjusted EBITDA of approximately $1.1 billion;
- Results for our Flat-Rolled, European, and Tubular segments to be higher than 2016; and
- Other Businesses to be comparable to 2016 and approximately $50 million of postretirement benefit expense.

We believe market conditions will change, and as changes occur during the balance of 2017, we expect these changes to be reflected in our net earnings and adjusted EBITDA.

322.    Although Longhi alluded to taking outages, he failed to mention where the production problems were centered and which plants might require maintenance outages. Investors were further left in the dark regarding the precise figures or costs that the repairs would be and what they related to. In an email to AMM, U.S. Steel spokeswoman stated: "[w]e do not provide that level of detail on outages." Michael Cowden, *USS Shares Plunge; Billion-Dollar Repairs Needed,* AMERICAN METAL MARKET (Apr. 26, 2017).

323.    On April 26, 2017, Defendants held an investor earnings call (the "April 2017 Call"). During the April 2017 Call, Individual Defendants Longhi and Burritt further explained the implications of the previously undisclosed information concerning the Company's capital assets.

324.    Longhi stated that a new multi-year revitalization plan ("Revitalization Plan") was being implemented in order for U.S. Steel to remedy the problems and inefficiencies it had experienced. Longhi stated that the Revitalization Plan will take "three to four years" and will "address some of the issues" in order to achieve "sustainable long-term profitability." Defendant Longhi described the plan as an "acceleration" which was expected to result in: (i) $300 million in increased investment costs per year of implementation; (ii) "more downtime" at facilities; and (iii) limiting of "steel production volumes." Longhi stated that the newly implemented acceleration program could be "safely, efficiently, and effectively" implemented even at the accelerated pace.

325.    As a result of the dissemination of this previously undisclosed information, the price of U.S. Steel common stock declined from a closing share price of $31.11 on April 25, 2017 to close at $22.78 per share on April 26, 2017, *a loss of 27% or over $2 billion in market value,*

*on extremely heavy trading volume,* representing the steepest drop in price since 1991.

326.    Market analysts, even those who had previously been skeptical about U.S. Steel's maintenance and capital expenditures, were surprised at just how badly the U.S. Steel Defendants' underinvestment impacted the Company's performance.

327.    On April 26, 2017, Morningstar reported that "[a]lthough we have long- maintained a negative outlook on U.S. Steel, the magnitude of the Company's earnings miss took us very much by surprise. . . . U.S. Steel's asset base is considerably older than the assets used  by many of its competitors and, accordingly, it will continue to require sizable reinvestment."

328.    On May 3, 2017 Jefferies admitted "[w]e were wrong. We underestimated elevated risks inherent with X's 'revitalization' efforts as well as cost headwinds in 1Q17 . . . ." Seth Rosenfeld of Jefferies noted that these repairs and maintenance "may also be an increasingly necessary step following years of underspending . . . . the disruption caused by these efforts will ultimately cap (U.S. Steel's) ability to participate in currently favorable markets."

329.    Moreover, analysts recognized that the U.S. Steel's new guidance for 2017 was an admission by the Company that its own actions had affected capacity such that it was unable to take advantage of a rising steel market.  On April 26, 2017 Credit Suisse reported that "X also noted it was effectively volume constrained despite having significant latent capacity and restarting the Granite City hot rolling facility, which was done to limit the volume impact from the planned outages outlined last quarter. The ability of the US operations to run at consistently higher levels of productivity and volume is now called into question and therefore so is its future earnings power."

330.    This information was even more of a shock considering U.S. Steel's competitors had not reported similar losses. Rather, "U.S. Steel's triple-digit loss is all the more notable because its competitors - Charlotte N.C.-based Nucor Corp.; Fort Wayne Ind.-based Steel Dynamics Inc. (SDI); and West Chester, Ohio-based AK Steel Corp - have all recorded big first-quarter profits." Michael Cowden, *USS' 1st-Qtr. Loss at $180M On Flat-Rolled Woes,* AMERICAN METAL MARKET (Apr. 25, 2017). Not only did they record profits, but as one article noted, "AK Steel Corp. swung to a profit on higher steel prices in its best first quarter since 2008." Michael Cowden, *The Week That Was: Strong Earnings, Except One,* AMERICAN METAL MARKET (May 1, 2017).

331.    John Tumazos, president of Holmdel, N.J.-based Very Independent Research LLC told AMM that "It's not fun when you lose $180 million . . . . It's even less fun to lose $180 million when everyone else is swimming in cash." The Chairman, CEO and President of Cliffs Natural Resources also remarked that "[r]ecent weaknesses . . . by a few companies are not an indication of any underlying problem with the steel business in the United States. These weaknesses are actually ***company specific***." AMM Staff, *The Week That Was: Strong Earnings, Except One,* AMERICAN METAL MARKET (May 1, 2017) (Emphasis added).

332.    In a May 10, 2017 article in the Post-Gazette, Goodish was quoted criticizing Longhi and Burritt stating "to have an upturn and not be able to harvest the market is irresponsible. None of the top executives have a passion for the company and their jobs."

**POST CLASS PERIOD EVENTS**

333.    On May 10, 2017, U.S. Steel announced Defendant Longhi was retiring from the CEO position, effective immediately, and would be replaced by Defendant Burritt.

334.    According to industry analysts, "[a] new CEO also won't change the fact that the Pittsburgh-based steel maker faces the daunting task of overhauling its dated operations at the same time that competitors are bringing new equipment to the market in both the flat-rolled and pipe-and-tube areas." Michael Cowden, *USS Needs More Than New CEO: Analysts*, AMERICAN METAL MARKET (May 11, 2017).

335.    Analyst Chuck Bradford of Bradford Research Inc. stated that "Longhi spent too much time lobbying for trade relief in Washington and not enough time focusing on fixing the company's mills." Other analysts noted that the Carnegie Way initiative "cut too deep" and criticized U.S. Steel for its lack of transparency to investors. Michael Cowden, *USS Needs More Than New CEO: Analysts,* AMERICAN METAL MARKET (May 11, 2017).

336.    One analyst commented that "U.S. Steel blamed the loss on production problems at its North American flat-rolled mills. Those problems appear to be centered around the company's rolling operations, although it's hard to say that with certainly ***because investors have been kept largely in the dark.***' . . . ***These issues that they've had last year and into this year have not been clearly described***." Michael Cowden, *USS Needs More Than New CEO: Analysts,* AMERICAN METAL MARKET (May 11, 2017) (Emphasis added) (quoting John Tumazos, president of Very Independent Research LLC).

337.    On July 25, 2017, U.S. Steel reported its second quarter 2017 results. In the July 25, 2017 Press Release, the Company reported essentially flat sales with a negligible increase of $419 million in net sales for the second quarter 2017 as compared to the first quarter 2017. Despite the Company's purported asset revitalization program, the Company reported flat-rolled shipments of 2,497 thousand tons for the second quarter, as compared to 2,404 thousand tons the previous quarter, representing a mere difference of 93 thousand tons. Defendant Burritt stated, in part: "Our

investment in our facilities and our people continues to increase. These strategic investments, combined with our focus on achieving operational excellence, will deliver continuous improvements in safety, quality, delivery and costs that will position us to succeed through business cycles, and support future growth initiatives."

338.     The Company also released a July 25, 2017 Earnings Presentation, which reported, for the *first time*, annual maintenance and outage expenses for 2015-2017. While annual maintenance and outage expense in 2015 and 2016 were $964 million and $950 million, respectively, 2017 is forecasted to incur *$1.3 billion in expenses*. In fact, as of July 25, 2017, U.S. Steel has already spent $640 million on maintenance and outage expenses, which is over 67% of the total expenses in 2015 and 2016.

339.     The July 25, 2017 Earnings Presentation further recounted a number of "project updates," including a $2 million investment in a Mon Valley Works BOP Cooling Tower, which was anticipated as being completed in the first quarter 2017. This is the same tower that CW#10 reported had went down in October of 2016. The Earnings Presentation also reported that the Mon Valley Works #2 Generator Replacement and Turbine Rebuild would be completed in the third quarter 2017 for $9 million. According to CW#9, the second generator at Mon Valley broke in the fourth quarter 2016. Thus, this generator will have been inoperable for approximately one year, assuming it is in fact repaired by the third quarter 2017.

340.     Despite the Company's July 25, 2017 promise to improve safety, on August 1, 2017, the Company announced an incident at its Great Lakes Works facility in Ecorse and River Rouge, Michigan involving injuries to five employees. The press release stated, in part:

> Earlier today there was an incident at U.S. Steel's Great Lakes Works in the facility's Hot Strip Mill.
>
> Five employees were transported to local hospitals for treatment. Two remain

hospitalized at this time. One employee was treated and released at the plant's onsite medical care facility. Due to privacy laws, we cannot provide any additional information about the employees who were injured or their conditions.

341.    Great Lakes is the same facility that CW#5 stated had cranes dating back to 1958 which were "almost unsafe to operate," and which received a violation notice from the Department of Environmental Quality back in April 2016 regarding its use of blast furnaces.

342.    Indeed, analysts commented that while U.S. Steel temporarily benefitted from increased imports and steel prices as a result of Hurricane Harvey in August 2017, the Company would not benefit in the long term due to the massive underspending and lack of maintenance it performed in the years prior:

> While [management upgrading its earnings outlook] that's encouraging, ***relying on steel prices isn't enough to sustain momentum as U.S. Steel continues to face the humongous challenge of fixing operational inefficiencies and upgrading its core facilities on time to ride an upturn.***
>
> It'll come at a cost, too, which means the steelmaker will have to grow its earnings at a much faster clip to be able to compete with rivals that are already positioned for growth. As an investor, I'd prefer staying on the sidelines until U.S. Steel's efforts start showing up in its numbers than bet my money on one strong quarter.[19]

343.    Another Motley Fool article commented that the Company "appears to be poorly positioned for the future," explaining:

> The reason for that is management's decision to pull back on the spending that would have prepared the steel mill for the current upturn. It has plans to fix that, but ***those plans are too late*** to allow U.S. Steel to fully benefit from the steel rebound. [I]nvestors would be better off investing in a company like Nucor, where management didn't sacrifice the future to save some money in the present.[20]

---

[19] Neha Chamaria, *What Drove United States Steel Corporation Stock Up 17.1% in August,* The Motley Fool (Sept. 9, 2017).
[20] Reuben Gregg Brewer, *Is Management Really to Blame for United State Steel Corp.'s Woes?* The Motley Fool (Aug. 10, 2017).

344.    Accordingly, U.S. Steel's lack of maintenance and attention to repairs continues to have grave repercussions to this day and will continue to cause unplanned outages and safety issues in future.

345.    On May 3, 2017, a related securities class action was filed in this District asserting similar claims arising out of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.  That action is still pending and is captioned *Vrakas v. United States Steel Corporation., et al.*, No. 2:17-cv-579.  On October 2, 2017, plaintiffs in the *Vrakas* case filed an Amended Class Action Complaint For Violations of the Federal Securities Laws (the "Vrakas Amended Complaint").  On September 29, 2018, the Court granted, in part, and denied, in part, the defendants' motion in the *Vrakas* action to dismiss the Vrakas Amended Complaint (the "Vrakas MTD Order").

346.    The Vrakas MTD Order was interlocutory, as that case has not, as of the filing of this action, proceeded to trial and final judgment on the Exchange Act allegations that were dismissed from the Vrakas Amended Complaint.  Accordingly, Plaintiff hereby asserts identical Exchange Act claims to the Exchange Act claims asserted in the Vrakas Amended Complaint to preserve their appellate rights of review.

## ADDITIONAL SCIENTER ALLEGATIONS

347.    As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

348.    The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of U.S. Steel and, thus, controlled the information disseminated to the investing public in the Company's press releases, investor conference calls and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

349.    Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes herein to inflate the Company's stock price and profit from insider sales of large blocks of their personal holdings of U.S. Steel stock. The Individual Defendants' scienter may be imputed to U.S. Steel as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

**I.    THE INDIVIDUAL DEFENDANTS KNOWINGLY AND/OR RECKLESSLY MADE MATERIAL MISSTATEMENTS AND/OR OMITTED MATERIAL FACTS**

350.    The Individual Defendants knew that U.S. Steel was not maintaining, repairing and investing in the Company's assets, particularly as it related to the Flat-Rolled Segment, resulting in numerous costly unplanned outages and repairs, decreased production and capacity utilization and a substantial loss of revenue and profits because: (A) they admitted such in their testimony before the ITC; (B) DRO and OER reports to which they had access and would have reviewed as part of their job responsibilities, reported declining production, delayed production and repairs, among other things, prior to and throughout the Class Period; (C) they admitted the Secondary Public Offering was conducted because the Company had insufficient funds to fix the massive asset revitalization needed to upgrade and repair its assets; (D) they reviewed and approved the capital and maintenance budgets; (E) Defendant Longhi was forced to retire once the truth was revealed; and (F) the Flat-Rolled Segment was U.S. Steel's "core" business.

**A. The Individual Defendants Admitted in Sworn Testimony Before the International Trade Commission Before and During the Class Period that U.S. Steel Was Not Investing in Technology or Maintaining its Facilities**

351.    As alleged herein, the Individual Defendants admitted during their sworn testimony before the ITC that, contrary to their public statements, U.S. Steel was not maintaining or investing in its assets prior to and during the Class Period. The Individual Defendants further admitted that, as a consequence of the Company's actions, U.S. Steel was experiencing numerous unplanned outages, causing a significant decline in steel shipments and revenue. Defendants' ITC testimony demonstrates that they knew by at least mid-2015 that the resulting impact on U.S. Steel was "catastrophic," "not sustainable," and would inevitably lead to additional plant closures.

352.    For instance, U.S. Steel's General Manager, Rob Kopf, admitted during the August 18, 2015 ITC hearing that: "[U.S. Steel was] having to spend enormous amounts of money to put together alternatives for our customers, to still buy steel. Unfortunately, ***those investments that we need to make are being -- we're not able to make them right now***."[21] (Emphasis added). During the same August 18, 2015 ITC hearing, Doug Matthews, U.S. Steel's Senior Vice President of Industrial, Service Center and Mining Solutions, similarly admitted that the Company failed to invest in its facilities, stating: "As the U.S. grew out of the recent economic crisis and demand for cold-rolled steel increased, ***U.S. Steel had an opportunity to grow its business to reinvest in technology***, and its workers and undertake useful capital expenditures. ***However, subject imports deprived U.S. Steel and other U.S. producers of this opportunity***."[22]

---

[21] August 18, 2015, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM.

[22] August 18, 2015, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM

353.    Defendant Longhi also confirmed that, as a result of the unplanned outages and repairs, the Company had experienced drastic declines in production, sales and capacity utilization. Specifically, during the May 24, 2016 ITC hearing, Defendant Longhi stated that "[t]he last two years should have been banner years for American cold-rolled steel producers.  We should have been able to increase our sales, operate our plants on maximum capacity utilization levels, hire more workers, ***make badly needed profits and re-invest some of those profits into new technologies and new products***," yet this was not what occurred.[23] Longhi confessed that, "[i]nstead, [U.S. Steel] ***experienced dramatic declines in production, sales and capacity utilization***."[24] As a result, Longhi revealed the Company could not invest in its assets: "In cold-rolled steel, the American industry's operating income and operating margins have been low and continue to decline. ***In fact, they are nowhere near where they need to be for us to invest in our future***, to compete at home and abroad and to comply with all the environmental and regulatory requirements that we face."[25] (Emphasis added).

354.    Further, during Doug Matthews' August 18, 2015 testimony, he explained that "[o]nly yesterday we were forced to announce the shutdown of all steel making and rolling operations at our facility in Fairfield, Alabama."[26] Doug Matthews was well aware that this shutdown, as well as others, severely impacted the Company, pleading: "Let me be clear, the current situation is not sustainable. We cannot afford cold-rolled steel at such low prices. ***We cannot afford to keep operating at such low levels of capacity utilization***. If these conditions

---

[23] May 24, 2016, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM.
[24] May 24, 2016, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND  THE UNITED KINGDOM.
[25] May 24, 2016, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM.
[26] August 18, 2015, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM

continue, ***there is no question that there will be further shutdowns and layoffs*** throughout the industry." (Emphasis added).[27]

355.    Accordingly, the Defendants admitted, as early as 2015 – well before the Class Period even began – that they were well aware that the Company was not maintaining or investing in its assets, that U.S. Steel would continue to shut down facilitates as a result, and ultimately the impact on the Company was and would continue to be devastating.

### B. The Individual Defendants Were Aware that U.S. Steel Was Under-Investing and Deferring Desperately Needed Maintenance and Repairs Through the Daily Report of Operations and Operating Efficiency Report

356.    The Individual Defendants were aware or recklessly disregarded that U.S. Steel was experiencing significant and costly unplanned outages and massive delays in production throughout the Class Period from data provided in the DROs and OERs, which accumulated and aggregated data from all of U.S. Steel's facilities, including: production delays, tons per turn, planned tons and actual tons, among other information. The Individual Defendants had direct access to the DROs and OERs, which were available on U.S. Steel's internal website, through the click of a button on their desktop computers, and would have reviewed them as part of their job responsibilities.

357.    According to CW#11, the DROs showed a significant decline in production volume (by as much as 20%) as a result of unplanned outages and production delays from damaged equipment and repairs. CW#11 further stated that actual production was often "not even close" to planned production throughout 2016 and the Company was missing production goals by "thousands of tons of missed steel production," which occurred "quarter after quarter." Another witness, CW#5, stated that the delays caused from planned and unplanned outages would be

---

[27] August 18, 2015, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM

captured in the DROs, which captured the time a piece of equipment was not in operation.

358.    Defendant Longhi, as the CEO of U.S. Steel responsible for day-to-day management decisions and for implementing the Company's long and short term plans, and Defendant Burritt, who served as President and CFO throughout the majority of the Class Period and who both spoke directly about these issues in Company press releases and during investor calls, had access to and would have reviewed the DROs and OERs, particularly in light of the representations made during testimony to the International Trade Commission.

### C.  The Individual Defendants Belatedly Admitted U.S. Steel's Facilities Were Underperforming and Failing at the time of the Secondary Public Offering

359.    On August 15, 2016, the Company conducted a Secondary Public Offering of 21.7 million shares of U.S. Steel common stock at a price of $23.00 per share, raising proceeds of approximately $482 million. The Secondary Public Offering was conducted for one reason only: U.S. Steel needed money to invest in its outdated equipment. Badly. Indeed, on April 25, 2017, **_nearly nine months after the Secondary Public Offering_**, Defendant Longhi came clean, admitting in a press release that "[U.S. Steel] issued equity last August to give us the financial strength and liquidity to position us to **_establish an asset revitalization plan large enough to resolve our issues_**, and to see that plan through to completion." (Emphasis added). Accordingly, the Secondary Public Offering was not for "financial flexibility" as investors were originally led to believe, but, rather, it was to fund the desperately needed maintenance and replacement of the Company's deteriorating assets.

360.    Defendant Longhi's admission during the ITC proceedings further lends support to the fact the Company was relying on the Secondary Public Offering to keep the Company afloat. For instance, just three months prior to the Secondary Public Offering, Defendant Longhi had testified that the Company's "operating income and operating margins have been low and continue

to decline" and were "nowhere near where they need to be for [U.S. Steel] to invest in the future."[28]

Longhi cautioned that "these results do not even come close to representing a sufficient return for

a capital-intensive industry like ours." [29]

361.    Accordingly, the Individual Defendants' express (albeit belated) admission that the

Secondary Public Offering was conducted to "establish an asset revitalization plan large enough

to resolve our issues," as well as the Defendants' ITC testimony in the months and year prior,

unequivocally demonstrates that the Individual Defendants knew the Company suffered from

numerous operational issues by August 2016 and earlier.

### D.    The Individual Defendants Were Aware That U.S. Steel Was Slashing Its Capital Expenditures and Maintenance Because They Reviewed and Approved the Maintenance and Capital Budgets

362.    Following U.S. Steel's tremendous $1.5 billion full-year 2015 loss – with only

$755 million left in cash on hand and bankruptcy on the brink – Defendants Longhi and Burritt

doubled down on the purported Carnegie Way "transformation" by implementing extreme cost-

cutting measures in the form of mass layoffs, closure of swing and operating facilities, and drastic

reductions in capital expenditures. While these measures were billed to investors as part of

Carnegie Way and "not just a cost cutting initiative," in reality, Carnegie Way had become an

extreme cost cutting measure designed to salvage the Company's bottom-line at any means

necessary, including through the Defendants' top-down refusal and failure to invest in critically

necessary new technology or maintain U.S. Steel's Flat-Rolled facilities.

363.    According to CW#9, the U.S. Steel Board, upon which Defendant Longhi sat,

approved the annual capital budget. Moreover, CW#9 stated that Defendant Burritt routinely

---

[28] May 24, 2016, COLD-ROLLED STEEL FLAT PRODUCTS _ FROM BRAZIL, CHINA, INDIA; JAPAN, KOREA, RUSSIA AND THE UNITED KINGDOM.

[29] May 26, 2016, CERTAIN CORROSION-RESISTANT STEEL PRODUCTS FROM CHINA, INDIA, ITALY, KOREA, AND TAIWAN

participated in capital budgeting meetings with CW#9 and other members of the Company, including the Head of Engineering and various Directors, wherein capital budgets and spending were discussed. Thus, Defendants Longhi and Burritt knew that U.S. Steel had slashed its capital expenditures in 2016.

364.    CW#5 corroborated CW#9's account. CW#5 explained that maintenance spending was determined based upon a Business Plan, which contained the budget for repair and maintenance costs, capital spending, production costs and other items. According to CW#5, after he met with McKinsey, the Plant Manager and others in the fall of 2015 about the 2016 Business Plan, McKinsey then took the Business Plan to Longhi, Burritt and other executives in Pittsburgh for approval. CW#5 recalled going through numerous iterations of the 2016 Business Plan for Great Lakes Works because McKinsey and Longhi and Burritt kept decreasing the maintenance budgets. CW#5 believes the other flat-rolled facilities experienced the same cutting process as CW#5 did.

365.    Simultaneously, U.S. Steel also idled some operating facilities and closed its "swing" facilities, *i.e.* those that are designed to absorb production capacity when U.S. Steel's primary facilities experience outages. This reduction in operations was striking – the facilities idled or permanently closed by U.S. Steel during the Class Period accounted for well over two- thirds of U.S. Steel's entire production capacity.

366.    Accordingly, as the Individuals Defendants eventually conceded, the decision to drastically reduce capital expenditures and maintenance spending, at least in part, prevented the Company from investing in its facilities or conducting proper maintenance, which exacerbated the financial impact of the unplanned outages produced by such under-maintained facilities. Yet inexplicably, the Individual Defendants falsely assured investors throughout the Class Period that

"[w]e have achieved *sustainable cost improvements* through process efficiencies and *investments in reliability centered maintenance* (RCM), and we will continue to find more cost improvements," without any basis. (Emphasis added).

### E. The Retirement of CEO Longhi Supports an Inference of Scienter

367.    As U.S. Steel continued to experience severe unplanned outages and operational issues, on February 28, 2017, the Company announced that Defendant Burritt – then the CFO – had been elected President and Chief Operating Officer and would assume all responsibility from Defendant Longhi for the day-to-day operations of U.S. Steel in the United States and Central Europe.

368.    Shortly thereafter, on May 10, 2017, U.S. Steel announced that Defendant Longhi was retiring from the position of CEO, effective immediately, and that Defendant Burritt would assume the role in place of Longhi. While Longhi commented that his retirement was part of a pre-planned tenure, stating that he had envisioned a "five-year tenure" upon his hiring, the Employment Letter entered into between Longhi and the Company was silent as to a five-year tenure and was entered into on June 28, 2012—meaning there was nearly two months of tenure from his retirement date.

369.    Defendant Longhi, of course, had been the brainchild behind the dismally failing Carnegie Way initiative at the time of his loss of day-to-day control of the Company and subsequent "retirement." Indeed, his purported retirement came just two weeks after U.S. Steel's dismal first quarter 2017 financial results – due to increased unplanned outages and operational issues, produced by the extreme cost cutting measures implemented by Defendant Longhi under the Carnegie Way initiative. Given the conspicuous timing and the fact that the success of Longhi's tenure at U.S. Steel was synonymous with the success of Carnegie way, his phasing out beginning in February 2017 and subsequent departure are probative of scienter.

F. **The Individual Defendants Knew that U.S. Steel's Facilities Were Underperforming or Experiencing Unplanned Outages Because U.S. Steel's Flat-Rolled Segment and Facilities was a Highly Material Aspect of the Company's Business Operations and its "Core" Business**

370.    As alleged herein, during the Class Period, U.S. Steel's Flat-Rolled segment accounted for 67-70% of the Company's total steel shipments in tons and 67-73% of the Company's year-end net sales making the segment – by far, the Company's most important business segment.

371.    As a result, U.S. Steel's Flat-Rolled segment constituted the Company's "core business operations" and a "vital corporate function" that U.S. Steel's most senior executives are rightly presumed to have knowledge of its performance as a matter of law. Indeed, the implementation of the Carnegie Way initiative was expressly designed to invest in and maintain U.S. Steel's Flat-Rolled facilities and, thus, knowledge of the severe unplanned outages and operational issues at the Flat-Rolled Segment facilities is virtually inexplicable absent fraud.

II. **THE INDIVIDUAL DEFENDANTS HAD MOTIVE TO MAKE MATERIAL MISSTATEMENTS AND/OR OMIT MATERIAL FACTS**

A. **The Individual Defendants Profited From Their Fraud by Making Millions of Dollars From Selling Off Large Blocks of Their Personal Holdings of U.S. Steel Common Stock at Inflated Prices**

372.    The Individual Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate U.S. Steel's common stock price and maximize their individual profits through insider trading. Defendants Longhi and Burritt's trading patterns before, during, and after the Class Period show that their trades were anything but routine and instead were directly motivated by a desire to profit from a fraudulent scheme designed to mask the problems experienced by U.S. Steel's deteriorating infrastructure and equipment.

373.    As detailed below, Defendants Longhi and Burritt collectively sold **699,671** shares of U.S. Steel common stock over the course of only **eight trading days** during the Class Period for collective proceeds of **$24,980,414.46**. These sales began immediately after U.S. Steel's November 2016 announcement that the Company had faced "some operational challenges," including "unplanned outages in the third quarter [2016]," but while U.S. Steel's stock price was still artificially inflated by the Secondary Public Offering and Defendant Longhi's tempering, unequivocal assertion on a November 2, 2016 conference call that: "**no, we have not been under-spending…we've been investing appropriately [and] moving to minimize the conditions that we experienced in the past quarter, which is unplanned events**." (Emphasis added). Defendants have not sold a single share of U.S. Steel common stock before or after the Class Period.

374.    These trades throughout the Class Period were highly unusual in both timing and amount, and correlated with market moving events or dates on which Defendants Longhi and Burritt would likely be in possession of material non-public information. Longhi and Burritt also traded, in parallel, approximately $25 million of personally held common stock over the course of only two weeks, immediately following their partial disclosure of "operational issues," and "unplanned outages." Further, Burritt sold approximately $8,363,327 of common stock on February 21, 2017, only eight days before he took over day-to-day control of the Company.

### 1.  Individual Defendant Longhi's Insider Sales

375.    During the Class Period and in the span of five total sales over only eight trading days, Individual Defendant Longhi sold 443,250 shares of U.S. Steel common stock, representing fifty-seven percent (57%) of his holdings for total proceeds of $14,930,871.40, all while in the possession of material non-public information and while the price of U.S. Steel's common stock was artificially inflated as a result of the U.S. Steel Defendants' materially false and misleading

statements. Individual Defendant Longhi's Class Period sales are reflected in the following table:

| Date | No. Shares | Price | Proceeds | 10b5-1 Plan | Correlating Events |
|------|-----------|-------|----------|-------------|--------------------|
| November 28, 2016 | 176,040 | $32.25 | $5,677,290 | No. | The Company's first tempered, partial disclosure of "operational challenges" and "unplanned outages," occurred on November 1, 2016. |
| November 28, 2016 | 101,160 | $32.24 | $3,261,398 | No. | Same as above. |
| December 5, 2016 | 54,500 | $35.00 | $1,907,500 | No. | Same as above. |
| December 7, 2016 | 53,450 | $36.18 | $1,933,821 | No. | Same as above. |
| December 7, 2016 | 58,100 | $37.02 | $2,150,862 | No. | Same as above. |

376. Individual Defendant Longhi was appointed CEO of U.S. Steel in September 2013, and *did not sell a single share* of U.S. Steel common stock until he sold 443,250 shares over the course of five transactions, during eight trading days, all while the price of U.S. Steel was artificially inflated by his own false and misleading statements. Defendant Longhi *has not sold a single share* of U.S. Steel common stock since the truth regarding U.S. Steel's business was disclosed in April 2017.

377. On May 8, 2017, U.S. Steel announced that Longhi would be retiring as CEO, effective immediately.

### 2. Individual Defendant Burritt's Insider Sales

378. During the Class Period and in the span of just four total sales, over only eight trading days, Individual Defendant Burritt sold 256,421 shares of U.S. Steel common stock, representing sixty-four percent (64%) of his holdings for total proceeds of $10,049,543.06, all while he was in possession of material non-public information and while the price of U.S. Steel's common stock was artificially inflated as a result of Defendants' materially false and misleading

statements. Individual Defendant Burritt's Class Period sales are reflected in the following table:

| Date | No. Shares | Price | Proceeds | 10b5-1 Plan | Correlating Events |
|---|---|---|---|---|---|
| November 23, 2016 | 51,791 | $32.56 | $1,686,315 | No. | • The Company's first tempered, partial disclosure of "operational challenges" and "unplanned outages," occurred just weeks earlier, on November 1, 2016. |
| November 29, 2016 | 10b5-1 Trading Plan Established for February 21, 2017. | | | | |
| February 21, 2017 | 152,810 | $40.87 | $6,245,344 | Yes. | • Specifics regarding asset revitalization plan first disclosed in January 2017<br>• While the trade occurs in February 2017, the plan was adopted at the time of the same above suspicious circumstances.<br>• Burritt assumes day to day control of the Company on February 28, 2017. |
| February 21, 2017 | 33,560 | $40.87 | $1,371,597 | Yes. | • Same as above. |
| February 21, 2017 | 18,260 | $40.87 | $746,383 | Yes. | • Same as above. |

379.    Individual Defendant Burritt was appointed CFO of U.S. Steel in September 2013, and ***did not sell a single share*** of U.S. Steel common stock until he sold 256,421 shares over the course of four transactions, over only eight trading days, all while the price of U.S. Steel stock was artificially inflated by his own false and misleading statements. Defendant Burritt ***has not sold a single share*** of U.S. Steel common stock since the truth regarding U.S. Steel's business was disclosed in April 2017.

380.    For those stock sales on February 21, 2017 that Burritt made pursuant to a 10b5-1 plan established on November 29, 2017, the circumstances under which the plans were created belies any inference that it was established in good faith. The plan in question was entered into during the Class Period, shortly after U.S. Steel's November 2016 announcement that the Company had faced "some operational challenges," including "unplanned outages in the third quarter [2016]."

381.    Moreover, Defendant Burritt's 10b5-1 trades were highly irregular in terms of the number of shares sold in that they all occurred on one day. Sales pursuant to a trading plan should occur with a prescribed, regular pattern of stock sales, such as 500 shares a month on the 10th day of the month. This was not the case here. As reflected in the chart above, Defendant Burritt's trades all occurred on one day – seven days before Burritt was appointed COO and took control of day-to-day management of U.S. Steel – and thus, these trades are inherently suspicious.

## B.  The Individual Defendants Had Motive to Inflate the Desperately Needed Proceeds from the Secondary Public Offering

382.    The Individual Defendants were further motivated to engage in the fraudulent course of conduct alleged herein in order to complete the Secondary Public Offering on August 15, 2016, at the artificially inflated price of $23.00 per share, raising net proceeds of $482 million. Immediately prior to the Secondary Public Offering, the Individual Defendants or U.S. Steel expressly assured investors that: (i) "there has been and *will be* sustainable cost improvements through efficiency and investments in reliability centered maintenance." *See* July 29, 2015 Q&A Packet (Emphasis added); and (ii) "*we have experienced fewer unplanned outages and lower maintenance costs*…We are creating a more reliable and agile operating base." *See* July 26, 2016 Earnings Presentation (Emphasis added).

383.    Yet simultaneously, while testifying before the International Trade Commission, the Defendants also expressly acknowledged that "the investments that we need to make are being – *we're not able to make them right now*."[30] (Emphasis added). In November of 2016, while announcing the third quarter 2016 results, Defendants revealed that the Company had experienced "operational challenges," including "unplanned outages in the third quarter [2016]," meaning during the time of the August 2016 SPO. To make matters worse, when marketing the Secondary Public Offering to shareholders, the Company stated that it intended to "use the net proceeds from the offering for financial flexibility," yet Defendant Longhi belatedly revealed that U.S. Steel actually conducted the SPO to fund "an asset revitalization plan large enough to resolve our issues," thus admitting undisclosed operational issues existed at the time of the SPO, while the Company was trumpeting U.S. Steel's "*fewer unplanned outages and lower maintenance costs*….[and] more reliable and agile operating base." *See* July 26, 2016 Earnings Presentation (Emphasis added).

384.    Without the U.S. Steel Defendants' misrepresentations, the Secondary Public Offering would have been significantly less successful given the true nature of the Company's assets and equipment. Indeed, Defendants purposefully masked the true condition of its assets to investors while misrepresenting the purpose of the SPO—in order to remedy the very same problems that U.S. Steel faced.

---

[30] *See* Robert Kopf, U.S. Steel, August 18, 2015 Transcript in Cold-Rolled Steel Flat Products from Brazil, China, India, Japan Korea, Russia and the United Kingdom (Investigation Nos. 701- TA-540-544 and 731-TA-1283-1290).

### C. The Individual Defendants Had Motive to Satisfy U.S. Steel's Obligations Under the Credit Facility

385.    Defendants also had motive to mispresent the Company's financial and operational position in order to maintain its credit facilities as the Company continued to experience "negligible free cash flow," record year-over-year losses, and a stunning year-end 2015 loss of $1.5 billion, marking the Company's failure to turn a profit in the last *six out of seven years*. During the Class Period, U.S. Steel's liquidity included cash and cash equivalents, amounts available under a $1.5 Billion Credit Facility, and amounts available under USSK credit facilities. For the 2016 fiscal year, approximately 48% of U.S. Steel's purported $2.9 billion in liquidity was attributable to the credit facilities.

386.    As may be expected, these credit facilities came with strings attached – namely, that in order to draw on the credit facilities, U.S. Steel had to maintain certain financial covenants or risk reduction of the available credit. And in fact, due to the Company's poor financial performance over the 2015 and 2016 fiscal years, U.S. Steel had repeatedly failed to meet the financial covenants required to draw on its credit facilities, reducing the overall liquidity available to the Company. For instance, Defendants admitted in the 2016 Annual Report:

> *[S]ince the value of our inventory and trade accounts receivable less specified reserves calculated in accordance with the Third Amended and Restated Credit Agreement do not support the full amount of the facility at December 31, 2016, the amount available to the Company under this facility was reduced by $227 million.* Additionally, U. S. Steel must maintain a fixed charge coverage ratio of at least 1.00 to 1.00 for the most recent four consecutive quarters when availability under the Third Amended and Restated Credit Agreement is less than the greater of 10 percent of the total aggregate commitments and $150 million. *Based on the most recent four quarters as of December 31, 2016, we would not meet this covenant. So long as we continue to not meet this covenant, the amount available to the Company under this facility is effectively reduced by $150 million*.

387.    The Third Amended and Restated Credit Agreement, dated July 27, 2015, governing the $1.5 Billion Credit Facility also stipulated, among other things, that U.S. Steel must provide materially accurate financial information (Section 5.01) and maintain all material properties in good working order or risk default and termination of the facility (Section 5.04).

388.    Given U.S. Steel's increasingly precarious financial condition by the end of 2015, Defendants had every motive to make the false assurances relating to its financial and operational condition and keep U.S. Steel out of bankruptcy in the face of a remarkable $1.5 billion year-end 2015 loss.

### D.  The Individual Defendants Had Motive to Preserve Their Excessive Compensation

389.    The Individual Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to maximize their individual profits through executive compensation that was, as described in the Company's 2017 Definitive 14A Proxy Statement filed with the SEC on March 14, 2017 ("2017 Proxy Statement"), "designed to attract, reward and retain executives who make significant contributions through operational and financial achievements aligned with the goals and philosophy of our Carnegie Way transformation," as part of U.S. Steel's "strong pay-for-performance compensation culture."

390.    Throughout the Class Period, in addition to their substantial, guaranteed salaries and considerable perquisites, Defendants Longhi and Burritt were granted excessive equity awards and other compensation that was ostensibly based on performance—all while ensuring the public did not understand or appreciate their failure to invest in necessary capital expenditures and maintenance needs that would have allowed U.S. Steel to realize the upside of the turnaround in the steel market the way the Company's competitors did.

391.    In particular, the Individual Defendants reaped millions of dollars from incentive-based compensation tied to the Company's performance and certain performance metrics, including total shareholder return ("TSR"), which is derived from stock price appreciation and dividends paid. As disclosed in the 2017 Proxy Statement, a corporate governance highlight is that "Executive Compensation [Is] Driven by Pay-For-Performance Philosophy" pursuant to which the U.S. Steel's named executive officers, including Longhi and Burritt, were eligible to receive cash and equity grants that were based on certain metrics, including TSR, as well as grants of restricted stock units linked to stock price performance and stock options measured relative to appreciation in stock price. According to the 2017 Proxy Statement, the Individual Defendants' compensation is determined by means of "a strong pay-for-performance approach that links financial performance to the incentive opportunities realized by our executives."

392.    Payment of performance compensation was purportedly justified by certain "highlights and accomplishments from 2016" identified in the 2017 Proxy, including:

- *Our stock price increased by more than 300%*, reflecting strong execution on our strategy and improved market conditions
- *Realized $745 million of additional Carnegie Way benefits in 2016,* building upon the $575 million and $815 million in Carnegie Way benefits realized in 2014 and 2015, respectively, *underscoring the success of this transformational process*
- Ended 2016 with positive operating cash flow of $727 million and adjusted EBITDA of $510 million, despite beginning the year at historically low steel prices and facing the lowest full year average realized prices since 2004
- Strong year-end liquidity of approximately $2.9 billion, including cash on hand of $1.5 billion, which supports our goal of maintaining a healthy balance sheet
- Reduced long-term debt by over $100 million in 2016 which contributed to the reduction of net debt by more than 50% since 2013
- Successfully completed a $980 million debt offering and a $500 million equity offering, which provide for future financial flexibility
- Improved working capital by nearly $600 million, and over $1 billion over

the last two years.

- Continued to aggressively address unfair trade practices through landmark legal action, including leading industry efforts to clarify and enforce existing laws.

- Out-performed the BLS and AISI industry safety benchmarks in both OSHA Recordable Days and Days Away From Work.

393.    Nevertheless, the Company saw fit to link some compensation to so-called "negative benchmarks," whereby executives would still hit their targets even if the Company lost millions. As reported by Bloomberg in an article entitled "How to Lose Millions and Still Get Your Bonus," the lax performance targets resulted in fat payouts:

> Senior Vice Presidents Douglas Matthews and James E. Bruno would be awarded 100 percent bonus payouts if the company's flat-rolled division, its largest operating segment, lost $15 million in 2016. That reflected the bad year the unit had in 2015, when it lost $237 million.

> But as it happened, the steel market rebounded and the flat-rolled unit made $345 million before interest and taxes. Their cash payments as a result hit 175 percent of targets. ***Chief Executive Officer Mario Longhi got a $4.53 million bonus, his biggest ever, reflecting total company net income that was more than double the target***.

> "In sectors like steel, your compensation program can be completely wrong just a couple of months later," said Brent Longnecker, CEO of compensation advisory firm Longnecker & Associates. "It's so fluid that you have to watch it constantly."

394.    Separate and apart from the fact that Defendants Longhi and Burritt received excessive compensation that was partially linked to the artificially inflated price of the Company's stock during the Class Period, the compensation and bonuses received by the Individual Defendants was materially excessive when compared to compensation opportunities available to the highest paid executives and board members at U.S. Steel's self-identified peers.

395.    For 2016, Defendant Longhi received a $1.5 million salary, in addition to stock awards worth $2,837,507, option awards worth $1,425,049, non-equity incentive plan compensation worth $4,528,125, and other compensation worth $632,670, for a total

compensation package worth $10,923,351. As seen below, this compensation package was larger

than that paid to any CEO of a comparably-sized company in U.S. Steel's *self-selected* peer group.

396.    Indeed, Longhi made approximately 2.67 times as much as the CEO of Alcoa Inc.,

which is roughly 2.38 times the size of U.S. Steel:

| 2016 CEO Compensation | | |
|---|---|---|
| Company | Market Capitalization (09 13 17) | CEO Compensation $ |
| The Goodyear Tire & Rubber Company | 8.13B | 19,798,104 |
| Deere & Company | 37.73B | 18,642,871 |
| Ingersoll-Rand Plc | 22.92B | 16,372,314 |
| Whirlpool Corp. | 12.83B | 16,148,142 |
| Freeport-McMoRan Copper & Gold Inc. | 20.16B | 15,982,666 |
| Illinois Tool Works Inc. | 49.22B | 14,839,529 |
| Lear Corp. | 10.7B | 14,443,535 |
| Cummins Inc. | 27.81B | 13,419,856 |
| International Paper Company | 23.19B | 13,300,308 |
| Eaton Corporation plc | 33.32B | 13,037,109 |
| Textron Inc. | 13.86B | 12,672,171 |
| PPG Industries Inc. | 26.95B | 12,468,674 |
| Eastman Chemical Co. | 12.4B | 11,398,067 |
| *US Steel Corporation (Longhi)* | *4.66B* | *10,923,351* |
| Parker-Hannifin Corporation | 22.36B | 10,786,328 |
| Nucor Corporation | 17.121B | 10,627,499 |
| Weyerhaeuser Co. | 24.93B | 10,338,963 |
| Reliance Steel & Aluminum Co. | 5.38B | 10,281,585 |
| Terex Corp. | 3.82B | 9,970,048 |
| Masco Corporation | 11.95B | 9,765,728 |
| Cliffs Natural Resources Inc. | 2.19B | 9,536,481 |
| PACCAR Inc. | 24.29B | 7,666,020 |
| Commercial Metals Company | 2.07B | 7,243,610 |
| Schnitzer Steel Industries, Inc.* | 702.88M | 7,070,553 |
| Steel Dynamics Inc. | 8.12B | 6,563,182 |
| AK Steel Holding Corporation | 1.81B | 5,944,407 |
| Navistar International Corporation | 3.81B | 4,895,853 |
| Allegheny Technologies Inc. | 2.46B | 4,870,954 |
| TimkenSteel Corporation* | 635.28M | 4,467,849 |
| Worthington Industries, Inc.* | 3.2B | 4,152,472 |
| Alcoa Inc. | 11.13B | 4,085,956 |
| Carpenter Technology Corporation* | 1.9B | 3,236,919 |
| Olympic Steel Inc.* | 204.328M | 953,984 |

\* denotes a company included in U.S. Steel's performance pay group, but not its compensation pay group. Peer Johnson Controls Inc. is excluded because it is no longer publicly traded.

397.    Defendant Burritt was similarly overcompensated in 2016, a year in which he drew an $800,000 salary and received stock awards worth $891,720, option awards worth $447,864, non-equity incentive compensation worth $1,820,000, and other compensation worth $116,000, for a total compensation package worth $4,075,589:

| 2016 CFO Compensation | | |
|---|---|---|
| Company | Market Capitalization (09 13 17) | CFO Compensation $ |
| Eaton Corporation plc | 33.32B | 8,673,939 |
| Freeport-McMoRan Copper & Gold Inc. | 20.16B | 8,309,573 |
| The Goodyear Tire & Rubber Company | 8.13B | 5,105,271 |
| International Paper Company | 23.19B | 4,874,850 |
| Textron Inc. | 13.86B | 4,728,559 |
| Lear Corp. | 10.7B | 4,497,603 |
| Cummins Inc. | 27.81B | 4,445,105 |
| Parker-Hannifin Corporation | 22.36B | 4,394,354 |
| PACCAR Inc. | 24.29B | 4,307,479 |
| Weyerhaeuser Co. | 24.93B | 4,295,920 |
| Illinois Tool Works Inc. | 49.22B | 4,256,700 |
| Deere & Company | 37.73B | 4,106,705 |
| *US Steel Corporation* | *4.66B* | *4,075,589* |
| Ingersoll-Rand Plc | 22.92B | 3,999,933 |
| Eastman Chemical Co. | 12.4B | 3,823,324 |
| Alcoa Inc. | 11.13B | 3,643,612 |
| Masco Corporation | 11.95B | 3,503,171 |
| PPG Industries Inc. | 26.95B | 3,496,428 |
| Reliance Steel & Aluminum Co. | 5.38B | 3,398,997 |
| Steel Dynamics Inc. | 8.12B | 3,398,514 |
| Whirlpool Corp. | 12.83B | 3,358,503 |
| Nucor Corporation | 17.121B | 3,268,262 |
| Terex Corp. | 3.82B | 2,519,193 |
| Worthington Industries, Inc.* | 3.2B | 2,411,187 |
| Cliffs Natural Resources Inc. | 2.19B | 2,174,187 |
| Schnitzer Steel Industries, Inc.* | 702.88M | 2,059,967 |
| AK Steel Holding Corporation | 1.81B | 1,923,618 |
| Navistar International Corporation | 3.81B | 1,740,121 |
| Allegheny Technologies Inc. | 2.46B | 1,600,146 |

| Commercial Metals Company | 2.07B | 1,481,785 |
| TimkenSteel Corporation* | 635.28M | 864,197 |
| Carpenter Technology Corporation* | 1.9B | 772,017 |
| Olympic Steel Inc.* | 204.328M | 608,717 |

\* denotes a company included in U.S. Steel's performance pay group, but not its compensation pay group. Peer Johnson Controls Inc. is excluded because it is no longer publicly traded.

398.    As with Longhi, Burritt also received more compensation than any CFO of a company similarly situated in terms of market capitalization. Indeed, Burritt earned just $30,000 less than the CFO of Deere & Company, a company more than eight times the size of U.S. Steel.

399.    As such, the Individual Defendants had a considerable incentive to take steps to see that the stock price remained high, including their abject failure to properly invest in the Company so that its performance could improve concomitant with steel prices. It was only when U.S. Steel's abysmal earnings came out that the truth could no longer be concealed, and Defendants Longhi and Burritt began to reveal the truth of the dire situation, safeguarding their cash cow as long as possible.

**LOSS CAUSATION**

400.    During the Class Period, the Individual Defendants materially misled the investing public, thereby inflating the price of U.S. Steel's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about U.S. Steel's business, operations, and prospects as alleged herein.

401.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements concerning U.S. Steel's Carnegie Way initiative, maintenance spending, capital investments, plant outages and business prospects. The Individual Defendants' statements were false and misleading in that the Company was deferring needed maintenance and facility upgrades in order to improve its bottom line and financial performance and was not "positioned" to perform adequately under the demand of improved market conditions. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. The materially false and/or misleading statements made by Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein. For example:

- On April 26, 2016, the Company issued the April 2016 Press Release, in which Defendants falsely stated that U.S. Steel was improving the "reliability of [its] operations" and that the Company was "well-positioned to benefit from currently improving market conditions." In connection with the April 2016 Press Release the Company also released the Q1 2016 Earnings Presentation in which Defendants falsely stated that "benefits are starting to be reflected in fewer unplanned outages and lower maintenance costs" and that U.S. Steel was undertaking "operating updates" at steelmaking facilities, flat-rolled facilities, tubular facilities, and U.S. Steel Europe. In response to these misrepresentations the Company's stock price increased approximately 10% from a closing price of $18.49 per share on April 26, 2016 to $20.30 on May 2, 2016.

- In response to the July 2016 Press Release, in which Defendants falsely stated that the Carnegie Way had resulted in "significant improvements" to U.S. Steel's earning power and that the Company would be able to take advantage of an increasing market in that "[U.S. Steel's] net earnings and adjusted EBITDA" will stay consistent with "changes in market conditions," the

Company's stock price increased 19.78% from a closing price of $22.95 per share on July 26, 2016 to$27.49 per share on July 29, 2016.

- In response to the November 2016 Call, in which Defendant Longhi falsely stated that the Company had "not been under-spending" and that U.S. Steel was "investing appropriately in making sure that everything that we know is being addressed and moving to minimize…unplanned events," the Company's stock price increased 15.77% from a closing price of $17.82 per share on November 2, 2016 to $20.63 per share on November 7, 2016.

402.   During the Class Period, as detailed herein, the Individual Defendants engaged in a scheme to deceive the market and perpetuate a course of conduct that caused the price of U.S. Steel shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the U.S. Steel Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of U.S. Steel shares was removed, and the price of U.S. Steel shares fell. For example:

- In response to the April 24, 2017 Press Release, disclosing abysmal financial results of a net loss of $180 million, or $1.03 per diluted share due to, in part, "operating challenges at [the Company's] Flat-Rolled facilities" preventing U.S. Steel from benefiting from improved market conditions, the Company's stock price decreased a tremendous 38.38% from $31.11 per share on April 25, 2017 to a low of $19.17 per share on May 18, 2017. Additionally, the loss in the price of U.S. Steel common stock from a closing price of $31.11 on April 25, 2017 to $22.78 on April 26, 2017 represented the steepest drop in price since 1991.

403.   As a result of their purchases of U.S. Steel stock during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. The timing and magnitude of the price decline in U.S. Steel shares negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

404.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired U.S. Steel publicly traded securities between January 27, 2016 and April 25, 2017, inclusive, seeking to pursue remedies under the Exchange Act (the "Class"). Excluded from the Class are U.S. Steel and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

405.    Because U.S. Steel securities were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are hundreds or thousands of Class members. As of February 23, 2017, there were 174,290,761 shares of U.S. Steel common stock outstanding. Members of the Class may be identified from records maintained by U.S. Steel or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

406.    Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.

407.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a.   Whether Defendants violated the federal securities laws as alleged herein;

b.   Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about U.S. Steel's business and operations;

c.   Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   Whether the Individual Defendants caused U.S. Steel to issue false and misleading SEC filings and public statements during the Class Period;

e.   Whether the Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.   Whether the prices of U.S. Steel securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.   Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

408.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO STATUTORY SAFE HARBOR

409.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Class Action Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the  purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of U.S. Steel who knew that the statement was false when made.

## APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE

410.    The market for U.S. Steel securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, U.S. Steel securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's stock relying upon the integrity of the market price of U.S. Steel and market information relating to the Company and have been damaged thereby.

411.    During the Class Period, the artificial inflation of U.S. Steel securities was caused by the material misrepresentations and/or omissions particularized in this Amended Class Action Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about U.S. Steel's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of U.S. Steel and its business, operations, and prospects, thus causing the price of the Company's stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. The Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's stock at such artificially inflated prices, and each of them has been damaged as a result.

412.    At all relevant times, the market for U.S. Steel securities was an efficient market for the following reasons:

a.    U.S. Steel common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, U.S. Steel filed periodic public reports with the SEC and the NYSE;

c.    U.S. Steel communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.    During the Class Period, on average, over tens of millions of U.S. Steel shares were

traded on a weekly basis. On news days, the Company's trading volume increased into the hundreds of millions, reflecting an active trading market for U.S. Steel common stock and investors' expectations being impounded into the stock price; and

e.   The proportion of statistically significant stock price movement days for U.S. Steel common stock on news days is significantly over the proportion of non-news days and, thus, U.S. Steel common stock is more likely to have a statistically significant return on a day with news than no-news, consistent with an informationally efficient market.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against U.S. Steel and the Individual Defendants

413.   Plaintiff realleges each allegation as if fully set forth herein.

414.   This claim is brought under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against U.S. Steel, Longhi, Burritt, and Lesnak (the "Count I Defendants").

415.   The Count I Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

416.   The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

417.    The Count I Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

418.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

419.    As a result of the foregoing, the market price of U.S. Steel securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of U.S. Steel securities during the Class Period in purchasing U.S. Steel securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

420.     Had Plaintiff and the other members of the Class been aware that the market price of U.S. Steel securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased U.S. Steel securities at the artificially inflated prices that they did, or at all.

421.     As a result of the wrongful conduct alleged herein, Plaintiff and the other members of the Class have suffered damages in an amount to be established at trial.

422.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of U.S. Steel securities during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against U.S. Steel and the Individual Defendants**

423.     Plaintiff realleges each allegation as if fully set forth herein.

424.     This claim is brought under § 20(a) of the Exchange Act, 15 U.S.C. § 78t, against U.S. Steel, Longhi, Burritt, and Lesnak (the "Count II Defendants").

425.     Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of U.S. Steel, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of § 20(a) of the Exchange Act. The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff and the Class' investments in U.S. Steel securities within the meaning of § 20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

426.    The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

427.    The Count II Defendants knew or recklessly disregarded the fact that U.S. Steel's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

428.    By virtue of their high-level positions and their participation in and awareness of U.S. Steel's operations and public statements, the Count II Defendants were able to and did influence and control U.S. Steel's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

429.    The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

430.    As set forth herein, the Count II Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Count II Defendants are also liable pursuant to § 20(a) of the Exchange Act.

431.    As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of U.S. Steel securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other relief as the Court may deem just and proper.


## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.


Dated: April 24, 2019                                  Respectfully submitted,

LEVI & KORSINSKY, LLP                        __/s/ Vincent Coppola_____
Shannon L. Hopkins                               Vincent Coppola, Esquire
Nancy A Kulesa                                     Penn. Attorney # 50181
Stephanie A. Bartone                             513 Court Place
Gregory M. Potrepka                              Pittsburgh, PA 15219
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com
nkulesa@zlk.com
sbartone@zlk.com
gpotrepka@zlk.com


*Counsel for Plaintiff*